The Honorable John C. Coughenour

1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

| DR. A. CEMAL EKIN, individually and on behalf of similarly situated individuals, | ) ) |
|---|---|

10    No. C14-0244 JCC

Plaintiff,

**AMAZON'S MOTION
TO DISMISS UNDER
FED. R. CIV. P. 12(b)(6)**

v.

NOTE ON MOTION CALENDAR:
August 29, 2014

AMAZON SERVICES LLC, a Nevada
limited liability company,

Oral Argument Requested

Defendant.

17
18
19
20
21
22
23
24
25
26
27

AMAZON'S MOTION TO DISMISS UNDER RULE 12(b)(6)
(No. C14-0244 JCC)

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA  98101-3045
206.622.3150 main · 206.757.7700 fax

# TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................... 1

II.   BACKGROUND ........................................................................................... 2

      A.   Amazon.com and Amazon Prime ......................................................... 2

      B.   Plaintiffs' Allegations and Claims. ...................................................... 4

III.  ARGUMENT ................................................................................................ 6

      A.   Legal Standards. .................................................................................. 6

           1.   Rule 12(b)(6) Requires Plaintiffs to Show a Plausible Factual Premise for
                Their Claims. ............................................................................... 6

           2.   Rule 9(b) Requires Plaintiffs to Plead Their Claims With Particularity ............... 6

           3.   The Court May Consider Documents Referenced in the Complaints .................... 8

      B.   Plaintiffs Fail to State Plausible Claims for Breach of Contract. .............................. 9

           1.   Plaintiffs Have Not Identified Any Contract Term or Duty that Amazon.com
                Breached. ................................................................................... 10

           2.   Plaintiffs Have Not Alleged Causation for Their Contract Claims. ..................... 12

      C.   Plaintiffs Fail to State Plausible Claims Under the Washington Consumer
           Protection Act. ..................................................................................... 14

           1.   Plaintiffs Fail to Allege Any Deceptive Act or Representation. .......................... 14

           2.   Plaintiffs Cannot Assert a Per Se Violation of the Washington CPA and
                Cannot Rely on the FTC Guideline Concerning "Free" Offers. ........................ 16

           3.   Plaintiffs Have Not Alleged Any Causation for Their CPA Claims. ................... 20

IV.   CONCLUSION ............................................................................................ 21

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA 98101-3045
206.622.3150 main · 206.757.7700 fax

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

4

**Federal Cases**

5

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)................................................................................................6, 13

6

7

*Ass'n of Wash. Pub. Hosp. Dists. v. Philip Morris Inc.*,
   241 F.3d 696 (9th Cir. 2001) ................................................................................20

8

*Beasley v. State Farm Mut. Auto. Ins. Co.*,
   2014 WL 1494030 (W.D. Wash. Apr. 16, 2014 ) ......................................10, 11

9

10

*Bednaruk v. Nw. Tr. Servs., Inc.*,
   2010 WL 545643 (W.D. Wash. Feb. 9, 2010).................................................18

11

12

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)................................................................................................6, 13

13

14

*BP W. Coast Prods. LLC v. SKR Inc.*,
   __ F. Supp. 2d __, 2013 WL 5728899 (W.D. Wash. Oct. 22, 2013) ...................9, 11, 12

15

*Coto Settlement v. Eisenberg*,
   593 F.3d 1031 (9th Cir. 2010) ...........................................................................8

16

17

*Christensen v. Harris Cnty.*,
   529 U.S. 576 (2000)...............................................................................................17

18

19

*Datel Holdings Ltd. v. Microsoft Corp.*,
   712 F. Supp. 2d 974 (N.D. Cal. 2010) ..............................................................9

20

21

*Dreisbach v. Murphy*,
   658 F.2d 720 (9th Cir. 1981) .............................................................................18

22

*Eclectic Props. E., LLC v. Marcus & Millichap Co.*,
   751 F.3d 990 (9th Cir. 2014) ..............................................................................6, 13

23

24

*Fid. Mortg. Corp. v. Seattle Times Co.*,
   213 F.R.D. 573 (W.D. Wash. 2003) ................................................................7, 8, 14

25

26

*Freeman v. Quicken Loans, Inc.*,
   626 F.3d 799 (5th Cir. 2010), *aff'd*, 132 S. Ct. 2034 (2012)..........................18

27

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA 98101-3045
206.622.3150 main · 206.757.7700 fax

*Goodman v. HTC Am., Inc.*,
  2012 WL 2412070 (W.D. Wash. June 26, 2012) ..........................................................7, 16

*Haskins v. Symantec Corp.*,
  2013 WL 6234610 (N.D. Cal. Dec. 2, 2013)......................................................................9

*Johnson v. Microsoft Corp.*,
  2009 WL 1794400 (W.D. Wash. June 23, 2009) ............................................................10

*Kearns v. Ford Motor Co.*,
  567 F.3d 1120 (9th Cir. 2009) ..............................................................................6, 7, 14

*Knievel v. ESPN*,
  393 F.3d 1068 (9th Cir. 2005) ........................................................................................9

*Kotok v. Homecomings Fin., LLC*,
  2009 WL 2057046 (W.D. Wash. July 14, 2009).............................................................18

*Landin-Molina v. Holder*,
  580 F.3d 913 (9th Cir. 2009) ........................................................................................18

*Laster v. T-Mobile USA, Inc.*,
  2009 WL 4842801 (S.D. Cal. Dec. 14, 2009), *vacated in part on other
  grounds*, 466 F. App'x 613 (9th Cir. 2012)....................................................................17

*Lee v. City of Los Angeles*,
  250 F.3d 668 (9th Cir. 2001) ..........................................................................................8

*Lewis v. Chase Home Fin. LLC*,
  2011 WL 6149245 (W.D. Wash. Dec. 12, 2011) ............................................................21

*Maple v. Costco Wholesale Corp.*,
  2013 WL 5885389 (E.D. Wash. Nov. 1, 2013)...............................................................20

*Mashburn v. Wells Fargo Bank, NA*,
  2011 WL 2940363 (W.D. Wash. July 19, 2011).........................................................6, 13

*McFerrin v. Old Republic Title, Ltd.*,
  2009 WL 2045212 (W.D. Wash. July 9, 2009)...............................................................10

*Mickelson v. Chase Home Fin., LLC*,
  2012 WL 3240241 (W.D. Wash. Aug. 7, 2012), *aff'd* __ F. App'x __,
  2014 WL 2750133 (9th Cir. June 18, 2014)...................................................................15

*Minnick v. Clearwire US, LLC*,
  683 F. Supp. 2d 1179 (W.D. Wash. 2010) ........................................................11, 15, 17

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA  98101-3045
206.622.3150 main · 206.757.7700 fax

*Muniz v. Microsoft Corp.*,
  2010 WL 4482107 (W.D. Wash. Oct. 29, 2010)........................................................7, 10

*Perkins v. LinkedIn Corp.*,
  2014 WL 2751053 (N.D. Cal. June 12, 2014)..................................................................9

*Putz v. Golden*,
  2012 WL 2565017 (W.D. Wash. July 2, 2012).............................................................11

*Rhodes v. City of Federal Way*,
  2010 WL 1005868 (W.D. Wash. Mar. 16, 2010)..........................................................13

*Robertson v. GMAC Mortg. LLC*,
  2013 WL 2351725 (W.D. Wash. May 30, 2013) ..........................................................17

*Rockwell v. Chase Bank*,
  2011 WL 2292353 (W.D. Wash. June 7, 2011) ............................................................18

*Seattle Pac. Indus., Inc. v. Melmarc Prods., Inc.*,
  2007 WL 397450 (W.D. Wash. Jan. 31, 2007) .........................................................8, 16

*Segal Co. (E. States), Inc. v. Amazon.com*,
  280 F. Supp. 2d 1229 (W.D. Wash. 2003) ...............................................................8, 16

*Semegen v. Weidner*,
  780 F.2d 727 (9th Cir. 1985) ..........................................................................................7

*Siver v. CitiMortgage, Inc.*,
  830 F. Supp. 2d 1194 (W.D. Wash. 2011) ...................................................................10

*Stafford v. Sunset Mortg., Inc.*,
  2013 WL 1855743 (W.D. Wash. Apr. 29, 2013) ..........................................................20

*Steckman v. Hart Brewing, Inc.*,
  143 F.3d 1293 (9th Cir. 1998) ..................................................................................9, 11

*Swartz v. Deutsche Bank*,
  2008 WL 1968948 (W.D. Wash. May 2, 2008) ............................................................11

*Swartz v. KPMG LLP*,
  476 F.3d 756 (9th Cir. 2007) ..........................................................................................9

*Tomek v. Apple, Inc.*,
  2013 WL 3872774 (E.D. Cal. July 25, 2013)..................................................................9

*Torres v. JC Penney Corp.*,
  2013 WL 1915681 (N.D. Cal. May 8, 2013)..................................................................17

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA 98101-3045
206.622.3150 main · 206.757.7700 fax

*Tritz v. U.S. Postal Serv.*,
  721 F.3d 1133 (9th Cir. 2013) .........................................................11

*Vess v. Ciba-Geigy Corp.*,
  317 F.3d 1097 (9th Cir. 2003) ...............................................7, 8, 14

**State Cases**

*Baldwin v. Silver*,
  165 Wn. App. 463, 269 P.3d 284 (2011)........................................9

*Brummett v. Washington's Lottery*,
  171 Wn. App. 664, 288 P.3d 48 (2012)........................................17

*California v. Overstock.com, Inc.*,
  No. RG10-546833 (Alameda Cnty. Sup. Ct. Feb. 5, 2014)............19

*Crane & Crane, Inc. v. C&D Elec., Inc.*,
  37 Wn. App. 560, 683 P.2d 1103 (1984)......................................21

*Denaxas v. Sandstone Court of Bellevue, LLC*,
  148 Wn.2d 654, 63 P.3d 125 (2003)...........................................10

*Fid. & Deposit Co. of Md. v. Dally*,
  148 Wn. App. 739, 201 P.3d 1040 (2009)..............................11, 13

*Fid. Mortg. Corp. v. Seattle Times Co.*,
  131 Wn. App. 462, 470-71, 128 P.3d 621 (2005) ........................20

*Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*,
  105 Wn.2d 778, 719 P.2d 531 (1986)...............................14, 17, 20

*Indoor Billboard/Wash, Inc. v. Integra Telecom of Wash., Inc.*,
  162 Wn.2d 59, 170 P.3d 10 (2007)...............................................20

*Klem v. Wash. Mut. Bank*,
  176 Wn.2d 771, 295 P.3d 1179 (2013)...................................14, 17

*Lehrer v. Dep't of Soc. & Health Servs.*,
  101 Wn. App. 509, 5 P.3d 722 (2000)..........................................11

*N. Coast Enters., Inc. v. Factoria P'ship*,
  94 Wn. App. 855, 974 P.2d 1257 (1999).......................................10

*Nw. Indep. Forest Mfrs. v. Dep't of Labor & Indus.*,
  78 Wn. App. 707, 899 P.2d 6 (1995)...................................9, 10, 12

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA 98101-3045
206.622.3150 main · 206.757.7700 fax

*Panag v. Farmers Ins. Co. of Wash.*,
  166 Wn.2d 27, 204 P.3d 885 (2009)..................................................................18

*Robinson v. Avis Rent A Car Sys., Inc.*,
  106 Wn. App. 104, 22 P.3d 818 (2001).............................................................15

*Sheldon v. Am. States Preferred Ins. Co.*,
  123 Wn. App. 12, 95 P.3d 391 (2004), *rev. denied,* 153 Wn.2d 1030, 110
  P.3d 756 (2005) ...............................................................................................15

*Smith v. Stockdale*,
  166 Wn. App. 557, 271 P.3d 917 (2012)..........................................................14

*State v. Reader's Digest Ass'n*,
  81 Wn.2d 259, 501 P.2d 290 (1972)................................................................18

**Federal Statutes**

15 U.S.C. § 57b(d) .................................................................................................18

15 U.S.C. § 45 ........................................................................................................18

**State Statutes**

RCW 19.86.020 ......................................................................................................18

RCW 19.86.090 ......................................................................................................20

RCW 19.86 *et seq.* ........................................................................................... *passim*

**Rules**

Fed. R. Civ. P. 9(b)........................................................................................ *passim*

Fed. R. Civ. P. 12(b)(6)................................................................................. *passim*

Fed. R. Civ. P. 12(c) ........................................................................................10, 21

Fed. R. Civ. P. 19 ..................................................................................................13

**Regulations**

16 C.F.R. § 1.5.......................................................................................................17

16 C.F.R. § 240.1...................................................................................................17

16 C.F.R. § 251.1(b)(1).....................................................................................16, 17

16 C.F.R. § 251.1(c)...............................................................................................20

36 Fed. Reg. 21,517 (1971) ...................................................................................17

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA  98101-3045
206.622.3150 main · 206.757.7700 fax

1

## I.   INTRODUCTION

Plaintiffs' attack on Amazon's[1] popular Amazon Prime program is based on two entirely false premises.  First, Plaintiffs claim Amazon Prime promised "free shipping," but, in fact, Amazon's promise was (and is) that Prime members receive "free two-day shipping" and discounted "one-day shipping."[2]  Second, Plaintiffs assert that Amazon supposedly "induced" third-party sellers in its Fulfillment by Amazon ("FBA") program to include shipping costs in prices for Prime-eligible products, yet Plaintiffs concede those sellers were at all times solely responsible for their own pricing decisions.  On the whole, Plaintiffs' claims cannot survive Rule 12(b)(6), much less Rule 9(b), for several reasons.

***First***, Plaintiffs cannot manufacture claims by misrepresenting the Prime shipping benefits Amazon actually promised and provided.  The Amazon Prime Terms and Conditions (which Plaintiffs admit govern their claims) provide that members will receive "free two-day shipping."  They do not promise "free shipping" or anything about how third-party FBA sellers will set their prices.  Plaintiffs nowhere allege they did not receive free two-day shipping, nor could they.  Plaintiffs have not shown and cannot show any plausible basis for the linchpin of their claims.

***Second***, Plaintiffs offer nothing but speculation about what Amazon and FBA sellers purportedly did.  They claim Amazon "induced" or "advised" FBA sellers to include shipping charges in their prices, but they admit that FBA sellers set prices on their own. They allege FBA sellers "routinely inflated" prices, yet identify no instance when that ever happened.  Plaintiffs have fallen well short of showing a plausible factual basis for their claims or the specifics of "who, what, when, where and how," as the Federal Rules require.

***Third***, Plaintiffs have failed to allege any facts to show they suffered any injury. Plaintiffs allege little more than that they were Prime members.  Plaintiffs do not allege

---

[1] Defendant Amazon Services LLC is a wholly owned subsidiary of Amazon.com, Inc. and is referred to here as "Amazon."

[2] Except as noted, this motion refers to Amazon Prime as it existed in Plaintiffs' proposed class period, October 24, 2007-February 22, 2011.  For example, the annual fee has since changed to $99.

AMAZON'S MOTION TO DISMISS UNDER RULE 12(b)(6)
(No. C14-0244 JCC) — 1

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA  98101-3045
206.622.3150 main · 206.757.7700 fax

they ever purchased any Prime-eligible product from an FBA seller, much less that they paid a price the seller had "inflated" to include shipping charges.  Plaintiffs cannot advance claims without alleging they themselves were deceived and harmed.[3]

This Court should not permit Plaintiffs to level allegations that Amazon "deceived" customers, maligning its reputation, forcing costly litigation, and allowing Plaintiffs to embark on a fishing expedition.  Rule 9(b) is designed to prevent exactly this.  Amazon's mission is to be "Earth's most customer-centric company," and keeping commitments to customers is central to Amazon's goal.  Because Plaintiffs advance a hypothetical theory but no factual basis for their claims, the Court should dismiss this action.

## II.   BACKGROUND

### A.   Amazon and Amazon Prime

Consistent with its mission to be Earth's most customer-centric company, Amazon launched its Prime program in 2005.  In the period Plaintiffs claim is at issue, Amazon Prime offered customers unlimited free two-day shipping and discounts on one-day shipping on certain products available through Amazon.com, for an annual membership fee of $79.  *See* First Amended Complaint, *Ekin v. Amazon Servs. LLC*, ("FAC") ¶ 3.1; Complaint, *Burke v. Amazon Servs. LLC*, No. 2:14-cv-335 ("Burke Compl."), ¶¶ 12-13 (Dkt. No. 1).  Amazon has since expanded the benefits of Amazon Prime to include free access to movies and television episodes, more than 500,000 Kindle titles, and over 1,000,000 songs through Prime Music (and other benefits).  *See* Burke Compl. ¶ 13.[4]

The Amazon Prime shipping benefits apply to millions of products offered on Amazon.com, but not all products.  The shipping benefits apply to products sold by Amazon itself, as well as to products sold by merchants that participate in the Fulfillment by Amazon ("FBA") program.  *See* FAC ¶¶ 3.4, 3.7.  FBA sellers contract with Amazon to

---

[3] In a similar vein, Amazon's accompanying 12(b)(1) motion seeks dismissal of Plaintiffs' claims for lack of standing, because Plaintiffs have not alleged and did not suffer any injury-in-fact.

[4] *See also* http://www.amazon.com/gp/help/customer/display.html?nodeId=200444160 ("About Amazon Prime," explaining current Prime benefits).

AMAZON'S MOTION TO DISMISS UNDER RULE 12(b)(6)
(No. C14-0244 JCC) — 2

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA  98101-3045
206.622.3150 main · 206.757.7700 fax

provide fulfillment services—Amazon stores the FBA sellers' products in its fulfillment

centers, then picks, packs and ships products when customers make purchases through

Amazon.com (and provides related customer services, such as handling returns).  *Id.* ¶ 3.3;

Burke Compl. ¶ 16.[5]  Products offered and sold by other third-party sellers (*i.e.*, Amazon

Marketplace merchants, who fulfill orders on their own and ship directly to customers) are

not eligible for the shipping benefits of Amazon Prime.  *See* Declaration of Karen

Ressmeyer ("Ressmeyer Decl."), Exs. A-B.[6]

Amazon Prime provides members significant savings on shipping.  Amazon

customers who are not Prime members must pay charges for expedited (two-day or one-

day) shipping, whether they buy from Amazon, FBA sellers, or other third-party

merchants.[7]  Prime members receive unlimited free two-day shipping on Prime-eligible

products and unlimited discounted one-day shipping.  *Id.*  And while all Amazon customers

can get free slower shipping (estimated at 5-8 business days) for purchases of qualifying

products totaling more than a specific dollar amount ($25 in 2007-2011; $35 today), Prime

members receive free two-day shipping on all Prime-eligible products, regardless of price.

*See* Burke Compl. ¶ 19 (referring to "Super Saver Shipping").  Thus, Prime gives members

options to make their own decisions about whether to purchase based on price, seller

reputation, shipping speed or costs, or on some other basis.

The Prime Terms & Conditions ("Prime Ts & Cs") that all Prime members accept

when they enroll in Prime make these benefits clear.  In the period Plaintiffs claim is at

[5] The Court consolidated the *Ekin* and *Burke* actions and appointed Dr. Ekin's counsel as interim lead counsel, but declined to stay Ms. Burke's claims.  Order (Dkt. No. 23), at 6-7, 9.  In response to an inquiry from Amazon, Plaintiffs' counsel indicated they would not seek to file an amended complaint to include the both Plaintiffs' claims before Amazon's deadline for responding to the complaint(s).  Amazon therefore refers to both complaints in this and its other motions.

[6] Plaintiffs' complaints refer to and rely upon the Amazon Prime Terms and Conditions and Amazon's Conditions of Use, but Plaintiffs did not provide the contracts.  As discussed below, the Court may consider the contracts in this motion under the doctrine of incorporation by reference.  *See* Section III.A.1.

[7] *See, e.g.*, http://www.amazon.com/gp/help/customer/display.html?nodeId=201118510 (current schedule regarding shipping rates for Marketplace third-party sellers); http://www.amazon.com/gp/help/customer/display.html?nodeId=468636 (current schedule for purchases from Amazon).

AMAZON'S MOTION TO DISMISS UNDER RULE 12(b)(6)
(No. C14-0244 JCC) — 3

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA 98101-3045
206.622.3150 main · 206.757.7700 fax

issue (October 24, 2007-February 22, 2011, *see* FAC ¶¶ 3.1, 5.1), the Prime Ts & Cs expressly defined the shipping benefits as "free Two-Day shipping and $3.99 per unit One-Day shipping on all eligible purchases."  Ressmeyer Decl., Exs. A-B.  They also explained that the shipping benefits applied to eligible "products sold by Amazon.com" and "third-party merchants participating in the Fulfillment by Amazon Program," but not for products sold and fulfilled by other third-party merchants.  *Id.* Ex. B at 12 ("Products sold and fulfilled by third parties or through third-party areas such as Marketplace and/or Auctions, are NOT eligible for Prime."); *see also* FAC ¶ 3.3; Burke Compl. ¶ 17.  Prime-eligible products are easy to identify on Amazon.com, as they are designated on the website by the logo ✓*Prime*.  FAC ¶ 3.1; Burke Compl. ¶ 14.  The Prime Ts & Cs do not promise anything about how FBA sellers will set prices; in fact, they do not address this subject at all.  *See generally* Ressmeyer Decl. Exs. A-B.  As Plaintiffs acknowledge, third-party sellers (whether FBA or not) set their own prices.  Burke Compl. ¶ 19.

### B.   Plaintiffs' Allegations and Claims.

Plaintiffs A. Cemal Ekin and Marcia Burke allege they were Amazon Prime members at certain times from 2008-2011.  Dr. Ekin alleges he was a Prime member from December 2008 through December 2010.  FAC ¶ 3.6.  Ms. Burke does not say when she was an Amazon Prime member, but alleges she "utilized" Prime shipping benefits "at least eighteen times from January 11, 2010 through December 4, 2010."  Burke Compl. ¶¶ 6, 24.[8]  Both allege they paid the $79 fee at some point.  *Id.* ¶ 24; FAC ¶ 3.6.

Plaintiffs allege Amazon "promised [them], like all Prime Program Members, free shipping on [their] Prime-Eligible purchases."  FAC ¶ 3.6; *see also* Burke Compl. ¶ 25.  Plaintiffs repeat this "free shipping" allegation numerous times, *see, e.g.*, FAC ¶¶ 3.1, 3.2, 3.5, 3.7, 3.8, 6.2; *see also id.* ¶¶ 5.3, 5.4; Burke Compl. ¶¶ 1, 12, 13, 14, 20, 23, 25, 26, 38, 39, 45; *see also id.* ¶¶ 17, 30, 32, but never cite any provision of the Prime Ts & Cs or any

[8] For purposes of this motion, Amazon does not dispute Plaintiffs' allegations about their tenure as Prime members, but states the correct facts in connection with the accompanying motion to compel arbitration and 12(b)(1) motion.

AMAZON'S MOTION TO DISMISS UNDER RULE 12(b)(6)
(No. C14-0244 JCC) — 4

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA  98101-3045
206.622.3150 main · 206.757.7700 fax

other place where Amazon allegedly made this representation.[9]  Plaintiffs further allege that

Amazon breached its supposed "free shipping" promise because it "induced," "advised,"

"encouraged," or "recommended" that FBA sellers "include shipping charges in the prices

of FBA Prime-Eligible items."  FAC ¶¶ 3.4, 3.5, 3.7; *see* Burke Compl. ¶¶ 1, 3, 18, 23, 25.

But Plaintiffs admit FBA sellers set prices on their own.  *See* Burke Compl. ¶ 19.  Plaintiffs

also allege (again repeatedly) that FBA sellers "routinely inflated" prices to include

shipping charges, *see* FAC ¶¶ 3.7, 3.8, 5.3, 5.4, 6.2; Burke Compl. ¶¶ 25, 26, 30, 32, 39, but

do not mention any instance when this happened or provide any price comparisons showing

this alleged "inflation."

      Other than alleging that Plaintiffs were Prime members, the complaints say almost

nothing about Dr. Ekin's and Ms. Burke's experiences.  Neither alleges that he or she ever

purchased any Prime-eligible products from FBA sellers.[10]  Plaintiffs do not allege they ever

selected free two-day shipping and did not receive it.  Plaintiffs also do not allege they ever

paid a purchase price an FBA seller had allegedly "inflated" to include shipping charges.

      Plaintiffs assert claims for breach of contract and violation of the Washington

Consumer Protection Act ("CPA"), RCW ch. 19.86.  *See* FAC ¶¶ 6.1-6.3, 7.1-7.3; Burke

Compl. ¶¶ 37-46.  They allege throughout that Amazon's practices were "unfair and

deceptive," "fraudulent," and "likely to deceive," and that Amazon "disguised" prices and

"conceal[ed] the shipping charges."  FAC ¶¶ 3.4, 3.8, 7.2.3; Burke Compl. ¶¶ 1, 4, 5, 21,

26, 30(d), 34, 42-45.  Still, the complaints do not say that either Plaintiff was deceived in

any way.  Plaintiffs seek to represent a class of "[a]ll persons and entities residing in the

United States who became Amazon Prime members at any time from October 24, 2007

until February 22, 2011, and paid one or more $79 annual Prime membership fees during

the Class Period."  FAC ¶ 5.1; *see also* Burke Compl. ¶ 27.

---

[9] They also claim "free shipping" was Prime's "exclusive benefit" before February 22, 2011, FAC
¶ 3.1, acknowledging Amazon has since added other benefits.  Burke Compl. ¶ 13.

[10] Ms. Burke alleges she made purchases using Prime, but does not say she bought anything from
FBA sellers.  *See* Burke Compl. ¶ 6.

AMAZON'S MOTION TO DISMISS UNDER RULE 12(b)(6)
(No. C14-0244 JCC) — 5

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA  98101-3045
206.622.3150 main · 206.757.7700 fax

1

### III.   ARGUMENT

2

**A.**   **Legal Standards.**

3

      **1.**   ***Rule 12(b)(6) Requires Plaintiffs to Show a Plausible Factual Premise for Their Claims.***

4

5
       Rule 12(b)(6) exists to weed out undeserving complaints.  *Bell Atl. Corp. v.*

6
*Twombly*, 550 U.S. 544, 559 (2007).  The rule "does not require courts to assess the

7
probability that a plaintiff will eventually prevail," but does require that the plaintiff's

8
"allegations … must cross 'the line between possibility and plausibility of 'entitlement to

9
relief.'"  *Mashburn v. Wells Fargo Bank, NA*, 2011 WL 2940363, at *1 (W.D. Wash. July

10
19, 2011) (quoting *Twombly*, 550 U.S. at 557).  A claim has "facial plausibility" when a

11
plaintiff "pleads factual content that allows the court to draw the reasonable inference that

12
the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678

13
(2009).  This "requires more than labels and conclusions, and a formulaic recitation of the

14
elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555.   "[I]f the facts are

15
merely consistent with Defendant's liability but cannot ground a reasonable inference that

16
Defendant actually is liable, the motion to dismiss will succeed."  *Mashburn*, 2011 WL

17
2940363, at *1; *see also Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990,

18
995, 997 (9th Cir. 2014) ("[P]laintiffs must include sufficient 'factual enhancement' to

19
cross 'the line between possibility and plausibility,'" *i.e.*, "from conceivable to plausible.").

20
      **2.**   ***Rule 9(b) Requires Plaintiffs to Plead Their Claims With Particularity.***

21
       Plaintiffs' complaints are also subject to Rule 9(b), which requires that, when

22
"alleging fraud or mistake, a party must state with particularity the circumstances

23
constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  The rule serves three purposes:

24
> (1) to provide defendants with adequate notice to allow them to defend the
> charge and deter plaintiffs from the filing of complaints as a pretext for the

25
> discovery of unknown wrongs; (2) to protect those whose reputation would
> be harmed as a result of being subject to fraud charges; and (3) to prohibit

26
> plaintiffs from unilaterally imposing upon the court, the parties and society

27
> enormous social and economic costs absent some factual basis.

AMAZON'S MOTION TO DISMISS UNDER RULE 12(b)(6)
(No. C14-0244 JCC) — 6

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA 98101-3045
206.622.3150 main · 206.757.7700 fax

*Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009) (internal quotations and alterations omitted); *see Semegen v. Weidner,* 780 F.2d 727, 731 (9th Cir. 1985) (Rule 9(b) is designed to prevent plaintiffs from filing complaints as a pretext to engage in fishing expeditions and to protect a defendant's reputation and goodwill from improvident charges of wrongdoing); *Muniz v. Microsoft Corp.*, 2010 WL 4482107, at *2 (W.D. Wash. Oct. 29, 2010) ("Rule 9(b) seeks to avoid [the] situation" where a "[p]laintiff makes a blanket assertion of nondisclosure without providing any factual basis," as "social and economic resources are wasted by a fraud claim that lacks any factual basis.").

As the Ninth Circuit and this Court have held, Rule 9(b) applies not only to claims expressly alleging fraud, but also ones that are "grounded" or "sound" in fraud." *Vess v. Ciba-Geigy Corp.,* 317 F.3d 1097, 1103-04 (9th Cir. 2003). "Fraud can be averred by specifically alleging fraud, or by alleging facts that necessarily constitute fraud (even if the word 'fraud' is not used)." *Id.* at 1105; *accord Kearns*, 567 F.3d at 1124; *Goodman v. HTC Am., Inc*., 2012 WL 2412070, at *9 (W.D. Wash. June 26, 2012) ("Plaintiffs cannot plead their way around the requirements of Rule 9(b) by simply omitting the word 'fraud' or by disclaiming that they are alleging fraud."). Thus, the Ninth Circuit has held that claims alleging deceptive conduct under California's consumer protection statutes "sound in fraud" and are subject to Rule 9(b). *Vess*, 317 F.3d at 1103-04; *Kearns*, 567 F.3d at 1125. So too, in *Fidelity Mortgage Corp. v. Seattle Times Co.*, 213 F.R.D. 573 (W.D. Wash. 2003), this Court held that claims under the Washington CPA sounded in fraud where the plaintiff alleged the Times published "false, deceptive, and/or misleading" listings of mortgage rates. *Id.* at 575 (dismissing claims because plaintiff's complaint failed to give particulars as to why the information was false or misleading); *see also Goodman*, 2012 WL 2412070, at *16 (dismissing Washington CPA claim under Rule 9(b) because, "[a]lthough fraud is not a necessary element of a WCPA claim," the plaintiffs "allege[d] fraudulent conduct," *i.e.*, that HTC "engaged in misrepresentations, omissions of material information, and/or wrongful courses of conduct [with] the capacity to deceive").

AMAZON'S MOTION TO DISMISS UNDER RULE 12(b)(6)
(No. C14-0244 JCC) — 7

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA 98101-3045
206.622.3150 main · 206.757.7700 fax

Plaintiffs' claims sound in fraud.  Ms. Burke expressly alleges Amazon's actions were "fraudulent," *see* Burke Compl. ¶ 5, Prayer for Relief ¶ C, as well as "deceptive" and "likely to deceive," *see id.* ¶¶ 1, 5, 26, 30(d), 34, 42-45, and that Amazon set out to "conceal[] shipping charges," *id.* ¶¶ 4, 21, resulting in "ill-gotten gains," *id.* ¶ 35, for which she seeks "punitive and special damages," *id.* ¶ 46.  Dr. Ekin's complaint says the same, alleging Amazon "disguised [a] price increase," FAC ¶¶ 3.4, its activities were "deceptive" and "deceived" Prime members, *id.* ¶ 3.8, 5.3, 7.2.2, 7.2.3, and Amazon therefore "unjustly benefited," *id.* ¶ 6.3, for which he seeks "treble damages" under the CPA, *id.* ¶ 8.3.  This case is also uniquely appropriate under Rule 9(b) because Plaintiffs' bare accusations unfairly malign Amazon, its reputation and customer relationships.

When claims are subject to Rule 9(b), "[g]eneral or conclusory assertions of fraud are insufficient to defeat a motion to dismiss."  *Segal Co. (E. States), Inc. v. Amazon.com,* 280 F. Supp. 2d 1229, 1231 (W.D. Wash. 2003).  Under Rule 9(b), "a complaint … must adequately specify the statements it claims are false or misleading, give particulars as to the respect in which plaintiff contends the statements are fraudulent, state when and where the statements were made, and identify those responsible for the statements."  *Fid. Mortg. Corp.*, 213 F.R.D. at 575; *see also Seattle Pac. Indus., Inc. v. Melmarc Prods., Inc.*, 2007 WL 397450, at *2 (W.D. Wash. Jan. 31, 2007).  Put simply, Rule 9(b) requires a plaintiff to state "the who, what, when, where and how of the misconduct charged."  *Vess*, 317 F.3d at 1106; *Seattle Pac. Indus.,* 2007 WL 397450, at *2.  As discussed below, Plaintiffs' allegations here fall well short.

### 3. *The Court May Consider Documents Referenced in the Complaints.*

Under the doctrine of incorporation by reference, in a 12(b)(6) motion the Court may consider documents mentioned and relied upon in the complaint whose authenticity is not in question.  *Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1038 (9th Cir. 2010); *Lee v. City of Los Angeles*, 250 F.3d 668, 688-89 (9th Cir. 2001).  This is to "prevent plaintiffs from

AMAZON'S MOTION TO DISMISS UNDER RULE 12(b)(6)
(No. C14-0244 JCC) — 8

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA  98101-3045
206.622.3150 main · 206.757.7700 fax

surviving a 12(b)(6) motion by deliberately omitting documents upon which their claims are based." *Swartz v. KPMG LLP*, 476 F.3d 756, 763 (9th Cir. 2007) (alterations omitted).  The Court need not "accept as true conclusory allegations which are contradicted by documents referred to in the complaint." *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1295-96 (9th Cir. 1998).

Plaintiffs' complaints reference and rely on two contracts—the Prime Ts & Cs and the COUs.  *See, e.g.* FAC ¶¶ 2.2, 3.5, 4.1, 5.4, 6.2; Burke Compl. ¶¶ 10, 32, 36, 38.  Indeed, Plaintiffs repeatedly purport to characterize Amazon's "promises," "agreements," and "contractual obligations."  *See* FAC ¶¶ 3.1, 3.2, 3.3, 3.5, 3.6, 3.7, 5.3, 5.4, 6.2, 6.3; Burke Compl. ¶¶ 12, 14, 17, 24, 30(b), 32(b), 38, 39, 40, Prayer for Relief ¶ B.  Although Plaintiffs do not provide the contracts, the complaints incorporate them by reference.[11]

Plaintiffs should not be allowed to assert claims by contradicting contract terms and webpage disclosures.  The applicable case law in this Circuit does not allow them to do so.

**B.      Plaintiffs Fail to State Plausible Claims for Breach of Contract.**

In Washington,[12] a breach of contract claim requires proof of four elements:  duty, breach, causation, and damages.  *Baldwin v. Silver,* 165 Wn. App. 463, 473, 269 P.3d 284 (2011); *BP W. Coast Prods. LLC v. SKR Inc.*, __ F. Supp. 2d __, 2013 WL 5728899, at *9 (W.D. Wash. Oct. 22, 2013); *see also Nw. Indep. Forest Mfrs. v. Dep't of Labor & Indus.*,

---

[11] The complaints also refer to and rely on the Amazon.com website, characterizing webpages and terms, but again without providing the actual pages.  *See* FAC ¶¶ 3.4; Burke Compl. ¶¶ 17, 19, 20, 21.  The Court may consider these materials too, both under the incorporation-by-reference doctrine and by taking judicial notice.  *See Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005) ("The rationale of the 'incorporation by reference' doctrine applies with equal force to internet pages as it does to printed material," as webpages should considered in the context of the website as a whole.); *Perkins v. LinkedIn Corp.*, 2014 WL 2751053, at *7-8 (N.D. Cal. June 12, 2014) (court "may take judicial notice of matters ... capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned [including] publically accessible websites" (citing Fed. R. Evid. 201(b)); *Haskins v. Symantec Corp.*, 2013 WL 6234610, at *1 n.1 (N.D. Cal. Dec. 2, 2013) (dismissing claims, taking judicial notice of webpages containing license agreement); *Tomek v. Apple, Inc.*, 2013 WL 3872774, at *1 & n.3 (E.D. Cal. July 25, 2013) (dismissing claims, taking judicial notice of website); *Datel Holdings Ltd. v. Microsoft Corp.*, 712 F. Supp. 2d 974, 983-84 (N.D. Cal. 2010) (taking judicial notice of pages from website).

[12] Plaintiffs allege (and Amazon.com does not dispute) that Washington law governs their breach of contract claims.  *See* FAC ¶ 4.1; Burke Compl. ¶ 30(c).

AMAZON'S MOTION TO DISMISS UNDER RULE 12(b)(6)
(No. C14-0244 JCC) — 9

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA 98101-3045
206.622.3150 main · 206.757.7700 fax

78 Wn. App. 707, 712, 899 P.2d 6 (1995) (a "breach of contract is actionable only if the contract imposes a duty, the duty is breached, and the breach proximately causes damage to the claimant"); *N. Coast Enters., Inc. v. Factoria P'ship,* 94 Wn. App. 855, 861-62, 974 P.2d 1257 (1999) (affirming Rule 12(c) dismissal of contract claim).

### 1.   Plaintiffs Have Not Identified Any Contract Term or Duty that Amazon Breached.

A plaintiff cannot assert a contract claim without identifying the contractual obligation or duty the defendant allegedly breached. *See N. Coast Enters.,* 94 Wn. App. at 861. As this Court has said, a "[p]laintiff misunderstands the legal doctrine of breach of contract" when he "fails to point to any provision of the contract that Defendant breached …." *Muniz,* 2010 WL 4482107, at \*3. Similarly, "a contract cannot be breached if [it] does not include the term in question." *Id.*; *see also McFerrin v. Old Republic Title, Ltd.,* 2009 WL 2045212, at \*5 (W.D. Wash. July 9, 2009) (granting partial summary judgment, holding that plaintiff must allege facts that would establish the breach of a specific provision in the contract); *Denaxas v. Sandstone Court of Bellevue, LLC*, 148 Wn.2d 654, 663, 63 P.3d 125 (2003). Plaintiffs' contract claims fail for this reason.

Plaintiffs offer general allegations that Amazon "promised" and "agreed" to provide Prime members "free shipping," and that "the prices of Prime-Eligible items would not be increased by the inclusion of shipping charges." FAC ¶ 3.6. But Plaintiffs do not cite, quote, or provide any portion of the Prime Ts & Cs making either promise, because that is not what the contract says. *See* Ressmeyer Decl. Exs. A-B. Plaintiffs have failed to point to any contract term Amazon supposedly breached *because there are no such terms.* For this reason alone, Plaintiffs' claims should be dismissed. *See Johnson v. Microsoft Corp.,* 2009 WL 1794400, at \*2 (W.D. Wash. June 23, 2009); *accord Siver v. CitiMortgage, Inc.,* 830 F. Supp. 2d 1194, 1200 (W.D. Wash. 2011) (dismissing contract claim under Rule 12(b)(6) where plaintiffs did "not identify any … contract provision that [defendant] has breached"); *Beasley v. State Farm Mut. Auto. Ins. Co.,* 2014 WL 1494030, at \*7 (W.D. Wash. Apr. 16,

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA 98101-3045
206.622.3150 main · 206.757.7700 fax

2014 ) (granting summary judgment dismissal of plaintiff's claims where he "ha[d] not identified any specific policy provisions allegedly breached by Defendant").

Plaintiffs' claims are flawed not merely because they fail to specify any contract terms, but also because they contradict the express contract terms. The Prime Ts & Cs refer throughout to "free Two-Day shipping and $3.99 per unit One-Day shipping on all eligible purchases." Ressmeyer Decl. Exs. A-B. Plaintiffs cannot pretend this is a promise to provide "free shipping" or that all shipping is the same. The Court need not "accept as true conclusory allegations which are contradicted by documents referred to in the complaint." *Steckman*, 143 F.3d at 1295-96; *see also Minnick v. Clearwire US, LLC*, 683 F. Supp. 2d 1179, 1188 (W.D. Wash. 2010). When a plaintiff alleges a contract promises one thing, yet it in fact says something different, the Court should disregard the allegations in favor of the actual contract terms. *See, e.g.*, *Tritz v. U.S. Postal Serv.*, 721 F.3d 1133, 1139-40 (9th Cir. 2013) (dismissing contract claims where parties' agreement contradicted allegations in complaint); *Swartz v. Deutsche Bank*, 2008 WL 1968948, at *24-25 (W.D. Wash. May 2, 2008).[13]

The distinction between the actual promise of free two-day shipping and Plaintiffs' mischaracterization is important, because Plaintiffs seek to compare apples to oranges. Plaintiffs have not alleged (and cannot allege) they did not receive free two-day shipping. Instead, they compare Prime-eligible offers by third-party sellers in FBA with offers that sellers fulfill and ship themselves, and draw the false conclusion that if the total prices of

---

[13] Put somewhat differently, "[f]or any breach [of contract] to arise, there must first be some duty to perform." *BP W. Coast Prods.*, 2013 WL 5728899, at *9. As noted, establishing a duty is an element of a contract claim that Plaintiffs must plead and prove. *See Putz v. Golden*, 2012 WL 2565017, at *15 (W.D. Wash. July 2, 2012) ("Under Washington law, a breach of contract claim is actionable if the contract imposes a duty, the duty was breached, and the breach is a proximate cause of the plaintiff's damages." (citing *Nw. Indep. Forest Mfrs.*, 78 Wn. App. at 712)); *see also Lehrer v. Dep't of Soc. & Health Servs.*, 101 Wn. App. 509, 516-17, 5 P.3d 722 (2000)). "Without a duty, there is no breach …." *BP W. Coast Prods.*, 2013 WL 5728899, at *9 (granting summary judgment dismissal of contract claims where parties' contract imposed no duty of fuel supplier to always to have gasoline to fill orders); *Fid. & Deposit Co. of Md. v. Dally*, 148 Wn. App. 739, 745-46, 201 P.3d 1040 (2009) (granting summary judgment dismissal of plaintiff's claims where contract imposed no duty to use a specific payee or verify endorsements on checks).

AMAZON'S MOTION TO DISMISS UNDER RULE 12(b)(6)
(No. C14-0244 JCC) — 11

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA 98101-3045
206.622.3150 main · 206.757.7700 fax

both offers are similar or the same (item price plus shipping costs), that must mean the FBA seller "inflated [its price] by the shipping charges." *See* Simmonds Decl. ¶ 4 & Ex. A. Plaintiffs gloss over the fundamental difference that the FBA seller's offer within Prime provides *free two-day shipping*, while the non-Prime offer provides slower standard shipping (estimated at 5-8 business days). The two offers are not the same. For many customers (perhaps most), being able to receive a product with faster, two-day shipping for free makes the Prime offer more valuable.

In sum, Plaintiffs cannot assert claims by mischaracterizing the contract and the actual free two-day shipping benefit Amazon Prime promises and provides.

## 2.   *Plaintiffs Have Not Alleged Causation for Their Contract Claims.*

Plaintiffs also do not allege any plausible factual grounds to show causation for their contract claims. A "breach of contract is actionable only if … the breach proximately causes damage to the claimant." *Nw. Indep. Forest Mfrs.*, 78 Wn. App. at 712; *Beasley*, 2014 WL 1494030, at *7 (granting summary judgment dismissal of contract claims because "Plaintiff has not demonstrated that … the [alleged] breach proximately caused him damage").

Plaintiffs claim they were "harmed and deceived by Amazon's activity because they paid the $79 annual Prime Program membership fee" for "free shipping," but FBA sellers "routinely offered [items] at prices inflated by shipping charges …." FAC ¶ 3.7. Yet Plaintiffs nowhere allege they *ever* bought from an FBA seller or *ever* were deceived in any way.[14] Moreover, neither Plaintiff alleges any instance when he or she used Prime membership to buy a product from an FBA seller when that seller previously (*i.e.*, before joining FBA) offered the same product with the same two-day shipping at a lower price.

---

[14] In fact, as shown in the accompanying 12(b)(1) motion, Dr. Ekin never made a purchase from an FBA seller in the one year he paid for Prime membership. Although Ms. Burke did buy from FBA sellers three times, she also cannot show any injury. Indeed, given the prices of the products Ms. Burke bought and the costs of two-day shipping, she would have to show that, before participating in FBA, these sellers had *negative prices*, *i.e.*, they paid customers to purchase the products.

AMAZON'S MOTION TO DISMISS UNDER RULE 12(b)(6)
(No. C14-0244 JCC) — 12

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA 98101-3045
206.622.3150 main · 206.757.7700 fax

1    Plaintiffs' claims lack any plausible showing of causation for the additional reason

2  that they allege no factual predicate that Amazon allegedly "inflated" prices.  Notably,

3  Plaintiffs are not suing FBA sellers, the parties they allege improperly increased prices to

4  include shipping charges.[15]  Although Plaintiffs admit that FBA and other third-party sellers

5  set their own prices, *see* Burke Compl. ¶ 19, they seek to hold Amazon liable.  Plaintiffs

6  offer only vague and conclusory allegations that Amazon "induced," "advised," or

7  "encouraged" FBA sellers in some fashion, but even if that were true, Plaintiffs' allegations

8  still fail because it is undisputed that FBA sellers make the ultimate pricing decisions.

9    Plaintiffs must allege (and ultimately prove) that they personally suffered injury

10  proximately caused by a contract breach committed by Amazon.  *See, e.g.*, *Rhodes v. City of*

11  *Federal Way*, 2010 WL 1005868, at *5 (W.D. Wash. Mar. 16, 2010) (dismissing claims on

12  summary judgment where plaintiff strip mall owner provided no facts to support claim that

13  he lost rental income due to city's tardy completion of street construction project); *Fid. &*

14  *Deposit Co. of Md.*, 148 Wn. App. at 744-45 (affirming summary judgment dismissal of

15  contract claim where plaintiff showed no nexus between payee designations defendant used

16  on checks and plaintiff's losses due to employee's theft of checks).  It is not enough merely

17  to speculate that someone *might* have been injured.  Plaintiffs offer a theory for liability,

18  dressed up with labels and conclusions, but devoid of any facts to show they suffered harm

19  proximately caused by Amazon, *i.e.*, nothing to support a reasonable inference that their

20  claims cross the line between "possibility and plausibility."  *See Twombly*, 550 U.S. at 555;

21  *Iqbal*, 556 U.S. at 678; *Eclectic Props. E.*, 751 F.3d at 995-96; *Mashburn*, 2011 WL

22  2940363, at *1.

---

[15] Amazon reserves all arguments that FBA sellers should be joined as necessary parties in this action under Fed. R. Civ. P. 19, if the case were to proceed.

AMAZON'S MOTION TO DISMISS UNDER RULE 12(b)(6)
(No. C14-0244 JCC) — 13

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA 98101-3045
206.622.3150 main · 206.757.7700 fax

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

**C.      Plaintiffs Fail to State Plausible Claims Under the Washington Consumer Protection Act.**

To state a claim under the Washington CPA, Plaintiffs must establish five elements: "(1) [an] unfair or deceptive act or practice; (2) occurring in trade or commerce; (3) public interest impact; (4) injury to plaintiff in his or her business or property; [and] (5) causation." *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wn.2d 778, 780, 719 P.2d 531 (1986).  Failure to allege all five elements is fatal to the claim.  *Id.* at 793.  Plaintiffs' complaints fail on at least two of these elements for similar reasons as their contract claim, *i.e.*, they fail to identify any unfair or deceptive practice and show no causation.  Plaintiffs' CPA claims are also deficient because they do not comply with Rule 9(b), offering no particularity of the "who, what, when, where, and how" of the allegedly deceptive scheme Plaintiffs allege.  *See Vess*, 317 F.3d at 1103-04, 1106; *Kearns*, 567 F.3d at 1124-25; *Fid. Mortg. Corp.*, 213 F.R.D. at 575.

**1.      Plaintiffs Fail to Allege Any Deceptive Act or Representation.**

A CPA claim "may be predicated upon [1] a per se violation of statute, [2] an act or practice that has the capacity to deceive substantial portions of the public, or [3] an unfair or deceptive act or practice not regulated by statute but in violation of public interest." *Klem v. Wash. Mut. Bank*, 176 Wn.2d 771, 786-87, 295 P.3d 1179 (2013).  Here, Plaintiffs formulaically allege Amazon.com's practices are "unfair or deceptive," *see, e.g.*, FAC ¶¶ 7.2.2, 7.2.3; Burke Compl. ¶¶ 42-44, but in substance they allege only claims of deceptive practices, *see* FAC ¶¶ 3.4, 3.8; Burke Compl. ¶¶ 4, 5, 21, 26, 34, (alleging Amazon "disguised," "conceal[ed], and hid price increases to "deceive" Prime members), with one brief allusion by Ms. Burke to a *per se* violation, Burke Compl. ¶ 45 (discussed below).  Plaintiffs provide no premise for any claim under either of these CPA prongs.

First, under the deceptive act prong, a statement that is truthful and unlikely to mislead is not actionable under the CPA.  *See Smith v. Stockdale*, 166 Wn. App. 557, 271 P.3d 917 (2012) (statement that customer owed $5 to cliff jump on adjacent public property

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA 98101-3045
206.622.3150 main · 206.757.7700 fax

was not deceptive where cliff jumping itself was free but customer used area for which $5 fee was required); *Sheldon v. Am. States Preferred Ins. Co.,* 123 Wn. App. 12, 16-18, 95 P.3d 391 (2004) (fully disclosed installment fee could not be the basis of CPA claim), *rev. denied,* 153 Wn.2d 1030, 110 P.3d 756 (2005); *Robinson v. Avis Rent A Car Sys., Inc.,* 106 Wn. App. 104, 119, 22 P.3d 818 (2001) (allegedly deceptive fee could not be the basis of claim where it was disclosed).

Here, Plaintiffs have pointed to no untrue or misleading statements by Amazon. As discussed, Plaintiffs' allegations purport to rely on the Prime Ts & Cs, but that contract does not promise "free shipping," but rather free two-day shipping and discounted one-day shipping. Here too the Court should disregard allegations contradicted by the express terms of the contract. *See Minnick*, 683 F. Supp. 2d at 1188 (dismissing CPA claims and disregarding plaintiff's allegations about poor quality of Clearwire service contradicted by FAQ on Clearwire website); *Mickelson v. Chase Home Fin., LLC*, 2012 WL 3240241, at *6 (W.D. Wash. Aug. 7, 2012) (dismissing under Rule 12(c) plaintiff's CPA claim that bank promised its offer of loan modification would halt foreclosure when the bank "clearly indicated … that until Plaintiffs made payments towards modification and submitted the loan modification agreement, foreclosure proceedings would continue"), *aff'd*, __ F. App'x __, 2014 WL 2750133 (9th Cir. June 18, 2014). Plaintiffs make no claim that they did not receive the actual benefits promised.

Other than mischaracterizing the contract terms, the complaints say nothing about *when, where, or how* Amazon supposedly promised "free shipping," or that FBA sellers would not include shipping costs in their prices. They provide no particulars about *how* Amazon supposedly promised anything about how other sellers would set their prices, caused any sellers to increase prices, or *which* sellers allegedly inflated their prices, or *what* they did and *how* it allegedly resulted in injury to Plaintiffs. And, the complaints do not say at any point that either Dr. Ekin or Ms. Burke relied on any statement or representation, much less *what* the representations were or *how* or *why* either Plaintiff allegedly was

AMAZON'S MOTION TO DISMISS UNDER RULE 12(b)(6)
(No. C14-0244 JCC) — 15

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA  98101-3045
206.622.3150 main · 206.757.7700 fax

deceived.  *See Goodman*, 2012 WL 2412070, at *12 (dismissing claims under rule 9(b) where the complaint did "not specify what the advertisements and other sales material allegedly relied upon by the plaintiff stated, which sales material the plaintiff relied upon, and who made the misleading statements plaintiff relied upon and when these statements were made").  Plaintiffs' claims fail under Rule 12(b)(6), and are completely deficient under Rule 9(b).  *See also Segal Co.,* 280 F. Supp. 2d at 1231 (Rule 9(b) not satisfied where plaintiff failed to specify "the time and place the fraudulent statements were made, and exactly what statements were fraudulent"); *Seattle Pac. Indus.,* 2007 WL 397450, at *2 (dismissing complaint where party failed to provide time and place of the alleged fraud).

> ### 2.  *Plaintiffs Cannot Assert a Per Se Violation of the Washington CPA and Cannot Rely on the FTC Guideline Concerning "Free" Offers.*

Ms. Burke's complaint contains one conclusory sentence that "Amazon engaged in a *per se* unfair trade practice with respect to advertising 'free shipping,'" Burke Compl. ¶ 45, but does not explain what the *per se* CPA claim is.  Dr. Ekin's complaint contains no claim of a *per se* CPA violation.  However, both complaints refer to a portion of an FTC guideline concerning "free" offers, *see* FAC ¶ 3.5 (quoting 16 C.F.R. §251.1(b)(1)); Burke Compl. ¶ 23 (same).[16]  To the extent Plaintiffs mean to assert a CPA claim—whether a *per se* claim or some other claim—based on the FTC guideline, they misunderstand the CPA and the guideline, which does not have the force of law.

Plaintiffs may assert a *per se* CPA claim only if they can point to an express declaration by the Washington legislature that violation of a given statute is an unfair or

---

[16] The portion of the FTC guideline Plaintiffs cite states:

> [W]hen the purchaser is told that an article is "free" to him if another article is purchased, the word 'Free' indicates that he is paying nothing for that article and no more than the regular price for the other.  Thus, a purchaser has a right to believe that the merchant will not directly and immediately recover, in whole or in part, the cost of the free merchandise or service by marking up the price of the article which must be purchased, by the substitution of inferior merchandise or service, or otherwise.

16 C.F.R. § 251.1(b)(1), *quoted in* FAC ¶ 3.5; Burke Compl. ¶ 23.

AMAZON'S MOTION TO DISMISS UNDER RULE 12(b)(6)
(No. C14-0244 JCC) — 16

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA 98101-3045
206.622.3150 main · 206.757.7700 fax

deceptive practice under the CPA.  *Hangman Ridge,* 105 Wn.2d at 787 (the legislature is the appropriate body to determine when violations of other statutes are also *per se* violations of the CPA and must do so specifically); *see Klem*, 176 Wn.2d at 785; *Robertson v. GMAC Mortg. LLC*, 2013 WL 2351725, at *2 (W.D. Wash. May 30, 2013); *Minnick*, 683 F. Supp. 2d at 1186 ("In *Hangman Ridge*, the Supreme Court refined its definition of 'per se unfair trade practice' to include only those practices the Legislature … determined were unfair."); *Brummett v. Washington's Lottery*, 171 Wn. App. 664, 677, 288 P.3d 48 (2012) (a *per se* violation requires showing a pertinent statute that contains a specific declaration of public interest).  The Washington legislature has never declared that violation of the FTC guideline about "free" offers, 16 C.F.R. §251.1(b)(1), is a *per se* CPA violation.  Plaintiffs do not allege otherwise, and it would be absurd to do so for several reasons.

First, and fundamentally, the FTC guideline Plaintiffs cite *does not have the force of law*.  *See* 16 C.F.R. § 240.1 (the FTC's guides "do not have the force of law"); 36 Fed. Reg. 21,517 (1971) (the FTC guide is merely "interpretive of laws administered by the [FTC] and thus advisory in nature"); *see also* 16 C.F.R. § 1.5 (FTC's industry guides are administrative interpretations for guidance).  For this reason, courts have expressly refused to allow state consumer protection act claims premised on the FTC guidelines, including specifically the "free" offers guideline Plaintiffs cite.  *Laster v. T-Mobile USA, Inc.*, 2009 WL 4842801, at *5 n.1 (S.D. Cal. Dec. 14, 2009) ("the FTC's guide ["regulat[ing] use of the word 'free'"] does not have the force of law, so it cannot be 'borrowed'" to assert a claim under California's Unfair Competition Law), *vacated in part on other grounds*, 466 F. App'x 613 (9th Cir. 2012); *see also Torres v. JC Penney Corp.*, 2013 WL 1915681, at *3 (N.D. Cal. May 8, 2013) (rejecting defendant's argument that FTC guides provided a safe harbor precluding claims under California consumer protection laws, stating "the Court is not persuaded that such Guides have the force of law"); *Christensen v. Harris County*, 529 U.S. 576, 587 (2000) (agency interpretations contained in policy statements, agency manuals, and enforcement guidelines lack the force of law and do not warrant *Chevron-*

AMAZON'S MOTION TO DISMISS UNDER RULE 12(b)(6)
(No. C14-0244 JCC) — 17

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA 98101-3045
206.622.3150 main · 206.757.7700 fax

style deference); *Landin-Molina v. Holder*, 580 F.3d 913, 920 (9th Cir. 2009) (agency opinion letters, policy statements, agency manuals and enforcement guidelines lack the force of law and are entitled to respect only to the extent they are persuasive); *Freeman v. Quicken Loans, Inc.*, 626 F.3d 799, 805 (5th Cir. 2010) (agency interpretations in enforcement guidelines "lack the force of law," in part because "the agency has not used a deliberative process such as notice-and-comment rulemaking"), *aff'd*, 132 S. Ct. 2034 (2012).[17]

Even assuming the FTC guideline was a law and not merely advisory, Plaintiffs could not rely on it to assert CPA claims here. The guideline is an interpretation of the FTC Act, 15 U.S.C. § 45, which does not allow a private right of action and may only be enforced in court by an action brought by the FTC itself. *Dreisbach v. Murphy*, 658 F.2d 720, 730 (9th Cir. 1981); *Rockwell v. Chase Bank*, 2011 WL 2292353, at *10 (W.D. Wash. June 7, 2011) ("the FTC Act provides no private cause of action"). Moreover, the FTC Act itself contains a three-year statute of limitations. 15 U.S.C. § 57b(d). Plaintiffs filed suit on February 19, 2014, *see* Complaint (Dkt. No. 1), and so, even assuming they could rely on the FTC guideline as a basis for their CPA claims, they could do so only for claims after February 19, 2011. *See, e.g.*, *Bednaruk v. Nw. Tr. Servs., Inc.,* 2010 WL 545643, at *4 (W.D. Wash. Feb. 9, 2010) (claims time-barred under the Truth in Lending Act and Real Estate Settlement Practices Act could not be used to establish *per se* CPA claims); *Kotok v. Homecomings Fin., LLC*, 2009 WL 2057046, at *4-5 (W.D. Wash. July 14, 2009) (same). Yet, Plaintiffs assert claims for themselves and on behalf of the putative class only up to February 22, 2011. *See* FAC ¶ 5.1; Burke Compl. ¶ 27. In other words, Plaintiffs cannot borrow the FTC guideline to create CPA claims that would otherwise be time-barred, and

---

[17] In the CPA, the Washington legislature expressed its intent that courts be guided by "final decisions of the federal courts" and "final orders of the federal trade commission" interpreting similar federal statutes, RCW 19.86.020, but did not direct that courts pay deference in any respect to the FTC's advisory guidelines. For that matter, even federal court decisions are merely "guiding, but not binding, authority." *Panag v. Farmers Ins. Co. of Wash.*, 166 Wn.2d 27, 47, 204 P.3d 885 (2009); *State v. Reader's Digest Ass'n*, 81 Wn.2d 259, 275, 501 P.2d 290 (1972).

AMAZON'S MOTION TO DISMISS UNDER RULE 12(b)(6)
(No. C14-0244 JCC) — 18

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA 98101-3045
206.622.3150 main · 206.757.7700 fax

they have not alleged that their claims (or anyone's) arose in the three-day period from February 20-22, 2011.

Here, it is likewise nonsensical for Plaintiffs to contend that any law precludes FBA sellers from taking into account their fulfillment costs in setting prices, or that consumers could reasonably believe that *no one* would pay for shipping. Moreover, to reiterate, Amazon's actual commitment to Prime members is that they pay nothing extra for two-day shipping and can get discounted one-day shipping, and Plaintiffs have not alleged that they (or anyone) did not receive these benefits.

Indeed, a California court rejected a similar theory earlier this year, in a case in which eight county district attorneys sued Overstock.com, claiming, among other things, that Overstock falsely promised to provide "free" or $2.95 shipping but nonetheless factored shipping costs in its product prices. *California v. Overstock.com, Inc.*, No. RG10-546833 (Alameda Cnty. Sup. Ct. Feb. 5, 2014).[18] Calling the claim "nonsensical," the court questioned whether the district attorneys could "seriously contend that one can only advertise 'free' shipping if the seller takes a loss or persuades UPS to accept its shipments at no charge." *Id.* at 80 ¶ 123. "[I]s there any evidence or reason to believe that consumers think that no one pays for shipping?" *Id.* "The most logical inference by anyone seeing 'free' shipping is that the cost thereof has already been factored into the price. It is no different than advertising 'shipping included.'" *Id.* The court found that "[n]o reasonable consumer could believe that 'free shipping' means that the shipping is 'free'" in the sense the state urged, and that "the most reasonable inference is that there is no additional charge beyond the stated price of the goods being sold." *Id.*[19]

Finally, Plaintiffs reference only a portion of the FTC "free" guideline, but ignore the rest, which advise sellers to "clearly and conspicuously" disclose terms and conditions

---

[18] A copy of the court's decision is attached as Appendix A.

[19] Overstock.com has appealed other portions of the court's decision, but the state has not challenged the court's ruling rejecting its claim about "free" shipping.

AMAZON'S MOTION TO DISMISS UNDER RULE 12(b)(6)
(No. C14-0244 JCC) — 19

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA 98101-3045
206.622.3150 main · 206.757.7700 fax

1   of offers for "free" products or services.  *See* 16 C.F.R. § 251.1(c).  Consistent with this

2   intent, the Prime Ts & Cs clearly disclose the benefits of free two-day shipping and

3   discounted one-day shipping.  Also, for every product offered by any seller, Amazon.com

4   lists the terms of the offer, including the product price and shipping costs, *see* Burke

5   Compl. ¶ 19; Simmonds Decl., Ex. A, so customers can decide whether to purchase based

6   on price, shipping speed, seller reputation, or something else.  Amazon provides full

7   disclosure, as the FTC guideline contemplates.

8           **3.      *Plaintiffs Have Not Alleged Any Causation for Their CPA Claims.***

9           Lastly, Plaintiffs' CPA claims fail because they lack any plausible factual basis—let

10  alone particularized facts, as Rule 9(b) requires—to establish causation or that either

11  Plaintiff suffered any injury.

12          The CPA allows recovery only if a plaintiff was "injured in his or her business or

13  property by a violation" of the statute.  RCW 19.86.090.  Thus, a plaintiff must allege

14  enough facts to support "a causal link … between the unfair or deceptive acts and [an]

15  injury."  *Hangman Ridge*, 105 Wn.2d at 792-93.  Failure to plead causation for a CPA

16  claim requires dismissal.  *See Ass'n of Wash. Pub. Hosp. Dists. v. Philip Morris Inc*., 241

17  F.3d 696, 706 (9th Cir. 2001) (affirming dismissal of CPA claim for failure to plead

18  causation); *Maple v. Costco Wholesale Corp*., 2013 WL 5885389, at *5-6 (E.D. Wash.

19  Nov. 1, 2013) (same; plaintiff challenged allegedly misleading statements on drink bottle

20  but failed to allege he read or relied on them); *Fid. Mortg. Corp. v. Seattle Times Co.*, 131

21  Wn. App. 462, 470-71, 128 P.3d 621 (2005) (affirming summary judgment against CPA

22  plaintiff for lack of causation).

23          The CPA causation element requires a plaintiff to allege "that but for the

24  defendant's unfair or deceptive act or practice the plaintiff's [alleged] injury would not

25  have occurred."  *Indoor Billboard/Wash, Inc. v. Integra Telecom of Wash., Inc.*, 162 Wn.2d

26  59, 81-82, 170 P.3d 10 (2007) (breach of contract claim); *see also Stafford v. Sunset*

27  *Mortg., Inc.*, 2013 WL 1855743, at *3 (W.D. Wash. Apr. 29, 2013) (granting Rule 12(c)

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA 98101-3045
206.622.3150 main · 206.757.7700 fax

motion because, among other things, "even if Plaintiff could prove ... a deceptive act or unfair business practice, her CPA claim still fails because she does not allege specific facts regarding causation"); *Lewis v. Chase Home Fin. LLC*, 2011 WL 6149245, at *6–7 (W.D. Wash. Dec. 12, 2011) (dismissing CPA claim when plaintiff failed to "sufficiently plead[]" causation); *Crane & Crane, Inc. v. C&D Elec., Inc.*, 37 Wn. App. 560, 563, 683 P.2d 1103 (1984) (plaintiff failed to show causation where it hired the defendant not as a result of its allegedly misleading statements, but instead "because that was the electrical shop usually called").

As with their contract claims, Plaintiffs offer no facts to support causation or that they suffered any injury for their CPA claims.  They do not allege that at any time Amazon failed to provide two-day shipping at no extra charge.  They do not allege they were deceived by or relied upon any actual commitments of Amazon.  They have not alleged (and cannot show) they purchased any products from an FBA seller and paid prices allegedly "inflated" by shipping charges.  Nor could they allege that Amazon caused such allegedly inflated prices, given that they admit that sellers were responsible for setting their own prices.  Plaintiffs have provided nothing more than conclusory and speculative allegations that they and others were "harmed and deceived" by Amazon, FAC ¶ 3.7, and that is plainly not enough.

## IV.   CONCLUSION

Plaintiffs' complaints advance a theory but no factual predicate for their claims.  Their claims are barred in many respects, nonsensical in others, and should be dismissed under Fed. R. Civ. P. 12(b)(6) and 9(b).

DATED this 24th day of July, 2014.

DAVIS WRIGHT TREMAINE LLP

By:  _s/ Rebecca Francis_
      James C. Grant, WSBA #14358
      Ambika K. Doran, WSBA #38237
      Rebecca Francis, WSBA #41196

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA 98101-3045
206.622.3150 main · 206.757.7700 fax

1201 Third Avenue, Suite 2200
Seattle, WA 98101-3045
Telephone: (206) 622-3150
Facsimile: (206) 757-7700
Email:  jamesgrant@dwt.com,
ambikadoran@dwt.com,
rebeccafrancis@dwt.com

*Attorneys for Amazon Services LLC*

AMAZON'S MOTION TO DISMISS UNDER RULE 12(b)(6)
(No. C14-0244 JCC) — 22

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA  98101-3045
206.622.3150 main · 206.757.7700 fax

## CERTIFICATE OF SERVICE

I hereby certify that on July 24, 2014, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to those attorneys of record registered on the CM/ECF system.  All other parties (if any) shall be served in accordance with the Federal Rules of Civil Procedure.

DATED this 24th day of July, 2014.

Davis Wright Tremaine LLP

By *s/ Rebecca Francis*
Rebecca Francis, WSBA #41196
1201 Third Avenue, Suite 2200
Seattle, Washington  98101-3045
Telephone:  (206) 757-8136
Fax:  (206) 757-7700
E-mail:  rebeccafrancis@dwt.com

AMAZON'S MOTION TO DISMISS UNDER RULE 12(b)(6)
(No. C14-0244 JCC) — 23

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA  98101-3045
206.622.3150 main · 206.757.7700 fax

# APPENDIX A





# FILED
## ALAMEDA COUNTY
FEB 05 2014

CLERK OF THE SUPERIOR COURT
By: _____
Deputy

SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF ALAMEDA

PEOPLE OF THE STATE OF
CALIFORNIA,

    Plaintiff,

       vs.

OVERSTOCK.COM, INC.,

    Defendant.

No.  RG10-546833

STATEMENT OF DECISION

On September 9 through 12 and 16 through 20, 2013, the parties appeared

through counsel for trial on the above-captioned matter.  After extensive post-trial

briefing, counsel appeared for oral argument on December 19, 2013, and the case was

submitted.  The court entered a tentative ruling and proposed decision on January 3,

2014, after which the parties filed objections and proposed additions on January 27, 2014.

Having considered the extensive evidentiary record, the exceptional briefing by the

parties and the argument of counsel, the court provides the following explanation of the factual and legal basis of its Decision on the principal controverted issues.

I.    **GENERAL BACKGROUND**

1.     Defendant Overstock.com ("Overstock") was founded in 1999 and launched its website in October of that year.  Initially it posted about 100 products for sale, but that site and the company has expanded dramatically over the past 14 years. Today there are over a million products offered on the Overstock website for sale to consumers nationwide, in California and all of the eight counties appearing in this action. At the beginning, most if not all of Overstock's offerings were products from manufacturers, retailers or jobbers who were liquidating excess or outdated inventory, and this enabled Overstock to acquire these products at a very substantial discount from the prices at which they were typically offered for sale.  Today Overstock still acquires products in this manner, but over the years Overstock has also developed relationships with manufacturers, importers and others who use Overstock as a channel for online distribution of non-distressed merchandise.  These suppliers are referred to by Overstock as its "fulfillments partners" or simply its "partners."  Today a majority of the products sold by Overstock are from its partners.

2.     From its inception Overstock has engaged in comparative advertising techniques on its website (URL www.overstock.com and later www.o.co).  These have included the initial practice of displaying on each of its product pages what was referred to as a "list price" for the product above the price at which Overstock was offering it and then showing a calculation of the "savings" expressed in both absolute dollar and

2

inflated due to the selection of the highest price or application of a formula to manufacture a non-existent, "straw-man" price. Such practices are alleged to violate California law, which the People contend should be interpreted in part by reference to the Federal Trade Commission's "Guide Against Deceptive Advertising" (16 C.F.R. §233.3)("FTC Guide") wherein the practices Overstock has allegedly engaged in are said to be deceptive and misleading.

4.    More specifically, the First Cause of Action ["the Pricing Claim"] alleges that Overstock has violated the False Advertising Law ("FAL")(Bus. & Prof. Code §§17500 and 17536) by making false and misleading statements concerning the pricing of products on its website in various way – e.g., claiming (a) that a unique Overstock product was identical to a product offered by another merchant, (b) that Overstock had previously ascertained the price at which other merchants were selling a product offered by Overstock, (c) that Overstock's ARP was that typically offered by other merchants, (d) that Overstock's "Today's Price" was equal to or lower than that typically offered by other merchants, (e) that Overstock's "Today's Price" was a discount from the price typically offered by other merchants, (f) that the "You Save" amount accurately represented the discount customers would receive by buying at Overstock, and/or (g) that Overstock had previously sold the product at the ARP.  Further, it is alleged that Overstock violated the two sections by (i) setting ARPs without ascertaining what other merchants were typically selling the product for, (ii) using formulas to set fictitious ARPs, (iii) using the highest price that could be found as the ARP and (iv) setting its ARPs above "street price."

5.      The Second Cause of Action ["the Amount of Price Reduction Claim"]
alleges Overstock violated the Unfair Competition Law ("UCL")(Bus. & Prof. Code
§17200) and the Consumer Legal Remedies Act ("CLRA")(Civ. Code §1770(A)(13)) by
making false and misleading statements of fact to consumers concerning (a) the existence
or amount of price reductions represented by the difference between "List Price" and
"Today's Price," (b) the existence or amount of price reductions represented by the
difference between "Compare at" or "Compare" prices and "Today's Price," and (c) the
existence or amount of savings represented by the dollar amount and percentage next to
the term "You Save."

6.      The Third Cause of Action ["the Source of Products Claim"] alleges that
Overstock violated the FAL by representing it was a liquidator selling distressed, second-
hand or discontinued items when the majority of products sold were being offered by
Overstock's partners through Overstock's website at the partner's usual retail price.  In
such circumstances, Overstock was being used as an ordinary online channel of retail
trade by its partners, who shipped the products from their own warehouses (i.e., "drop
shipped").

7.      The Fourth Cause of Action ["the Shipping Charges Claim"] alleges that
Overstock violated the FAL by representing shipping was "free" or "only $2.95" when in
fact the full cost of shipping had already been factored into the underlying product price.

8.      The Fifth Cause of Action ["the Derivative Claim"] alleges that Overstock
violated the UCL based on the unlawful conduct alleged in the First, Third and Fourth
Causes of Action, which conduct is also alleged to violate the "unfair prong" of the UCL.

9.     All five causes of action allege continuing violations from at least January 1, 2006, to the present.  Based on all the alleged violations, the Complaint seeks injunctive relief directed at the practices found to be unlawful, civil penalties under the FAL and UCL in the minimum amount of $15 million, restitution, reasonable investigation costs, costs of suit and whatever else the court finds to be equitable and just.

## II.    THE PEOPLE'S CASE

10.     The People called as live witnesses four consumers and one expert witness.  The balance of their case consisted of 26 deposition designations of 25 Overstock employees and one consumer who were all beyond the subpoena power of the court.[1]  Many of the deposition designations are patently cumulative and in many instances offered to prove, and prove again and again, undisputed facts – e.g., that prior to the Fall of 2008 on some occasions the ARP was set by means of a formula.  Undisputed fact, and yet in one deposition designation after another, testimony to that fact is designated.  Had these witnesses all been within the subpoena power of the court, there is no doubt that only a fraction of them would have been called as live witnesses and, of those called, many of the designated questions would never have been asked.  The waste that all of this entails is underscored by the fact that in the People's opening post-trial brief it is difficult to find a single citation to a designated transcript.  While the court appreciates that some designations were needed to establish the prima facie case, it is clear that the bulk of the designations go far beyond any conceivable utility.

---

[1] Designated deposition transcripts are cited by the deponent's last name, date of deposition and pages, e.g., "King 4/5/13 Tr. at 32-35."  The trial testimony is cited as "Trial at ___."

11.     To compound this folly, the defense filed objections that are more often than not also a total waste of time – e.g., "asked and answered," "statement of counsel," "assumes facts not in evidence," etc. – and then the People filed similar objections to the defense counter-designations.  The court declines to take the time to record rulings on individual objections that can have no conceivable impact on the analysis of the issues before it.  Where the court has nonetheless ruled on some of the objections (perhaps out of force of habit), the rulings sustaining those evidentiary objections may be found in a footnote the first time the deponent's testimony is referenced.  All other objections are *overruled*.  Where a deposition transcript is not even cited in this Decision, one may infer that the designated testimony was at best cumulative and thus any objections were not worth the effort of either counsel or the court and are for that reason summarily *overruled*.

12.     Turning to the merits of the People's case, their evidence was organized from the opening statement through trial into three broad time periods corresponding to the ARP nomenclature used during each timeframe – i.e., "list price, "compare at" and "compare."  The court will summarize the People's case following that convention.  But whatever the timeframe, while the nomenclature and formatting changed, all of these labels and ARP displays were intended to convey to consumers that Overstock was a discounter and very substantial savings could be enjoyed by purchasing from its site.  In the words of one of its executives in the company's more recent advertising: "we compare prices so you don't have to." (Byrne 7/9/13 Tr. 97-98, 100-102.[2])  The People

---

[2] Byrne Objection(s) sustained: 7/9/13 Tr. at 189, 190, 206, 214.  Hearsay objections to third-party statements in email chains sustained to the extent offered for the truth of the matter asserted as opposed to use for context, notice, etc.

contend that in conveying this general message, Overstock used labels, formats and practices that resulted in advertising that was often false or at least misleading within the terms of the relevant statutes, and as a result its advertising practices are actionable.

**A.    The "List Price Era"**

(i)    Initial Policies & Practices re ARPs

13.    The People refer to the period commencing sometime before February 2003 through some point in September 2007 as the "List Price Era." The hallmark of Overstock's advertising during this period was to display for all eligible products what was characterized as (1) a "list price," (2) a "Today's Price" to represent Overstock's price and (3) a "You Save" figure calculated in absolute dollars and percentage terms. (E.g., Exh. 950; Murakami 4/10/13 Tr. at 54-58, 95-96.[3]) No definition of "list price" appeared on the screen without prompting, but if a viewer's cursor scrolled across the term, a hyperlink to a definition would appear. (Exh. 829, Sp. Inter. Resp. 361, 364.) Throughout this period that definition read in full as follows:

What is "List Price?"

In most cases, list price is the price for the product, new and unused, as recommended by the manufacturer for retail sale, and Overstock.com has confirmed at least one instance in which the product is being sold at that price.

In cases where there is no manufacturer's recommended retail price, list price represents either of the following:

1.  The manufacturer's suggested retail price for a comparable product, new and unused

2.  An estimated price derived from standard wholesale and retail markups for this type of product

---

[3] Murakami Objection(s) sustained: 4/10/13 Tr. at 180, 214; 4/11/13 Tr. at 313, 314, 316, 416, 442, 475, 477; 4/12/13 Tr. at 533, 541, 569, 627, 688, 698.  Hearsay objections to third-party statements in email chains sustained to the extent offered for the truth of the matter asserted as opposed to use for context, notice, etc.

3. The retail price at which Overstock.com has found the product or a comparable product offered for retail sale in at least one instance

4. The comparison price stated by at least one other online vendor for the same product or a comparable product

List price is not necessarily the lowest price at which the product is commonly sold, and often will be higher than the actual price at which the product is sold. However, pursuant to the terms of its <u>Best Price Guarantee</u>, Overstock.com does provide you with assurance that, whatever difference there may be between the list price and the actual selling price, Overstock.com's own price for the product is the lowest you will find anywhere online.

[Exh. 710.]

There was no way for the consumer to determine which of the above four methods was used to determine "list price" for any particular item on the website. (E.g., Exh. 921.)

14. During the time the above definition was used (from at least 2003 to late 2007), it was Overstock's complete statement of its requirements for setting the list prices used as ARPs on its website. During this same period, though, Overstock had no formal processes or procedures in place to confirm for any given list price that there was in fact at least one instance of a sale at the list price stated in the advertisement (Exh. 859, 780), and thus the above policy was not strictly followed in at least this respect. (Murakami 4/10/13 Tr. at 105-107, 122; King 4/5/2013 Tr. at 32-35, 93-95, 193.[4]) Overstock also did not have in place any process for documenting which of the methods for determining list price was used in any particular instance. (Murakami 4/10/13 Tr. at 111-112.) As a result, it is impossible for Overstock to state for this period what percent, if any, of its ARPs for products reflected verified prices from the market place. (Murakami 4/10/13 Tr. at 255-259.)

---

[4] King Objection(s) sustained: 4/5/13 Tr. at 47, 117, 135; 4/6/13 Tr. at 417. Hearsay objections to third-party statements in email chains sustained to the extent offered for the truth of the matter asserted as opposed to use for context, notice, etc.

15.     The list price definition quoted above permitted the use as an ARP of an estimated price derived from standard wholesale and retail markups for the type of product in question. (Murakami 4/11/13 Tr. at 414-416.) In these instances a formula was used whereby a "multiplier" was applied to Overstock's cost to set the "list price" appearing online. The multiplier could vary from product area to product area depending on Overstock's understanding of the "standard" industry practice in the given product category. (Exh. 790, Sp. Inter. Resp. 15.) For example, in the case of jewelry, the formula was to set list price at three times Overstock's cost, while in Home & Garden it was two and a half times Overstock's cost. (Murakami 4/10/13 Tr. at 41-42.) If the partner was a manufacturer who only manufactured for Overstock, the foregoing policy meant in practice that a formula could be used by the partner (or the Overstock buyer) to set the reference price (Murakami 4/10/13 Tr. at 147-149; Ivers 7/26/13 Tr. at 158-159[5]) with the result that the ARP could be "just an arbitrary number." (King 4/6/13 Tr. at 542.) This was a natural consequence of Overstock's practice prior to September 2008 of relying on the list prices provided by its partners without any formal validation process. (Murakami 4/10/13 Tr. at 151-153.)

16.     Where the product being sold was only available at Overstock, the above quoted policy allowed the price of a "comparable" product to be used as the list price for the Overstock offering. Prior to September 2007, Overstock had no written guidelines that set the criteria or parameters buyers or partners were to use in selecting a product to use as a "comparable" for purposes of selecting an ARP. (Murakami 4/10/13 Tr. at 222-223.) This was true as well for products that could be considered "unique." Prior to

---

[5] Ivers Objection(s) sustained: 7/26/13 Tr. at 128. Hearsay objections to third-party statements in email chains sustained to the extent offered for the truth of the matter asserted as opposed to use for context, notice, etc.

September 2007, all products including "unique" products had ARPs developed in one of the four ways specified in the list price policy quoted above. (Murakami 4/10/13 Tr. at 229-230.) Consumers were never told on the product page when the ARP was based on a similar but not identical product. (Exh. 1065; King 4/6/13 Tr. at 376 ["Customers wouldn't know"].)

17.    Whether list price was based on an actual price comparison or MSRP, it was generally understood that the list price was a "high street price" or a "full retail price" as opposed to any attempt to determine a "prevailing market price," "street price" or lowest competitor's price. (Exh. 320; Murakami 4/10/13 Tr. at 156-157, 204-205, 212-213; Ivers 7/26/13 Tr. at 87-88.) In the case of a list price based on MSRP – especially where the supplier was a partner manufacturing only for Overstock – the price could be manipulated. This is illustrated by instances where a product was only sold on Overstock's and the manufacturer's sites and the two of them discussed raising the price on the manufacturer's site so as to provide a higher ARP for the offering on Overstock's site. (Exh. 362, 363, 366, 368; Murakami 4/10/13 Tr. at 170-174, 178-180.)

18.    Generally speaking, buyers knew what the street price was for products in their category because their objective was to set Overstock's price "aggressively" – that is, below standard retail or street price. (Murakami 4/11/13 Tr. at 328-329.) Overstock buyers would thus do comparative pricing online to determine a product's street price so that they could try to price below that and also discuss that issue with its suppliers. (Murakami 4/11/13 Tr. at 352, 364.) In the course of doing this online comparative pricing, Overstock buyers could see that the list prices on the company website were often higher than the prevailing online market price or street price. This led to internal

11

email observations such as "Oh, I think it's been established that the 'List Price' is egregiously overstated. This place has some balls." (Exh. 1028.)

(ii)    The Value of ARPs

19.    At all relevant times, including the 2003-2007 period, Overstock viewed the use of ARPs generally as beneficial to both the consumer and to the effectiveness of its advertising. (E.g., Murakami 4/10/13 Tr. at 62-64, 88-90, 92-96; Exh. 438.) The strength of that view and the basis for it varied from witness to witness, with some such as the designated PMQ (Lani Murakami) merely stating it had "some benefit" while others expressed stronger views, although the latter are usually found in emails and other documents rather than in the deposition or trial testimony of the witness. Typical of the views expressed in Overstock email traffic is that of Tara Seethaler: "Internal research has shown that the best predictor of whether a customer returns to our site is whether they feel they have 'received a good deal.'" (Exh. 403; see also, e.g., Exh. 414 ["It definitely helps entice the customer to purchase when compare at pricing is displayed"]; Exh. 430 ["We believe that products with a 'Compare at' price sell better than products without a 'Compare at' price"]; Exh. 444 ["Compare at prices provide the customer with savings information and make a big impact"].)

20.    As discussed in further detail below, some of this internal traffic from the 2008-2009 timeframe refers to the quantitative impact of including or excluding ARPs from product pages – e.g., products without ARPs suffer sales declines of 6% (Exh. 475, 485), 10% (Exh. 462) or even 20% (Exh. 477, 501), while those with ARPs enjoy increased sales of 6% (Exh. 483), 10% (Exh. 487, 503, 510) or 13% to 25% (Exh. 482, 486, 488, 492). The internal traffic also discusses a perceived increase in the "conversion

12

rate" – that is, the percentage of site visitors who purchase products – and refer to ARPs increasing that rate. (Exh. 502 [8.9%].) The figures quantifying the impact of the presence or absence of ARPs vary by document, product line and context. But the overwhelming majority of internal Overstock emails reflect a widespread belief within the company that ARPs matter – that is, their presence has a positive impact on sales.

      (iii)   <u>Marc Ecenbarger Incident & Others</u>

21.     Toward the end of the List Price Era, a consumer in Shasta County, California, named Marc Ecenbarger purchased two patio sets from Overstock based on a product page displaying a "list price" of $999.00 and showing an Overstock price of $449.99 for a "savings" of $549.01 or 55%. (Exh. 950.) Ecenbarger testified at trial that he was familiar with patio furniture pricing and inferred from the stated list price a certain level of quality. (Trial at 156-159.) When the furniture arrived, he was surprised by the relatively poor quality but even more surprised when he found inside the packaging a WalMart price tag for $247. (Trial at 160-163.) He went online and found the set on the WalMart and other sites for $247. (Trial at 166-168; Exh. 953, 957.) He contacted Overstock and complained that he had been misled by the ARP on the product page. Overstock first offered to refund the difference and then to refund the entire amount and allow him to keep the product. (Trial at 181-182.) Angered by his experience, on July 23, 2007, Ecenbarger sent a letter to the Shasta County District Attorney complaining of what he believed to be false advertising. Shortly thereafter the D.A. wrote Defendant a letter requesting substantiation of its claims regarding list prices. (Exh. 6.)

22.     Overstock looked into the Ecenbarger incident and determined that what apparently had happened with this patio set was that the product had been acquired from a fulfillment partner, which had used a formula to set the ARP. (Trial at 1278-1280; Exh. 10 at 2.) But even after learning these facts, Overstock did not remove the patio set from its website or change the ARP information. (Exh. 850; Trial at 1282-1285.) Moreover, Ecenbarger was not the first consumer to report the above problem with the patio set to Overstock. Defendant had received an identical complaint regarding the same patio set three months earlier (Exh. 870) and yet continued to advertise the patio set for sale with the same ARP and sold dozens of them at the price paid by Ecenbarger. (Exh. 850.) To this day, Overstock has taken no steps to initiate any remedial action for those consumers who purchased the same patio set as Ecenbarger at $449.99 based on an ARP of $999. (Trial at 1285-1286.)

23.     In an attempt to demonstrate that the Ecenbarger incident was not an isolated event, the People called Sandra Prescott of Pingree, Idaho, Andrew Bride of Fresno, California, and Linda Finke of South Bend, Indiana, and designated the deposition testimony of Julie McIntyre of Columbia, South Carolina. Prescott testified that in 2010 she purchased an all-in-one printer from Overstock for around $800 based on an ARP of approximately $4,000 only to learn later that she could find the same printer elsewhere for a price within $50 of what she paid. (Trial at 131-135.[6]) Bride testified that he purchased a wedding ring set in 2008 from Overstock based on an ARP of $3,900 and a sale price of $1,399, but that there were quality issues and, when he had it

---

[6] To the extent that this customer testimony contains hearsay statements about the prices discovered elsewhere, an appraisal of the product, etc., such testimony is admitted not for the truth of the matter asserted but as examples of the notice to Overstock of customer complaints regarding the accuracy or fairness of its ARPs.

appraised, the value was substantially less than Overstock's ARP. (Trial at 231-236; Exh. 103, 105.) Finke testified to her familiarity with the Sizzix Essential line of dies and her seeing such dies offered on the Overstock site in 2010 with ARPs for the entire product line that were higher than the MSRPs published on the manufacturer's webpage. (Trial at 216-225; Exh. 164, 167-168.) McIntyre testified that she shopped for a specific tent on Overstock's site, which listed an MSRP, but that when she checked that against the manufacturer's webpage the latter's price was lower. (McIntyre 7/22/13 Tr. at 36-37, 46.[7]) In each of these instances, the consumer complained to Overstock, there was extensive back-and-forth between the parties, the complaints were noted in Overstock's records, and a standardized response was sent to the consumer.

<div align="center">(iv)     <u>Prior Notice of Above ARP Issues</u></div>

24.     In March 2004 an article appeared in Business Week alleging that Overstock may overstate the list prices shown on its website. (Compare Exh. 774 at ¶43 & Exh. 5 with Exh. 775 at ¶43.) Overstock responded, in part, that its suppliers provide it with list prices and "we verify these prices" and that on the rare occasions when suppliers do not provide a recommended retail price "our experienced buying team conducts thorough market research to determine the most accurate list price." (Exh. 2006.) As previously noted, at the time of this response Overstock did not have in place any formal processes or procedures to confirm for any given list price that there was in fact at least one instance of a sale at the list price stated in the advertisement. The People

---

[7] McIntyre Objection(s) sustained: 7/22/13 Tr. at 68, 70, 73, 75, 76, 77, 138. Hearsay objections to third-party statements in email chains sustained to the extent offered for the truth of the matter asserted as opposed to use for context, notice, etc.

would argue that the Business Week article put senior Overstock management on notice of the problems inherent in the company's practices for setting the ARPs on its website.

25.     As further evidence of notice, the People point to a company-wide email sent in March 2004 requiring fulfillment partners to "submit a link to a valid website where the MSRP was found" (Exh. 666) and the lack of any evidence that any systematic attempt was used to follow-up. The People also rely on various emails from consumers during this era complaining about its list prices. (E.g., Ex. 15 ["I admit it was my mistake not to check local stores before ordering from you, but I made the assumption that you quote real prices"].) They also argue that notice may be inferred from the fact that such complaints were common enough to warrant a standardized or "canned" response. (Exh. 36.)

(v)     The Mondeaux Letter

26.     Perhaps in response to the Ecenbarger incident or the inquiry from the D.A., Overstock's Vice President of Merchandising, Ralph Mondeaux, wrote a letter on September 5, 2007, to Overstock's fulfillment partners "as a reminder that when you provide 'List Price' associated with a product you sell on our website, it must be in compliance with Overstock.com's policy regarding 'List Price.'" (Exh. 556.) The letter enclosed a spreadsheet and requested that partners provide the information on the sheet, including "Location of List Price Comparable (where you found the same item sold at the List Price)" and "[i]f you can't find a comparable price for the exact item, then where the information on a similar product was found." (*Ibid.*) For further guidance it provided an order of priority for the methods to be used in confirming list prices. First was confirmation of an instance of at least one sale at MSRP; then the sale price for the same

16

item at another online retailer or storefront dealer; then a "nearly identical item" at
another online retailer or storefront dealer; and finally an estimated price "derived from
standard wholesale and retail markups for this type of product." (*Ibid.*) On this record,
the Mondeaux letter was the first time Defendant made any systematic effort to document
the basis for its list prices, and it still allowed the use of a formula if the other methods
were unavailable. (Murakami 4/10/13 Tr. at 136-137.)

27.     Following the Mondeaux letter there was significant email traffic within
Overstock and between it and its partners explaining why the spreadsheet was being
distributed and these new requirements imposed. The explanations included: "It has
come to our attention that we have some issues with our MSRP site wide" (Exh. 557);
"We have identified many products across the site where MSRP is inflated" (Exh. 269);
"Recently we have found some examples of over-inflated MSRP's/List Prices on our
site" (Exh. 270). The People point to all of these communications as Overstock
admissions as to the false and misleading use of ARPs during the List Price Era and as
notice to Overstock of the problem. There is no way to determine, though, how many or
what percentage of products on the company's website during this era used inflated list
prices as the ARP. This is because prior to September 2008 Overstock did not document
how any particular ARP on its site was determined.

### B.     The "Compare At Era"

(i)     New ARP Language & Policies

28.     Beginning at some point in late September 2007, Overstock started to use
the phrase "compare at" in its website advertising in lieu of the term "list price."
(Johnson 6/12/13 Tr. at 83; Exh. 795, Sp. Inter. Resp. 23.) The People refer to this period

17

running from September 2007 to early 2011 as the "Compare At Era." When it began

using this new terminology, Overstock replaced the definition of "list price" on its

website with a definition of "compare at" that one could find by scrolling over the term

where it appeared on a product page. The definition read:

> The term "Compare at" means the price at which, in the reasonable judgment of our
> experienced buyers, manufacturers or suppliers, the item may be sold on an everyday
> basis. Other vendors sometimes refer to this as the "retail price" exclusive of special
> promotions or sale prices, at which the item might be offered at retail stores and at
> customary retail mark-up. In many instances though not all, the "Compare at" price
> reflects a price suggested by the manufacturer or supplier of these goods, without
> reference to actual retail sales and include a reasonable average estimated shipping
> cost, if ordinary shipping costs have been discounted or eliminated. We make no
> representation that the products have been sold or offered at the "Compare at" price,
> and the price may or may not reflect the average or prevailing market price in any
> area on any particular day. For some items listed as a set, the "Compare at" price
> may be the aggregate of the suggested or estimated prices for all items included in the
> set. Actual retail sales in your area may substantially differ from the "Compare at"
> price. Moreover, the nature of internet sales on a national or international basis, and
> the fact that we deal in overstocks, closeouts, end-of-season, and unique items that
> may be sold only on Overstock.com, precludes our ability to know whether our
> products are sold at the "Compare at" price at any particular location or time by other
> vendors. You may choose to use the "Compare at" price as an appropriate guide to
> what you would or could pay for these items in other locations, at other times, or
> under other conditions, including full retail price.

[Exh. 961.]

29.     During the first year of the Compare At Era, there was no substantial

change regarding how Overstock set ARPs. (Murakami 4/11/13 Tr. at 302; Exh. 981.)

Thus the ARPs typically reflected a price suggested by the manufacturer without

reference to actual retail sales, there was no process or procedure for verifying the ARPs

provided by suppliers, Overstock continued to allow the use of formulas to develop the

"compare at" price, and there was and is no way to confirm any specific number of ARPs

that were in fact verified. (Murakami 4/10/13 at 255-257; 4/11/13 Tr. at 304; Exh. 886,

RFA Resp. 24; Exh. 859.) What was new was Overstock's definition of "compare at"

available via the hyperlink, which included, inter alia, the statement that it was not
representing that the "compare at" price was an actual price of another vendor at any
particular place or time.

30.     Because formulas could continue to be used, during this timeframe some
undetermined number of Overstock buyers discussed with partners the possibility of
raising their MSRP so as to create a higher ARP or achieve a certain desired discount off
of MSRP (e.g., 40% to 50%).  (Exh. 574, 577.)  For example, one email from this era
reflects a partner telling Overstock that it "bumped" its store price so as to give
Overstock "enough room" for its desired discount and Overstock noting this worked on
all but two ARPs where "the compare at site [was] not … your own."  (Exh. 380.)
Another shows Overstock asking to see whether the list price can be increased.  (Exh.
371; see also Exh. 251, 248; Murakami 4/10/13 Tr. at 174-177, 183-190.)  Defendant
continued to use ARPs for unique items without disclosing this on the product page to
customers (Exh. 376) and continued to look for the highest ARP even though the street
price was substantially lower.  (Exh. 334, 337, 735.)

31.     In July of 2008 Overstock did a study "to get a feel to see if our MSRP is
inflated compared to the market."  (Exh. 677.)  While little is known about the
methodology or other details of the study, it apparently looked at a random selection of
10 of the top 100 best-selling products in each department and compared the "compare
at" price on Overstock's website to the prices that could be found online: on average the
ARPs were 15.30% higher than the *highest* price that could be found online.  (Exh. 679.)
Among a random selection of 10 of the top 100 products for each department determined
by the greatest "You Save" percentage, "compare at" prices were on average 32.81%

19

higher than the *highest* price that could be found online. (*Ibid.*) Among a random

selection of 10 additional products from each department, the "compare at" prices were

on average 12.96% higher than the *highest* price that could be found online. (*Ibid.*)

<div align="center">(ii)     <u>Removal of ARPs</u></div>

32.     In October of 2008 Overstock removed all ARPs from its website and only

allowed them to be re-posted if the partner supplied a verifiable reference to support the

stated ARP. (Trial at 1129-1130.) Among the factors that may have played a role in this

policy change were the Ecenbarger incident and its aftermath, the inquiry from the Shasta

County D.A., which ripened into an investigative subpoena on April 14, 2008, the July

2008 internal study showing the prevalence of ARPs above the highest prices that could

be found on the internet and the continued receipt of consumer complaints (e.g., Exh. 60).

The reason given to Overstock's partners was that "most of the pricing (which we called

MSRP at the time) really was not accurate in terms of true competing prices that were out

on other retail websites" and the goal was "to ensure that accurate data was being

presented to our customers." (Exh. 308, 485.) The People rely on these statements as

further admissions that Overstock's prior use of ARPs was false and misleading, but

again the record provides no basis for determining the number or percentage of total

product listings with these issues.[8]

---

[8] One could argue that the July 2008 study (Exh. 677, 679) may provide a metric. The People argue that this internal Overstock document provides a range of percentages for estimating the extent that ARPs were inflated. The defense counters that this study may only show that prices in the market decline over time and thus eventually some ARPs will be relatively "high." Of course, prior to the fall of 2008 Overstock had no rules regarding how long an ARP, once posted, could remain on a page. This alternative theory as to why Overstock's ARPs may have been misleadingly high at the time suggests that the July 2008 study is not a good metric of the impact of the practices challenged in this case; however, the defense argument is somewhat unusual in this context – it's basically an argument that its ARPs *were* misleading but for a different reason than the ones alleged. Understood.

<div align="center">20</div>

33.     The removal of ARPs from Overstock's website generated a good deal of internal commentary regarding the impact of ARPs.  Founder and CEO Patrick Byrne, ("Byrne") warned: "Be aware we rolled out the elimination of 'Compare At' pricing the other night.  In testing, that cost us 6%."  (Exh. 466.)  This general view of the significance of "compare at" advertising was echoed by others.  (See, e.g., Exh. 468 ["the impact on sales has been more significant than what we expected"]; Exh. 481 ["when we ran a SiteSpect test which removed 'Compare At' from the site ... we saw a 6% drop in conversion (roughly $135k/day in revenue)"]; Exh. 482 [25% average increase based on "rough analysis" but 13% "safe" estimate]; Exh. 502 ["11.5% lift in orders overall and an 8.9% lift in conversion" when Compare At added back]; see also Exh. 485 [6% or more]; Exh. 463 [range of 5% to 25%]; Exh. 497 [range of 6% to 20%]; Exh. 475 [6%]; Exh. 462 [10%]; Exh. 477 [20%]; Exh. 494 [5% to 26%].)  The variability in these numbers is usually a function of context – some refer to the negative impact of the removal of ARPs, others refer to the positive impact of their restoration measured in terms of uplift, conversion rate or some other metric, some refer to the impact on specific product lines, etc.  These and other issues regarding such figures and their foundation were explored in the defense case (see below), but there is no disputing that the contemporaneous internal communications at the company reflect a consensus that ARPs matter because their presence has a positive impact on sales.

34.     Because of this belief in the efficacy of ARPs, there was a push by Overstock to motivate its partners to provide it with the source of the ARPs being offered so that Overstock could re-populate ARPs on its site.  To do this, Overstock emphasized to its partners the potential for ARPs to increase sales.  (King 4/5/13 Tr. at 269; Exh. 337,

21

418.) These efforts included, for example, a communication from Overstock's Senior Vice President Supply Chain (Jacob Hawkins) to all of its partners stating: "'Compare at' prices are a useful tool for our customers. We believe that products with a 'Compare at' price sell better than products without a 'Compare at' price. Because of this we are strongly committed to featuring 'Compare at' pricing on all eligible products by April 1, 2009 ..." (Exh. 494.) Follow-up emails to this communication reflect Overstock employees representing to fulfillment partners the kind of figures regarding the impact of ARPs noted above. (Exh. 463.) The motivational use of such figures is unmistakable and only serves to reinforce the inference that those in the best position to know at Overstock firmly believed that ARPs affected consumer behavior in a material, positive way. (Exh. 448, 449.)

35. Overstock's belief was, moreover, supported by its own contemporaneous consumer research through a company known as "Communispace," which was used to facilitate two discussion threads among customers. Some commented that, without ARPs, they had to "look at other sites for the same product to see if [the Overstock offer] is even a discount," or were driven "to other websites in search of a deal," or the prior use of ARPs "was the only reason I didnt [sic] shop around." (Exh. 425; see also Exh. 420.) Communispace also conducted a survey of customers regarding the removal of ARPs and their importance. 82.6% of respondents indicated that ARPs were either "extremely" or "somewhat" important. (Exh. 427.) These survey results help explain why Overstock viewed the restoration of ARPs as a high priority, and one can also see in the respondents' comments consumer reactions to ARPs that are consistent with the opinions

provided by the People's expert based on his own research and the academic literature on the subject (see below).

<div align="center">(iii)    <u>The Price Validation Team</u></div>

36.    At the same time Overstock removed all ARPs from its site, it also inaugurated a group within the company known as the "Pricing Validation Team" or simply the "Validation Team." (King 4/5/13 Tr. at 30-31.) Partners had previously submitted a "partner offer spreadsheet" (Exh. 3) and were now asked to complete a "price comparison template." (Exh. 2217.) On these forms the partners provide information on each of their products, including both the "low" and the "high" street price. By "high street price" it was generally understood Overstock meant the highest price that could be found for the product. (King 4/5/13 Tr. at 175-180, 269; Trial 1138-1141.) It was the responsibility of the validation team to go online, search catalogues or otherwise confirm that the identified high street price was in fact a price at which the product was being offered. (King 4/5/13 Tr. at 108; 4/6/13 Tr. at 452-453, 467.) This meant that MSRPs could not be used any longer to set the ARPs (King 4/5/13 Tr. at 126, 188), nor could formulas, which could produce "arbitrary" ARP numbers. (King 4/6/13 Tr. at 538-540, 542, 546.) The validation team required proof of an actual offer to sell at the proposed ARP and then documented the source of that ARP.

37.    While this was a major change, the practice was still to seek and use as the ARP the highest street price confirmed by the validation team (Exh. 348, 349) and, where shipping charges could appropriately be added to increase the ARP, that was done to ensure "the highest compare at price." (Exh. 643; also Exh. 418.) The policy of seeking the highest confirmed street price as the ARP was endorsed at the executive level. (Exh.

<div align="center">23</div>

1061 [Johnson]. Exh. 1068 [McClaughtery], Trial at 906 [Byrne].) Moreover, the validation team could still use similar products to confirm the ARPs submitted by its partners for products that were unique to Overstock. (King 4/5/13 Tr. at 164; 4/6/13 Tr. at 353; Exh. 622.) There were also instances of Overstock employees discussing with partners the possibility of the partner raising the price or MSRP on its own website for the purpose of generating a higher ARP for use on the Overstock website, even though with the advent of the validation team the use of MSRP for ARPs was disallowed (King 4/6/13 Tr. at 327-335; see also Exh. 382, 383) and the use of partner sites for ARPs was subsequently prohibited. (Exh. 725.)

38.   The People introduced evidence of continued consumer complaints (Exh. 115, 121) and occasions where the customer found price tags on the partner product they received that were lower than the ARP or even the price they paid Overstock. (Exh. 86.) As late as December 2011 one internal email noted that "[t]here have been a number of recent instances where the price tag listed on the product that was shipped to the customer was less than the price that they paid on our website." (Exh. 728.) Ms. King (Overstock's PMQ for this period) responded by advocating the removal of all price tags. (*Ibid.*) The People point to such evidence as exemplifying the problems inherent in the policy of looking for and using the highest online price as the ARP.

## C.    The "Compare Era"

39.    The People refer to the timeframe beginning in 2011 and continuing to the present as the "Compare Era." This marks the period where Overstock used the word "compare" in place of the phrase "compare at" and for some products began using MSRP as the ARP label. (Exh. 795.) The use of a hyperlink to the definition of "compare" and

the wording of it did not change, but Defendant did institute internal guidelines for determining these two types of ARP. (Exh. 566.) "Compare" was defined as "an actual price at which the product is being offered or sold … It is important to note that a 'Compare' price is not an estimate by the submitter of what the product might sell for, and it is <u>not</u> another retailer's stated estimate of value, but, rather it *must be a bona fide price* at which the product is being offered for sale or sold." (*Ibid.* [emphasis original].) Where an identical product is unavailable for an ARP, the guidelines continue to allow the use of similar products for ARPs. The guidelines also state that "Compare" prices must be revalidated every three months and MSRPs within six months.

40.    The guidelines also cover the use of shipping and handling charges in setting ARP and are consistent with what the record indicates was Overstock's policy throughout all three time periods. At the time the guidelines were issued, Overstock had a policy of charging $2.95 for non-expedited shipping on most items. At earlier times Overstock charged $1 or sometimes advertised "free shipping." When constructing an ARP the guidelines indicate that "[i]t is appropriate to take into account the shipping and handling charges applied to an Identical or Similar Product when establishing a 'Compare' price." (*Ibid.*) If the seller charges a flat fee, the amount over Overstock's flat fee (or no fee) may be added to the ARP. If the seller has a variable fee dependent on destination, the difference between what the seller would charge to ship to Kansas City, Missouri and Overstock's flat fee may be added to the ARP. (*Ibid.*) The People claim that this approach is deceptive because of evidence that the actual cost of shipping and

25

handling was already factored into the Overstock sales price.  (Murakami 4/12/13 Tr. at 723-726; Nielson 5/15/13 Tr. at 301, 304-305.[9])

41.    During the Compare Era and perhaps beginning earlier, one of the tools available to the validation team was third-party services such as WinBuyer that will search the web and "scrape" current product prices.  (Trial at 903-904.)  Overstock used such services for consideration in setting its own prices and for other purposes as well.  Another such service (Gazaro) was used by Overstock for pricing and identifying ARPs with respect to books, movies, music and games ("BMMG" aka "BMV" [Trial 831])) and on occasion with other categories as well.  (Trial at 855-856, 1037-1038.)  The People offered such evidence to support an argument that third-party sources have emerged that would allow an online retailer such as Overstock to use ARPs based on the current "prevailing market price" determined in an efficient, automated manner.

D.    **Compeau's Expert Testimony**

42.    The People called Professor Larry Compeau ("Compeau") of Clarkson University as an expert witness.  Compeau's research focus for more than twenty years has been the impact that ARPs have on consumer response.  Based on his own academic research and review of the extensive literature on the subject, Compeau opined that as the ARP is increased in an advertisement relative to the product being offered for sale, there is (a) an increase in a consumer's internal reference price ("IRP"), (b) an increase in the consumer's perception of the quality and value of the product, (c) an increase in the consumer's "purchase intention" and (d) a decrease in the consumer's search intentions –

---

[9] Nielsen Objection(s) sustained: 5/15/13 Tr. at 37, 201, 215, 334, 335.  Hearsay objections to third-party statements in email chains sustained to the extent offered for the truth of the matter asserted as opposed to use for context, notice, etc.

meaning a decrease in the likelihood that the consumer will do additional comparative

shopping. (Trial at 265-269, 282-287.) As to the increase in the perception of quality

and value, Compeau testified that there were at least two dimensions of value –

acquisition value (i.e., the perceived value to the consumer of owning the product) and

transaction value (i.e., the perceived savings or value of the deal itself) – and both

increase as ARPs increase relative to the products advertised. (Trial at 282-283.) He

pointed out that in all of these areas, the relationship is not linear – that is, as the gap

widens consumer skepticism increases, which dampens the consumer response, but the

impact is still positive. (Trial at 337-338, 429-430, 541-542.) Compeau testified that all

of these effects apply to the "vast majority" of consumers and are not limited to the naïve,

the gullible or the unsophisticated. (Trial at 288-289.) He further noted examples of

consumer responses in the records that illustrate all the effects noted in the literature and

his own research. (Trial at 335-338.)

      43.    Compeau cited a study he conducted in 2004 regarding different ARP

labels, including "compare at," and noted the finding that the vast majority of

respondents believed that the various ARP labels reflect "the price [an item] usually sells

at" or "the price at most other stores" rather than an inflated price. (Trial 277-280, 540-

541.) Given these consumer perceptions, Compeau testified that in order not to be

deceptive ARPs need to be based on bona fide prices – that is, have "some veracity in the

marketplace." (Trial at 290.) While opining on the cues in Overstock ads, Compeau

noted that certain Overstock cues suggested a fleeting opportunity (e.g., "today") and

may tend to decrease search intentions and that the name "Overstock" tended to convey a

liquidator with the ability to offer unusually low prices for a period of brief duration.

(Trial at 320-321.)  If given the opportunity, Compeau would testify based on all of the foregoing factors that Overstock's use of ARPs had the "capacity" to mislead and confuse consumers; however, the court excluded that line of testimony as either calling for legal conclusion or an otherwise inappropriate use of expert opinion.[10]

44.     Compeau's reliance on the literature included a 1998 article he co-authored  with Professor Grewal that reported on a meta-analysis conducted on the 38 articles in the literature at the time containing sufficient data to be included in the analysis.  (Trial at 275-276.)  The analysis consisted of a widely accepted statistical methodology for analyzing data across a series of studies to determine if they reflect a common phenomenon or not and for reconciling what might otherwise appear to be conflicting individual studies.  His 1998 meta-analysis of the available studies at that time supported his opinions in this case – i.e., that the presence of ARPs increases IRP, perceived value, perceived believability of price and purchase intentions, and that these effects increase as the ARP rises compared to the product being advertised.  (Trial at 529-531.)  Compeau testified that since then the body of scientific research had expanded to approximately 70 published studies, the vast majority of which support his opinions regarding the impact of ARPs on consumer response.  (Trial at 289.)  He conceded that none of the research would support a method for quantifying the impact of any given ARP in a particular sales transaction and that the strength of the ARP effect was contextual.  (Trial at 381.)

45.     The court finds Compeau's review of the literature and his conclusions regarding the general impact of ARP as reflected therein to be credible.  In making this

---

[10] Compeau's excluded opinions on this subject are memorialized in the trial transcript.  (Trial at 314-319, 326-334.)

finding, the court notes that Compeau's opinions from his own research and analysis of the literature predate any forensic work and reflect a long and deep engagement with the literature in the field. He defended his analysis credibly and readily admitted various limitations. For example, when questioned regarding the focus on purchase intentions rather than actual purchases by consumers in real transactions, he explained that to meet professional standards studies needed to be constructed with controls, which limited the ability of independent researchers to analyze actual consumer transactions. (Trial at 531-533.) He made other reasonable concessions on cross-examination and consistently tried to stay within the bounds of the literature in his field. For the foregoing reasons, the court accepts the above opinions with important limitations.

46. Those limitations were developed on cross-examination. With respect to the literature, Compeau was confronted with a number of statements in the literature that, taken in isolation, were counter to his overall conclusions regarding the impact of ARPs, e.g., the higher the reference price the lower its believability, or suggested the complexity of the issue and the variability in consumer response to ARPs. (Trial at 395-397, 403, 406-407, 462-463.) Significantly, with respect to Overstock's advertising in particular, Compeau readily conceded that he had not conducted any specific research on its customers, their buying habits, their interpretations of the semantics used in the Overstock price comparisons or their reliance on Overstock being a liquidator. (Trial at 411-413, 419.) Compeau also conceded that he had not undertaken to determine which or how many of Overstock's ARPs were higher than appropriate so as not to be deceptive. (Trial at 448-449.) Nor had he conducted a study of Overstock's use of ARPs or underlying practices compared to other online retailers to determine the differences or

similarities. (Trial at 412-413, 522.) The defense pointed to the observations in

Compeau's 1998 article's that it was possible that, if consumers are overexposed to

ARPs, they may become desensitized to such price comparisons and that further research

was needed, including study of the impact of repeated exposure to ARPs. (Trial at 465.)

He was also presented with research suggesting that the "compare at" cue was very

common and widely understood by consumers to mean a comparable product or an

alternative brand rather than the identical product. (Trial at 423.)

      47.     The defense cross-examination also spent considerable time on context.

This ranged, on the one hand, from questioning on the characteristics of the studies cited

and their very substantial differences in many instances from that of an actual online

shopper to, on the other hand, research questions in various articles as to how the

literature might apply to an internet or other setting and the rapidly changing

technological environment. (Trial at 468-472, 490-492, 497-501, 507-512.) With respect

to the internet, for example, some researchers have noted that the impact of ARPs on

consumer response is stronger in a store setting than at home, and of course the defense

would analogize the online shopping experience to the at-home scenario. (Trial at 493-

494.) The cross-examination also developed how technological innovations have made

online price comparisons easier and faster (Trial at 500-501) and questioned Compeau

regarding the relative lack of published research on ARPs in the online context and the

absence of such research on Overstock and its practices in particular. These lines of

questioning, of course, were by way of preparation for the defense case and its expert's

research and the opinions he expressed in response.[11]


III.    __THE DEFENSE CASE__

    A.    __Overstock's Retail Strategy & Use of ARPs__

    48.    Overstock introduced evidence that during the past 14 years it grew from

an online site offering fewer than 100 products acquired from liquidators and the like to

an online retailer of over a million items acquired principally from its partners, who use it

as a regular outlet.  (Trial at 809-810, 860-861.)  Throughout Overstock's history, its

policy and practice has been to try to sell every product at or below the lowest price on

the internet – what it calls "extreme value retailing."  (Trial at 814-15, 1235-1236.)  To

execute on this strategy, its buyers search the internet and catalogues in a comparative

shopping exercise that informs them of the range of prices available and enables them to

price at least 10% below the lowest price on the market.  (Trial at 1236-1237, 1248-

---

[11] On September 16, 2013, at the close of the People's case, the defense moved for judgment pursuant to C.C.P. section 631.8.  That motion was expressly reserved because the court had not had sufficient time to review all of the deposition designations included in the People's case-in-chief.  In its objections to the proposed decision, the defense correctly pointed out that the court had failed to rule on the reserved motion and requested a ruling based solely on the evidence submitted in the People's case-in-chief.  The court now rules based on the evidence in the case-in-chief.

The written motion raised three grounds: (1) the relief sought would be unconstitutional; (2) there was insufficient evidence to support each of the causes of action; and (3) each cause of action is barred by the applicable statute of limitations.  The first and third grounds are addressed in Part IV below.  The second ground fails because, while the court expressed skepticism on the People's "prevailing market price theory" supporting one aspect of the Pricing Claim, the balance of the First Cause of Action was supported by sufficient evidence and the motion was addressed to the entire cause of action rather than a subpart of it.  Moreover, the People have since pointed the court to Compeau testimony in the case-in-chief that helps support the "prevailing market price theory."  (Trial at 279-280.)

At oral argument the defense raised a fourth ground – namely, that People are relying on a "capacity to deceive theory" rather than actual deception to support the Pricing Claim.  The defense argues that the former is no longer adequate to prove an FAL claim.  For reasons discussed in Part IV, the court disagrees with this position.  Thus the court DENIES the reserved motion.

1249.) Given this pricing strategy, Overstock would argue that no consumer could be harmed by any of its advertising because, except in the rare case of an error (e.g., the Ecenbarger incident), its customers always got the lowest price available on the internet.

49.     Overstock has used ARPs from the outset for the purpose of branding itself as an extreme value retailer by showing consumers the large savings available on its site. In the words of its CEO, the intent was to communicate that "we're a place where you can save a lot of money." (Byrne 7/9/13 Tr. at 110.) To ensure that its ARPs were legally appropriate, Byrne testified that before settling on an ARP policy he consulted with the Better Business Bureau ("BBB") in Salt Lake City and claims he was advised that he could use any price as an ARP as long as he could find one offering at that price in the United States. (Trial at 817.) He further testified that he was advised that he could use a standard retail markup or a "formula" when no actual prices could be found. (Trial at 818, 822.) Overstock produced no documents from its records or the BBB corroborating this advice.

50.     During the List Price Era, over 70% – perhaps up to 90% – of Overstock's products carried a list price that came from an industry standard feed. (Trial at 833, 1036.) These were mostly BMMG products, which have universal product identification numbers that enable their prices to be tracked electronically. (Trial at 1036-1037; Exh. 2835-2844.) The non-BMMG products on Overstock's site displayed as the list price the price provided by Overstock's partners or, where no list price could be located, a price generated by the use of a standard markup or formula. (Trial at 1253-1258; Exh. 710.) Buyers were supposed to engage in a "competitive shopping" process to determine the lowest and highest price and all the ranges in between for every product in order to set

32

the price at which Overstock would sell any item. (Trial at 1240-1241, 1248.) This also served as a reasonableness check on the ARP.

51.     Overstock admitted that on occasion mistakes were made and the Ecenbarger incident was one such isolated case. Byrne testified that, when he learned of the Ecenbarger incident, he was "furious" and announced in writing that he would fire any employee who made that kind of mistake again. (Trial at 846; Exh. 2032.) Overstock notes, however, that the "mistake" in question was in the first instance that of its supplier, who applied a formula to the wrong base price to determine the ARP provided to Overstock, and the only Overstock "mistake" was not catching that error during the course of the buyer's comparative shopping exercise. At or about the same time as the Ecenbarger incident and the resulting D.A. Investigation, Overstock changed its ARP nomenclature to "compare at" and adopted a definition to track that used by the industry leader – Amazon. (Trial at 846-848.)

52.     In the fall of 2008 Overstock implemented its "Validation Team." This was described as a natural step in the company's development and paralleled the creation of other specialty teams for functions such as capital allocation, review moderation and the like – all of which had previously been vested in the buyers. (Trial at 849-850, 1263-1265, 1301.) The record indicates that the validation team manually searched for and confirmed every ARP (Trial at 1124-1125, 1130), although it may have been for the BMMG products the standard industry feed continued to be relied upon. In any event, formulas were out and each ARP was documented and memorialized with a screen shot of the product page supporting the ARP. (Trial at 1169-1170.) All ARPs were "revalidated" every 90 days. (Trial at 1145-1146.)

33

53.     In 2011 Overstock simplified "compare at" to "compare," and for some products started to use "MSRP" as the ARP label.  (Trial at 1300.)  Whatever the label, though, and even in instances where formulas were used in the earlier timeframe, Overstock maintains that the incontrovertible evidence is that its actual prices were always at or below that of any other online retailer.  If it could not achieve that position, Overstock did not want to carry the product.  (Trial at 848-849, 854-855, 1237.)  The only rare exceptions, it contends, were where a mistake was made such as in the Ecenbarger incident, and on those occasions the mistake was in the first instance made by the partner providing the ARP information.

54.     As for the July 2008 internal study (see ¶31, supra), Overstock dismisses that study because there is no evidence of the underlying methodology and the entire phenomenon may simply reflect the fact that prices decline over time.  Thus the defense argues that an ARP initially set based on an actual market price found by a partner and corroborated by a buyer while engaged in comparative pricing could be posted to the site and then days, weeks or months later no longer reflect what the high street price might be at that later time.  The defense contends that, at best, the July 2008 study demonstrates that many prices decline over time and they cannot be taken as evidence, for example, that ARPs  based on the use of formulas are inflated or arbitrary.

**B.      Test, Traffic, Survey & Expert Evidence**

55.     The core of the defense case consists of test and traffic evidence introduced through employee Seth Moore ("Moore") and survey evidence and expert opinions presented by retained expert Professor Joel Steckel of New York University ("Steckel").  Moore has held various positions at Overstock, and through education,

34

training and experience before and during his employment at Overstock he has gained

substantial expertise in analyzing data generated through websites and constructing

various tests, including what were referred to in the trial as "A/B tests" wherein visitors

to the Overstock website are randomly directed to different webpages for the same

product with only one variable on the two sets of pages changed. (Trial at 937.) Visitor

response to the two sets of pages can then be tracked, tabulated and compared in an

attempt to measure the significance of the variable being tested. (Trial at 938.) All

parties agree that, if the tests are properly designed and conducted, they may provide

significant insight to consumer behavior because, unlike the academic studies relied upon

by Compeau which test consumers' *stated intentions*, an A/B test may be used to

examine their *actual purchase decisions*. (Trial at 1356-1357.) Of course, as in all

experiments, "the devil is in the details," which was illustrated in the examination of the

defense witnesses as it was with Compeau.

       (i)    Moore's 2008 Tests

    56.    In the Fall of 2008 Moore participated in an effort to run an A/B test to

measure the "conversion rate" of visitors to the Overstock website – that is, the frequency

with which visitors actually entered into a purchase transaction – where the variable

being tested was the presence or absence of an ARP. One set of visitors who clicked on a

product were shunted to the then existing standard format displaying a "Compare at"

price, a "Today's Price" and a "You Save" calculation of the difference in dollars and

percentage terms; the other set of visitors were directed to a page that deleted the

"Compare at" price and "You Save" calculation. (Trial at 940; Exh. 2079, pp. 2-3.) This

35

test was run four times due to various technical difficulties encountered by the testers,[12]

which caused the first three tests to be stopped before the two week period Moore

believed was appropriate to eliminate any distortion due to the day of the week selected.[13]

The fourth test avoided most but not all of the problems inherent in the first three.[14]

(Trial at 951.)

57.    The four tests may be identified by date, duration and sample size as

follows:

- Test 1: August 18, 1 ½ days, 10,000 before stopped

- Test 2: August 20, 3 ½ days, 16,000 before stopped

- Test 3: October 21, 12 days with some interruption, 25,000 before stopped

- Test 4: October 31, 2 weeks, 30,000

The results for each test are tabulated on the last four pages of Exhibit 2902, which were

admitted.  (Trial at 943 et seq.)

58.    The results of Test 4 showed a conversion rate of 3.74% when the ARP

information was present (Group A) compared to a 3.71% conversion rate when such

---

[12] Some of the problems included "broken pages" (which refers to the failure to accurately display all the information on a page), issues with the link to the Finance database that captured some of the transaction information, "fixes" to the foregoing that significantly slowed page navigation due to the complexity of the code on the modified pages, etc.  These kinds of problems – individually and collectively – may have undermined the tests and their ability to measure the impact of the variable being tested.  (Trial at 940-942, 945-949.)

[13] Moore testified to variances based on the day of the week and weekday-vs.-weekend purchasing patterns and his practice of trying to eliminate that potential impact by running tests over a two week period.  One of the problems with the first three tests was that they had to be stopped before results could be accumulated over a sufficiently extended period to ensure that the results were not corrupted by these kinds of variances.  (Trial at 954-955.)

[14] Test 4 continued to have problems with the connection to Finance.  It is unclear what that problem was or if it was of the type that could impact the A and B groups differently.  (Trial at 1103.)

information was absent (Group B) – or a 1% "uplift" in conversion rate when ARPs were
present. (Trial at 952-953.) The earlier tests showed a more significant uplift, on the
order of 6% and even 13% in one iteration; however, Moore testified that these figures
reflected the impact of other factors such as the technical difficulties that caused broken
pages, the delay factor on the Group B pages, etc. (Trial at 956-957), that the 13% figure
had additional methodological problems and that a further analysis performed by staff
cast further doubt on these higher uplift figures. (Trial at 962-967.)

      59.    The 6% uplift data from Test 3 (and to a lesser extent the 13% figure) was
passed on to others within the company and was probably the foundation for much of the
email traffic introduced in the People's case (discussed above) wherein the importance of
ARPs was emphasized in the context of urging greater efforts to provide the validation
team with comparisons so that more ARPs could be posted. Moore testified that, while
he did not view the "absolute numbers" from the Test 3 data as accurate, Test 3 did
provide data on the *relative* impact of ARPs from one "store" or product line to the next
(e.g., Home & Garden vs. Jewelry) and that in some areas the impact was definitely
higher than others. (Trial at 1091-1092.) This obviously had some business utility and
was used by Overstock. Moore disagreed, though, with the use of Test 3 data by others
to claim his testing showed uplift effects of 6%, 8.9%, 11.5% or any other figure. (E.g.,
Exh. 475, 434.)

      60.    While Moore thus viewed the Test 4 as statistically the most valid, he
conceded on cross-examination that by the time it was run in November 2008 the
"holiday factor" had started to ramp up and could have had an impact on the data (as well
as the extreme economic downturn at the time). (Trial at 966-967, 1094-1095.) He also

agreed that all four tests showed that the use of ARPs resulted in some uplift in the conversion rate and thus sales, and for that reason the more APRs on the website the better. (Trial at 1101-1102.) As for the Test 3 data that was being cited in various internal emails, Moore testified that he had orally communicated his reservations but knew of no email communication from him at the time expressing those reservations. (Trial at 1090, 1093.)

        (ii)    <u>Moore's 2011 MSRP Test</u>

     61.    During August 2011 while the litigation was pending, Moore did a second A/B test using the same techniques as in Test 4 but only testing product pages displaying MSRP. (Trial at 984-985.) The test ran for two weeks and generated a sample size of 200,000. The conversion rate for Group A (MSRP present) was 3.23%, while for Group B it was 3.22%, for a 0.3% uplift. (Trial at 987-989; Exh. 2187 at p. .005.) Moore noted the consistency of these results with those of Test 4 and pointed out that the 2011 MSRP test could not have been affected by the "holiday factor." On cross-examination, he conceded as to both sets of tests that none of them measured the impact of accurate vs. inaccurate ARPs, the effect of ARPs on consumer perceptions of product quality or value, internal reference price, the likelihood of customers returning to the Overstock website, etc. and that all test results point to the use of ARPs causing a bump in sales. (Trial at 1101, 1106-1108.) The only issues in dispute were the appropriate way to measure, and the magnitude of, the "bump."

        (iii)    <u>Moore's Traffic Data</u>

     62.    Moore also testified to data generated internally and through a third-party under Overstock contract (Hitwise) reflecting website visitor behaviors. For example, in

Exhibits 2868 through 2873 he presented information regarding where website visitors came from and went to immediately prior to and following their visit to Overstock – referred to as upstream and downstream data, respectively. (Trial at 994-1001.) The upstream and downstream data shows major traffic to and from Google, Amazon and a host of other comparative shopping sites and other retailers – all of which led Moore to conclude that Overstock website visitors were actively engaged in substantial comparative shopping of products across websites. (Trial at 999-1003.) As the degree of such activity is a relevant factor in the analysis of the issues in this case, it is worth noting that all of this data was from the 2010-2012 timeframe rather than from 2004-2008, and Steckel, for example, opined that the ease with which consumers can comparatively shop on the web and the extent to which they engage in comparative online shopping started to change dramatically beginning in 2004. (Trial at 1573-1576.) Moreover, there is no way to determine from traffic data which are hits by consumers doing comparative shopping versus an automated program scraping data.

63.   With respect to the issue of whether site visitors look at the definitions for terms used to explain various ARP labels, Moore testified that Overstock had access to such "click through data" showing how many visitors clicked on the hyperlinks embedded in its product webpages to ARP definitions. (Trial at 1016-1018.) Exhibit 2888 was introduced to show daily website visits from June 27, 2012 through August 13, 2013, the number of "click throughs" to the definitions of "Compare" and "Was/MSRP" and the percentages. The percent of visitors who clicked through to the "Compare" definition ranged from .02% to .08% and for "Was/MSRP" from .005% to .01%. No data was presented for earlier time frames.

39

64.     Moore introduced data on a daily basis as to the number of visitors, orders
and conversion rates from September 2005 through December 2008.  (Exh. 2867.)  He
also introduced (a) data on an annual basis as to the number of orders and products (lines)
sold (Exh. 2883), (b) data as to "incidents" of contacts by customers to Overstock by
category (Exh. 2882), and (c) the number of discreet customer email addresses (Exh.
2884).  While Moore did not testify to any inferences to be drawn from such data, the
clear purpose was to show how huge the volume of products and number of customers
were compared to relatively miniscule number of contacts that might be construed as
complaints.  The People inquired as to ways in which the total incident numbers
composing the denominator may have been inflated by factors such as automated search
engines scraping its site for data.  The People also made its standard point on such
numbers: consumers who do not know they have been misled by an inflated price are in
no position to register a complaint.

            (iv)     Steckel's Opinions

65.     Steckel is the vice dean of doctoral education at the NYU School of
Business and has 25 years of academic experience with extensive work in marketing and
consumer research.  Based on his experience, his review of the literature, the Moore data
and an experiment and a survey conducted at his direction (both of which are described
below), he offered several opinions.  Underlying them all was his premise that for
Overstock purchasers to be misled, four conditions had to be met:  (1) they had to be
aware of the ARP, (2) they had to form an expectation as to what the ARP meant, (3)
they had to believe Overstock's use of the ARP conformed with their belief, and (4)
Overstock's use of ARP differed from their belief.  (Trial at 1334.)  Steckel did not

examine the fourth element but focused on the first three.  For reasons detailed in his testimony he opined that most consumers are not aware of the ARP or have no concrete expectation as to its meaning or Overstock's use of it, that to the extent they do have such an expectation it is that the ARP is a high or non-discounted price rather than a market price and thus cannot be misled, and that this is true across all ARP nomenclatures. (Trial at 1335-1340.)  He believed these conclusions were supported by Moore's 2008 and 2011 testing, an experiment and a survey he conducted, and the literature and his experience.  He also relied on the widespread use of comparative shopping tools online by consumers to look at prices across different internet sites.

<div align="center">(v)     <u>The Steckel Experiment</u></div>

66.     To test the above opinions, in July of 2013 Steckel had Overstock conduct a forensic experiment with the assistance of Moore and two consulting firms (Analysis Group and Applied Marketing Science).  The experiment was intended to determine whether online consumers notice ARPs and, if they do, what they think they mean.  The experiment had an A/B test component and a survey.  (Trial at 1031-1032; Exh. 2830.) Visitors to the Overstock site who clicked on a product that normally has MSRP as the ARP were randomly divided into two groups, one of which saw "MSRP" as the ARP label and the other saw the same page except the ARP label was "compare."  The only difference between what the two groups saw was the ARP nomenclature.  (Trial at 1361-1362.)  The conversion rate for the two groups was measured and the results showed a rate of 3.18% versus 3.19% for the MSRP vs. the "compare" pages – essentially identical results in Steckel's view.  (Trial at 1362-1363.)  Steckel noted conversion rate data for Overstock from October 2007 to the present, observed that the rates were relatively

<div align="center">41</div>

steady even though the ARP nomenclature changed during that period, and thus opined that this corroborated other evidence indicating that ARP nomenclature has no impact on consumer behavior.  (Trial at 1365-1366.)

      67.     The second part of the experiment was to ask those who purchased a product (whether or not they were part of the A/B test) to complete a short survey.  (Trial at 1374-1375.)  The survey essentially asked five questions:  (1) Was the purchase price easy to see?  (2) Did you see a reference price above or below the purchase price?  (3) Do you recall the reference price?  (4) What was the reference price (in which case the survey noted the number who came within 10%)?  (5) What label was used for the reference price?  (Trial at 1368.)  The results were presented for those who were in the A/B experiment and for all purchasers.  (Trial at 1369-1370.)  Steckel went through the various survey results and noted what he viewed as the important points – namely, the results did not change materially for different nomenclatures; only a little over a third even recalled seeing the ARP; for those viewing a page where there was no ARP a quarter nevertheless said they saw one; of those who claimed they saw the ARP, roughly half said they recalled it; of those claiming to recall the ARP, less than 10% were able to recall the ARP within 10% of the actual number; and only 6% said they recalled the nomenclature but only a third of those got it right.  (Trial at 1370, 1372, 1376-1377.)  From this he concluded that most people do not notice the reference price, do not pay enough attention to remember the label or the value and thus do not form any expectations about it.  (Trial at 1378.)  Absent such an expectation, Steckel concluded that consumers could not be misled by the ARPs.

      (vi)    Steckel's Zunega Survey

42

68.     Steckel also conducted a survey for a fictional company named "Zunega," in which he tested consumer response to two of Overstock's more popular products (a playhouse and a curtain product) using Overstock pages and four different ARP labels: list price, MSRP, compare and compare at.  (Trial at 1386, 1388-1392.)  An online panel screened to eliminate certain categories (e.g., persons employed by online retailers) was used with participants randomly assigned to view and answer questions related to the ARPs they were exposed to for one of the two products.  (Trial at 1393-1394.)  The participants were asked whether they remembered seeing the selling price ("Today's Price"), seeing the crossed out reference price, etc., and then the results were compared.  (Trial at 1394-1399.)  Roughly 40% did not remember any prices, and those who recalled seeing both the selling price and the ARP ranged in the mid-to-high 30 percentile.  (Trial at 1396-1399.)  In Steckel's view the results did not varying significantly with nomenclature and indicate that the presence or absence of an ARP may matter to roughly a third of consumers but not the ARP label that is used.  (Trial at 1400.)

69.     The survey also probed what participants thought the ARP meant by giving them possible definitions of *the source* to choose from – i.e., the manufacturer's recommendation, the nonsale retail price of the exact item at this retailer, the price of the exact item at other retailers, the price of similar products at this retailer, the price of similar products at other retailers, none of the above, no opinion.  (Trial at 1402.) Steckel reviewed the results and noted that they did not vary materially by the ARP nomenclature and that there was no consensus understanding as to what any of the labels meant.  (Trial at 1409-1413.)  Noting the substantial number who did not know or have an opinion, Steckel concluded that they could not be misled at all because "if they don't

43

know what the label means, they can't be misled." (Trial at 1412.) The fifth question in the survey was designed to test participants' views as to the significance of *the level* of the ARP by asking those who had an opinion as to source to choose one of three definitions of the level of the ARP – to wit, regular/average price, above regular/average price or no opinion. (Trial at 1416-1417.) Across all ARP nomenclatures, the percentage of participants exposed to an ARP who believed it was the regular/average price (a/k/a "prevailing market price") was, in Steckel's view, in the 3-to-5% range. (Trial at 1419-1422, 1425.)

(vii)   Cross-Examination on Surveys

70.     During the direct and cross-examination there was considerable back-and-forth on survey methodology and the potential impact of those details on the results. On the Steckel experiment, for example, there was some lag time and intervening screens between exposure to the product page and responding to the survey, and more screens between the time respondents last saw the ARP than when they last saw the purchase price, which could arguably affect respondents' ability to recall one better than the other. (Trial at 1551-1556, 1559-1560.) There was also a wide range of times respondents took to complete the survey – from less than a minute to more than 30 minutes – with the median about 5 minutes. (Trial at 1380, 1515-1516.) Steckel threw out the extremes but there was still a very wide range, which the People suggested might skew the results (Trial at 1516); Steckel disagreed because the survey results for those on each side of the medium were similar. (Trial at 1580-1581.) Steckel did concede, though, that the stimuli used were taken from 2013 Overstock ads rather than from earlier periods when a range

of details (e.g., font size, color, position, etc.) were different from those in 2013.  (Trial at 1490-1496.)

71.     The People questioned the survey's use of "other reference price" in survey questions when the actual ARP labels in the survey were "MSRP," "compare," etc. – a change in terminology the People suggested might suppress the number of respondents who recalled seeing the "referenced price" – and yet even with the use of the "referenced price" terminology, the People noted that approximately 45% of respondents said they saw the ARP.  (Trial at 1557-1559, 1562.)  The People also noted what respondents were *not* asked – e.g., whether they recalled seeing the amount "saved." (Trial 1561.)  These lines of cross-examination were used by the People to highlight the significant numbers and percentages of respondents who recalled seeing the ARP even with the survey limitations and the fact that others may have recalled, if asked, whether the Overstock price reflected some kind of savings.  To make the same point, the People questioned Steckel's use of recall to "filter" some respondents out of subsequent survey questions.  For example, if somebody said the purchase price was not easy to see, they were not asked any of the subsequent questions because Steckel believed it was unlikely they noticed the ARP or other details.  (Trial at 1382-1383.)  The People explored how this might also skew the results.  Thus, for example, depending on the survey in question, the filtering process eliminated respondents who did not see the ARP or know what the ARP label meant from subsequent questions.  Yet just because a respondent did not recall the ARP or know what the source of an ARP or its definition, the size of the discount displayed on the page may still have communicated a "deal" at either a conscious or subliminal level and thereby affected consumer behavior.  Steckel's rejoinder to such

45

points was that, while that was possible, in the Overstock context the impact of exposure to any ARP regardless of label or to any purported savings was minimal – as illustrated in part by the very minor "bump" in conversion rates measured by Moore when ARPs are shown. (Trial at 1383-1385.)

72.     Steckel was led through his July 2013 experiment and the choices presented respondents regarding what the ARP meant.  On choices two, three, four and five presented to respondents, Steckel conceded that they all might be read by participants as reflecting "real prices" – either current or former prices at either a particular retailer or a competitor.  (Trial 1499-1507.)  The percentage results were displayed in two ways – one using all survey completes as the denominator and the other just based those who responded to the particular question.  (Trial at 1516-1517.) Depending on the denominator used, the combined responses to those four choices reflected that 28-to-30% of all completes and 69-to-76% of all who responded to the question thought that the ARP was a "real price" in one of the four ways that term might be understood.  (Trial at 1506-1508, 1517-1518.)  Significantly more respondents (double or triple) thought "MSRP," "list price," "compare" and "compare at" indicated the "regular/average price" than thought these terms reflected a price that was higher than "regular/average price."  (Trial at 1519-1524.)  Steckel did not test how many respondents thought these terms referred to the highest price that could be found in the market. (Trial at 1533.)

73.     Steckel conceded that ARPs may increase a customer's sense that he or she derived some value from the "deal itself" (referred to as "transactional utility"), that ARPs may thus increase customer loyalty, entice the consumer to return to a site or have

an "anchoring" effect.  (Trial at 1471-1478.)  He did not test to determine whether

Overstock consumers thought they had received a "genuine bargain" or "true savings" or

were more likely to return to the site or not.  (Trial at 1528-1529.)  Nor did he examine

consumer response to relatively high versus relatively low ARPs.  (Trial at 1529.)

Steckel was questioned about one of his earlier articles in which he wrote that the internet

had not led consumers to search more broadly even though the internet provided the

means to readily gather more information.  (Trial at 1567-1568.)  He explained that those

observations were based on research dating back well before 2005 and explained the

dramatic changes since then based on the availability of enhanced search engines and

comparative shopping sites.  (Trial at 1573-1576.)

(viii)   Steckel Critique of Compeau

74.     Steckel criticized the methodology in some of Compeau's work and the

literature he relied upon.  For example, he criticized those surveys that forced

respondents to pick a definition rather than have "no opinion," as such a construct leads

many to guess, and he contrasted that to his filtering methodology, which identified and

dropped the no opinion respondents.  (Trial at 1427-1428.)  Steckel also noted that the

use of reference prices and the ubiquity of and improvements in comparative pricing

software have fundamentally changed consumer reaction to ARP since the period of 1974

to 1992 when most of the research Compeau relied upon was conducted.  (Trial at 1354-

1355.)  Steckel argued that "purchase intent" is extremely variable depending on context

and thus research such as Compeau's that focused on "purchase intent" was no substitute

for being able to observe actual consumer purchasing behavior as can be seen in Moore's

work in his various A/B exercises.  (Trial at 1355-1356.)

47

## IV.    <u>THE GOVERNING LAW</u>

### A.    The Legal Framework

75.    The court starts with the statutes and related case law. In this case four of the five causes of action are based directly or indirectly on section 17500 of the FAL, which provides in relevant part:

> It is unlawful for any ... corporation ... with intent directly or indirectly to dispose of ... personal property ... or to induce the public to enter into any obligation relating thereto, to make or disseminate ... before the public in this state, ... in any ... publication, or any advertising device ... or in any other manner or means whatever, including over the Internet, any statement, concerning that ... property or ... concerning any circumstance or matter of fact connected with the proposed disposition thereof, which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading ...

Section 17536(a) of the FAL provides that anyone who violates section 17500 shall be liable for a "civil penalty not to exceed two thousand five hundred ($2,500) for each violation." The other cause of action is based on section 1770(a)(13) of the CLRA, which provides in relevant part:

> The following unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale ... of goods ... to any consumer are unlawful:
> ...
> (13) Making false or misleading statements of fact concerning reasons for, existence of, or amounts of price reductions.

The above substantive provisions are also the basis for asserting violations of the "unlawful prong" of section 17200 of the UCL, and, in addition, the People allege that all of the underlying conduct gives rise to a claim under the "unfair prong" of the UCL.

76.    Significantly in both the FAL and the CLRA the key language regarding the kind of advertising statements that are actionable is framed in the disjunctive: "untrue

or misleading" in the FAL context and "false or misleading" in the CLRA.  Given the

derivative nature of the "unlawful prong" of the UCL and the breadth of the "fraudulent"

and "unfair prongs," the same may be said of that statute.  The three statutes are thus, at

least in this respect, co-extensive.  (See, e.g., *Committee on Children's Television v.*

*General Foods Corp.* (1983) 35 Cal.3d 197, 212 [comparing, inter alia, FAL and UCL];

*Nagel v. Twin Laboratories, Inc.* (2003) 109 Cal.App.4[th] 39, 51-54 [comparing UCL and

CLRA].)  In short, on the face of each of the three statutes, an action may be based on

statements that are simply false or on statements that, although literally true, are

"misleading."  (*Committee on Children's Television,* supra; *Nagel,* supra.)

　　　77.　　With respect to the "misleading prong," all parties agree that what is

misleading must be considered in light of the "reasonable consumer" rather than in terms

of what might be misleading to the least sophisticated or most gullible consumer.  (*Lavie*

*v. Proctor & Gamble Co.* (2003) 105 Cal.App.4[th] 496, 506-507); see also *Quin*

*Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4[th] 26, 55.)  This "reasonable

consumer" standard applies under all three statutes.  (*Committee on Children's*

*Television*, supra, 35 Cal.3d at 212 [FAL and UCL]; *Chern v. Bank of America* (1976) 15

Cal.3d 866, 876 [UCL]; *Colgan v. Leatherman Tool Group, Inc.* (2006) 135 Cal.App.4[th]

663, 680 [CLRA].)

　　　78.　　Based on the foregoing (and subject to the discussion of the "harm issue"

below), on an FAL claim the People must prove that Overstock's use of ARPs on its

website (a) was intended to induce consumers to purchase advertised items, (b) contained

statements that were either untrue or misleading, and (c) were either known to be untrue

or misleading or by the exercise of reasonable care should have been known to be untrue

or misleading.  With respect to the CLRA cause of action, the People must prove that

Overstock's use of ARPs on its website (a) contained statements of fact concerning the

reasons for, existence of, or amounts of its price reductions and (b) such statements were

either untrue or misleading.  On the UCL claim, the People must simply prove either a

violation of the FAL or CLRA or that the advertising is otherwise actionable under the

"unfair prong" of the UCL.

### B. The Disputed Legal Issues

#### (i) Whether "Harm" Is Necessary Element

79.    The defense argues that, despite the repeated use of the disjunctive in the

relevant statutes, falsity alone cannot support a claim under any of these statutes and that

there must be some harm, such as the likelihood of consumers being misled.  The

argument is based on California cases that often state "it is only necessary to show that

'members of the public are likely to be deceived'" (see, e.g., *Committee on Children's*

*Television,* supra, 35 Cal.3d at 211) and the recent Supreme Court case of *United States*

*v. Alvarez* (2012) ___ U.S. ___, 132 S.Ct. 2537, which the defense maintains requires an

element of harm rather than mere falsity.  The court rejects that first of these arguments

because such statements are found in the context where the cases are explaining why

actual falsity is not a necessary element of a false advertising claim.  In that context it is

"only necessary" to show consumers are likely to be deceived, but that does not mean

that where actual falsity is shown one must also prove likelihood of deception or actual

harm.  Such a construction would read half of the disjunctive language out of the

statutory schemes.

80.     Turning to the *Alvarez* argument, the defense argues that this case changes

the constitutional landscape in which these kinds of claims must be viewed.  In *Alvarez*

the Court addressed a facial, constitutional challenge to a statute that criminalized making

a false claim that one had been awarded the Congressional Medal of Honor.  The

plurality opinion noted that the statute on its face applied to any such false statement in

any context and was thus unprecedented in its sweep, and in this respect it distinguished

the statute from government regulation of "false claims … made to effect a fraud or

secure moneys or other valuable consideration."  (132 S.Ct. at 2547.)  The plurality went

on to apply a strict scrutiny test under which the government is required to show that the

statute is "the least restrictive means available" to achieve the legislative purpose.  (*Id.* at

2549-2551.)  The concurring opinion reached the same result but, instead of taking a

categorical approach, applied an "intermediate scrutiny" or "'proportionality' review."

(*Id.* at 2551-2552.)  Like the plurality, the concurrence reviewed a number of common

law and statutory contexts in which the making of a false statement is unlawful – e.g.,

common law defamation, fraud, perjury and trademark infringement statutes.  (*Id.* at

2553-2555.)  The concurrence was clear, however, that the circumstances listed were not

an exhaustive list and stated the principle somewhat more broadly than the defense here

would argue:

> While this list *is not exhaustive*, it is sufficient to show that few statutes, if any,
> simply prohibit without limitation the telling of a lie, even a lie about a particular
> matter.  Instead, in virtually all these instances limitations of context, requirements
> of proof of injury, *and the like*, narrow the statute to a subset of lies *where specific
> harm is more likely to occur*.
>
> (*Id.* at 2555 [emphasis added].)

Significantly, the above passage does *not* say proof of injury is required. Rather there

must be "limitations of context" *or* "requirements of proof of injury" *or* other measures

that narrow the scope of the prohibition to specific circumstances "where specific harm is

more likely to occur." The last of these phrases does not suggest that *evidence* of actual

harm or *evidence* of likelihood of harm is constitutionally required as part of a party's

case-in-chief. Instead, it indicates that the legislative branch of government may adopt

prohibitions directed at categories of false speech that are likely to cause harm, and, when

the legislature does so, the judicial branch may review the legislation to balance the harm

the statute seeks to reduce against the attendant burden imposed in order to assess

whether the measure "works disproportionate constitutional harm." (*Id.* at 2555-2556.)

81.     In assessing whether a statute "works disproportionate constitutional

harm," one of the relevant factors is whether the statute addresses commercial speech.

While commercial speech is entitled to constitutional protection, the First Amendment

"does not prohibit the State from insuring that the stream of commercial information flow

cleanly as well as freely." (*Virginia Bd. Of Pharmacy v. Virginia Citizens Consumer

Council, Inc*. (1976) 425 U.S. 748, 771.) In *Central Hudson Gas & Elec. Corp. v. Public

Serv. Comm'n of N.Y.* (1980) 447 U.S. 557, the Court expanded on how in light of the

State's legitimate interest one should analyze the regulation of commercial speech: "The

First Amendment's concern for commercial speech is based on the informational function

of advertising .... Consequently, there can be no constitutional objection to the

suppression of commercial messages that do not accurately inform the public about

lawful activity. The government may ban forms of communication more likely to

deceive the public than to inform it." (*Id.* at 563.) The *Central Hudson* Court went on to

explain that "[i]f the communication is neither misleading nor related to unlawful

activity, the government's power is more circumscribed," in which case a stricter

examination is triggered. (*Id.* at 564.) It is this latter, stricter standard that one sees

applied in slightly different ways by the plurality and concurring opinions in *Alvarez.*

      82.    The court concludes from the above that neither the plurality nor

concurring justices in *Alvarez* intended to change the long-standing principles governing

the State's power to regulate commercial speech.  Such speech is entitled to First

Amendment protection, but given the "informational function" of commercial speech, the

State may prohibit advertising that is either false or misleading.  A statute reflecting that

exercise of the State's power is constitutional, and *Alvarez* cannot be read as requiring

that the State must prove actual harm every time it attempts to enforce a statute

prohibiting false or misleading advertising.  To try to import that element into existing

false advertising statutes would conflate the rational for allowing a State to adopt such

laws with the elements the State must prove at trial.  Put another way, the First

Amendment protects "the informational function of advertising" and thus the State bears

a heavy burden if it seeks to regulate truthful advertising that is not in some way

misleading.  But where the State bans only advertising that is "untrue or misleading," no

evidence of actual harm is required in any given case.  (See *People v. Dolezal* (2013)

167, 173 & fn. 3 (a post-*Alvarez* case applying the traditional *Central Hudson* analysis to

commercial speech.)

      83.    The foregoing is consistent with long-standing California law.  As stated

by our Supreme Court in *Kasky v. Nike, Inc.* (2002) 27 Cal.4th 939, 951, the UCL and

FAL "prohibit 'not only advertising which is false, but also advertising which [,]

although true, is either actually misleading or which has a capacity, likelihood or tendency to deceive or confuse the public.' (*Leoni v. State Bar* (1985) 39 Cal.3d 609, 626.)." The *Kasky* court then reviewed *Central Hudson* and noted its rule that, for commercial speech to be protected under the First Amendment, "*it at least must concern lawful activity and not be misleading*" (*id.* at 952 [italics original]) and where it fails this threshold criteria there is no requirement that one go further and apply the additional tests established by *Central Hudson* and most recently applied in *Alvarez*. The *Kasky* court then cited *In re R.M.J.* (1982) 455 U.S. 191, 203, for the proposition that "commercial speech that is false or misleading is not entitled to First Amendment protection and 'may be prohibited entirely,'" and *Bolger v. Youngs Drug Products Corp.* (1983) 463 U.S. 60, 69, for the observation that "[t]he State may deal effectively with false, deceptive, or misleading sales techniques." To "deal effectively" with such false advertising, California has banned advertising that is either false or misleading without proof that the ad in question actually misled anyone. This means that "[t]he primary evidence in a false advertising case is the advertising itself." (*Brockey v. Moore* (2003) 107 Cal.App.4[th] 663, 679.) No consumer survey or other extrinsic evidence of actual consumer confusion or other harm is required. (*Id.* at 99; *Colgan,* supra, 135 Cal.App.4[th] at 672; *Consumer Advocates v. Echostar Corp.* (2003) 113 Cal.App.4[th] 1351, 1362.)

84.     For the above reasons, this court concludes that, if the People introduce evidence that an advertisement contains statements that are not true, then it has carried its burden and need not provide additional evidence that consumers were in fact harmed by the false statements in the ads. In other words, consumer "harm" from advertisements shown to be false *or* deceptive *or* misleading is a valid legislative presumption and that

54

presumption is sufficient to protect a statute banning such advertisement from any First

Amendment challenge. The court therefore rejects Overstock's attempt to inject "harm"

as an element the People must prove.

<div style="text-align: center;">(ii)   The "Misleading" Standard</div>

85.    With respect to the "misleading prong" of these statutes, the People rely

on cases that define this element in terms of "the capacity, likelihood or tendency to

deceive or confuse the public" (see, e.g., *Kasky,* supra, 27 Cal.4[th] at 951; *Leoni,* supra, 39

Cal.3d at 626), while the defense relies on cases that refer to this element more narrowly

as requiring that the challenged advertising must be "likely to deceive" the consumer.

(See, e.g., *Chern,* supra, 15 Cal.3d at 876; *Barquis v. Merchants Collection Assn.* (1972)

7 Cal.3d 94, 111.) The defense further argues that this latter formulation "implies more

than a mere possibility that the advertisement might conceivably be misunderstood by

some few consumers viewing it in an unreasonable manner. Rather, the phrase indicates

that the ad is such that it is probable that a significant portion of the general consuming

public or of targeted consumers, acting reasonably in the circumstances, could be

misled." (*Lavie,* supra, 105 Cal.App.4[th] at 508.) Further, the defense would argue that

this requires that, where the "misleading prong" of these statutes is used, the People must

introduce affirmative evidence – i.e., a survey – that shows a significant portion of the

general consuming public would be misled.

86.    The court disagrees. As discussed in the context of Overstock's

constitutional challenge, proof of actual harm is not required. A state may ban

commercial advertisements that are false, deceptive or misleading without violating the

First Amendment and, in doing so, may presume harm from the fact that an ad is false,

<div style="text-align: center;">55</div>

deceptive or misleading. This means that "[t]he primary evidence in a false advertising case is the advertising itself" (*Brockey,* supra, 107 Cal.App.4[th] at 679), and no consumer survey or other extrinsic evidence of actual consumer confusion or other harm is required. (*Id.* at 99; *Colgan,* supra, 135 Cal.App.4[th] at 672.) Rather the trier of fact may look at the ad and determine whether on its face it is misleading or has the capacity to mislead a reasonable consumer. A survey may inform that evaluation, but it is not required.

87.     Thus, for example, in *Colgan* the issue was whether advertising "Made in USA" violated the UCL, FAL and CLRA because a significant number of a product's components were substantially made abroad. The appellate court affirmed the trial court's granting of plaintiffs' motion for summary judgment where it had examined the advertising itself and considered what a reasonable consumer would infer from "Made in USA." From its examination of the ad alone, the trial court had concluded as a matter of law that the "Made in USA" representation was deceptive because a reasonable consumer would not expect a significant portion of the component parts of the item to be manufactured abroad. (*Id.* at 682-683.) No consumer survey or other extrinsic evidence was presented by plaintiffs. The *Colgan* case and authorities on which it relied clearly illustrate that these statutes empower the trier of fact to look at the words in an advertisement and decide what a reasonable consumer would take from those words. There need not be proof that actual consumers were in fact misled in the way alleged by plaintiffs; rather the trier of fact may decide if the ad has the *capacity* to deceive.

88.     The defense objects to this construction of the statute and insists that the court must determine (a) "[w]hether it is probable that a significant portion of the general

consuming public ..., acting reasonably under the circumstances, would even ***notice*** the ARP label and price to the extent that they could be misled," *and* (b) "[w]hat ... a significant portion of the general consuming public ..., acting reasonably under the circumstances, would be likely to ***expect*** Overstock's ARPs ... to mean in the abstract," *and* (c) "[w]hat ... a significant portion of the general consuming public ..., acting reasonably under the circumstances, would be likely to ***believe*** about Overstock's ARPs when presented with an actual ARP on an actual product page." (1/272014 Overstock Objections to Proposed Decision at 5 [emphasis original].) The court rejects these contentions because they would, in effect, graft three additional elements onto a statutory FAL claim and, further, would clearly introduce the requirement that the People present survey evidence of actual consumer response to actual Overstock ads – a ruling that would be tantamount to insulating all online retailers from any and all challenges to their advertising because enforcement authorities have no way of conducting such research. More fundamentally, Overstock does not get to pick an expert and have his views on these matters adopted *as the legal standard.* His opinions are clearly relevant and have been carefully and fully considered, but they are not the legal standard.

89.     In the court's view, it may look at some ads and determine on the face of the ad whether it has the capacity to mislead "a significant portion of the general consuming public acting reasonably under the circumstances." The court's conclusion may be corroborated by extrinsic evidence, but that is not always or even usually necessary. With other ads, the court agrees that such a determination may not be possible based solely on an examination of the ad. In these latter instances, the court may need to draw upon extrinsic evidence, which may include some combination of expert opinion,

consumer surveys, the testimony of actual consumers or consumer complaints in the

defendant's records. This case presents examples of these different circumstances;

however, whatever the circumstance, the court is not required to parse the inquiry into the

elements Steckel chose to examine.

(iii) The "Unfair Prong" of the UCL

90. As for the "unfair prong" of the UCL, which is pled in the Fifth Cause of

Action, there is a split of authority as to the proper standard to apply to consumer cases

arising under the "unfair prong" of the UCL. (*Drum v. San Fernando Valley Bar Assoc.*

(2010) 182 Cal.App.4th 247, 256-257.) One line of cases pre-dates *Cel-Tech*

*Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, and

continues to employ a traditionally broad standard that looks to whether the alleged

business practice "is immoral, unethical, oppressive, unscrupulous or substantially

injurious to consumers and requires the court to weigh the utility of the defendant's

conduct against the gravity of the harm to the alleged victim." (E.g., *Bardin,* supra, 136

Cal.App.4th at 1260; *Davis,* supra, 179 Cal.App.4th at 594-595; *Ticcono v. Blue Shield of*

*California Life & Health Ins. Co.* (2008) 160 Cal.App.4th 528, 539.) A second line of

cases reads *Cel-Tech* as substantially narrowing the "unfair prong" even in consumer

cases so as to require one to look to the definition of "unfair" in section 5 of the Federal

Trade Commission Act (15 U.S.C. § 45, subd. (n))("FTC Section 5"). This approach

requires that "(1) the consumer injury must be substantial; (2) the injury must not be

outweighed by any countervailing benefits to consumers or competition; and (3) it must

be an injury that consumers themselves could not reasonably have avoided." (*Davis,*

supra, 179 Cal.App.4[th] at 597-598; *Camacho v. Automobile Club of Southern Calif.* (2006) 142 Cal.App.4[th] 1394, 1403.)

91.     The third – and in this court's view the most persuasive – line of cases is somewhere in between and is exemplified by the First District decision in *Gregory v. Albertson's, Inc.* (2002) 104 Cal.App.4[th] 845, 854. There *Cel-Tech* was read as rejecting the traditional balancing test previously applied by appellate courts and signaling "a narrower interpretation of the prohibition of unfair acts or practices in *all* unfair competition actions" because "the broad language in earlier decisions [was found in *Cel-Tech*] to be 'too amorphous.'" *(Id.* at 394-395.) The *Gregory* court thus concluded that "where a claim of an unfair act or practice is predicated on public policy, we read *Cel-Tech* to require that the public policy which is a predicate to the action must be 'tethered' to specific constitutional, statutory or regulatory provisions." (*Ibid.*) Under this third line of authority, FTC Section 5 might provide such "tether" but that is not the exclusive source for such analyses.

92.     It appears that this third approach is gaining traction. (See, e.g., *Aleksick v. 7-Eleven, Inc.* (2012) 205 Cal.App.4[th] 1176, 1192-1193; *Durell v. Sharp Healthcare* (2010) 183 Cal.App.4[th] 1350, 1366; *Textron Financial Corp. v. National Union Fire Ins. Co.* (2004) 118 Cal.App.4[th] 1061, 1072; *Byars v. SCME Mortgage Bankers, Inc.* (2003) 109 Cal.App.4[th] 1134, 1147; *Schnall v. Hertz Corp.* (2000) 78 Cal.App.4[th] 1144, 1166.) By adopting this approach, if the UCL claims here are to reach anything *beyond* that encompassed by the first four causes of action, this court would expect the People to show some specific constitutional, statutory or regulatory provision *apart from* the FAL or CLRA that would guide the court's determination of "unfairness."

(iv)    The Statute of Limitations Defenses

93.    It is agreed that the parties entered into a tolling agreement effective
March 24, 2010, but the parties dispute what statute of limitations applies to each cause
of action and when that statute began to run.  The People allege that the relevant
limitation periods are three years for the FAL claims in the First, Third and Fourth
Causes of Action (C.C.P. §338(h)) and four years for the UCL claims in the Second and
Fifth Causes of Action (Bus. & Prof. Code  §17208) and that these periods began to run
no earlier than the receipt of the Ecenbarger complaint in July 2007.  The defense argues
that the statutes began to run at least as early as the publication of the Business Week
article in 2004 and that, with respect to any and all claims for civil penalties, the one year
statute in Code of Civil Procedure section 340(b) applies.

94.    In addressing whether the three and four year limitations specified in the
FAL and UCL apply or – at least as to the penalty portion of the causes of action –
whether the one year limitation in section 340(b) applies, the court must resolve the
possible inconsistency between subsections 340(a) and (b).  The former provides for a
one year limit in an action "upon a statute for penalty or forfeiture, if the action is given
to an individual, or an individual and the state, except if the statute imposing it prescribes
a different limitation," while the latter states *without any express exception* that the one
year limitation applies to an action "upon a forfeiture or penalty to the people of this
state."  At first glance, subsection (b) appears to swallow up the exception in subsection
(a); however, on closer examination the two can be harmonized by construing section
340(b) to apply where the cause of action is given *only* to the people. Causes of action
that are given to *both* an individual and the state come within section 340(a), which in

60

turn allows one to consider whether the underlying statute itself provides a different limitations period.

95.     Here the UCL cause of action is given both to an individual and the state, and thus per the express language of section 340(a) the four year period in section 17208 clearly governs rather than the one year in section 340(b).  Similarly, section 17535 of the FAL expressly allows for a private right of action, and there are numerous examples of private parties bringing actions under both statutes.  (E.g., *Committee on Children's Television,* supra; *Nagel,* supra.)  Accordingly, section 340(a) also applies to the FAL claims, and the three year statute in section 338(h) governs.  As to both the UCL and the FAL, this also comports with the general principle that "[w]here more than one statute might apply to a particular claim, a specific limitations provision prevails over a more general provision."  (*E-Fab, Inc. v. Accountants, Inc. Svcs.* (2007) 153 Cal.App.4th 1308, 1316.)  The defense cites *Gabelli v. S.E.C.* (2013) ___ U.S. ___, 133 S.Ct. 1216, 1218, to argue that the stricter one-year limitations period in section 340(b) should apply at least with respect to the civil penalties provisions in the statutes.  The use of *Gabelli* to advance a policy argument cannot overcome the express provisions of the governing statutes and controlling California authorities.[15]

96.     As for when these causes of action accrued, the court rejects Overstock's arguments for an accrual date earlier than the Ecenbarger incident.  The Business Week article did not trigger the statute for several reasons.  First, a report of inflated ARPs

---

[15] To the extent the defense argues for a construction that would at least bring the FAL claims within the one year statute, in the larger picture such a result would not matter because, even if the one year statute applied to an action to recover FAL civil penalties, all of the underlying conduct is covered by the UCL in one cause of action or another.  Thus the four year statute governing the UCL claims is applicable to all the challenged conduct, and it does not matter if one might argue that the FAL standing alone could only reach back one year.

does not put the reader on notice of the underlying practices challenged in this case – e.g., the use of formulas and similar products to set ARPs, the selection of the highest price as the ARP even when that price does not reflect "street price," etc. A reader of the article could as easily infer that Overstock's processes were error prone rather than a reflection of a systematic violation of the FAL. Overstock argues, however, that its contemporaneous press release provided the details of its list price definition so as to put the People on notice and trigger the running of the statute. The court rejects the notion that law enforcement authorities may be "on notice" for statute of limitations purposes of every issue reported anywhere in the press or any disclosure in a corporate press release. Such a rule would place an intolerable burden on enforcement authorities and potentially give a "pass" to any person or business that ever attracted even minimal press coverage or issued a press release on a topic.

97. Alternatively, the defense argues that Overstock's use of "list price" and other ARP nomenclatures – as well as the use of such terms by its competitors – has been open and notorious for years prior to the commencement of this action and sufficient to put the People on notice of Overstock's practices so as to trigger the running of any statute of limitations. The problem with this argument is that it is one thing to say that the use of the "list price" label and other ARP terms was open and notorious, but it is quite another to say that it was common knowledge that Overstock used formulas to set list price, set ARPs based on similar products or used the highest prices it could find for its ARPs. These particulars are what this case is about – not the generic use of ARPs[16] –

---

[16] This point also addresses the argument Overstock makes in other contexts that all of its online competitors use ARPs and there is something "unfair" about being singled out for an FAL enforcement action. While "everyone does it" has never been a defense to a FAL action, the more important point is that there is no evidence that it is "industry practice" to use formulas or similar products to set ARPs

and the court therefore rejects the argument that a press release or a hyperlink on a website puts enforcement authorities on notice of such details for statute of limitations purposes.

98.     Furthermore with respect to both lines of argument, it is important to note that daily advertising is a recurring event.  Every time an unlawful advertisement is posted, the statute is violated.  Thus, for example, the Business Week article might arguably have commenced the running of a statute for ads published as of that date, but it is nonsensical to suggest that such notice would bar an action based on any future publication of the same ad.  Any other interpretation might give a merchant who was the subject of such publicity a defense to a subsequent enforcement action while all its competitors engaged in the same practice would be exposed to prosecution.  That possible scenario illustrates the fallacy of the defense position and the reason why this is a classic example of the continual accrual doctrine.  (See *Aryeh v. Canon Business Solutions, Inc.* (2013) 55 Cal.4[th] 1185, 1198.)

99.     In sum, the court finds that the Ecenbarger incident that led to a complaint being sent to the Shasta County District Attorney's Office was the earliest event that could start the running of any statute of limitations and that, in any event, Overstock's challenged advertising practices amount to a continuing violation.

---

without any effective disclosure of the practice.  There is also scant evidence that Overstock's use of the highest price it can find as an ARP is the common practice among its competitors.  And, again, even if that were true, the People may choose to start its enforcement efforts with Overstock and then move on to others in the industry – e.g., those identified by Steckel as having higher ARPs than Overstock.

# V.   ANALYSIS OF THE LIABILITY ISSUES

## A.   The Pricing Claim

100.   The court starts with the Pricing Claim and the proposition that the underlying statute requires proof that the statement in question be either untrue or misleading.  The People allege in the Complaint that several aspects of Overstock's advertising and use of ARPs satisfy one or both prongs.  Each of the alleged practices needs to be analyzed under each prong and with reference to the nomenclature used and the related policies during the relevant time period.

### (i)   The "False Prong"

101.   Turning first to the practices during the Compare At and Compare Eras, the court notes that each of the nomenclatures used during these times is based on a verb – "compare" – and invites the consumer *to do something*, namely, look at another product and price.  Nothing is explicitly stated regarding the referenced product or price, and thus on its face the use of those terms is incapable of being "untrue."  If the People are to maintain a claim based on this nomenclature, the claim must be based on the "misleading prong" of the underlying statutes.

102.   The analysis is different, however, when one considers the term "list price."  Obviously the phrase does not contain a verb; the use of the term with an associated number is a factual representation and, as such, is capable of being true or false.  To the extent that the ARP is not an actual "list price" but either an estimate of one based on a formula or a reference to a price of a different item – that is, a non-identical product – it is a false representation because it is not the actual list price for the product

64

being sold.  Every time Overstock displayed a list price based on a formula or a similar

product rather than the list price established by the manufacturer of that identical product

it made an untrue statement.  Such a statement was "untrue" because there was *no* list

price.[17]  Because that statement was untrue, all derivative representations – e.g., the

amount of the so-called list price, the "You Save" amount and/or the "You Save"

percentage – were also untrue.

103.    In this court's view all such untrue statements are actionable under the

FAL.  As previously discussed, the defense objects to this conclusion on the ground that

there must also be a showing of harm and that the statute is the least restrictive means of

guarding against that harm.  If by this argument the defense means to impose a new or

implied element to that plain language of the statute to preserve its constitutionality after

*Alvarez*, the court disagrees.  For reasons previously discussed (see Part IV B (i), supra),

the statute reflects a legislative judgment that untrue statements in advertising are

inherently harmful and enforcement authorities (as opposed to private plaintiffs seeking

damages) do not need to introduce proof that consumers were harmed.  This is especially

the case where the untrue statement is about price, the ARP or the amount of the

"savings" – all of which may be viewed as "material" by definition in any commercial

transaction.  Rather than reflecting an expansion of government regulation of speech,

state and federal statutes have long prohibited "untrue" statements in advertising, and for

the reasons previously discussed, this court does not view *Alvarez* as undermining those

---

[17] The definition of "list price" one could find by clicking on the hyperlink found by scrolling over the term on the webpage does not change this analysis.  When asked during closing argument, even Overstock conceded that the hyperlink to a definition could not serve as an adequate "disclaimer" so as to protect the use of the term.  The issue of disclaimers is thus not addressed herein.  (But see authorities cited in 9/4/13 People's Bench Brief re Irrelevancy of [Various Defenses] at 3-4.)

statutes or the substantial body of authority upholding their application in contexts similar to the case at bar.

104.    Furthermore, if a showing of "harm" were required, the court finds there is sufficient evidence in this record that the use of the "list price" nomenclature misled consumers and certainly had the capacity to mislead them.  Such evidence is found in the Steckel survey results where a substantial percentage of respondents viewed the term "list price" as reflecting a "regular/average price" rather than a higher price.  (See ¶72, supra.[18])  While this survey evidence does not directly address the use of formulas to determine "list price," the use of such formulas was a subset of the Overstock's policies during the List Price Era that were collectively designed to lead to the highest possible ARP.[19]  The result of that approach was to mislead consumers who viewed that term as reflecting a "regular/average price," and thus one may infer that the use of formulas to set high ARPs had the capacity to mislead and did mislead consumers.  This conclusion is supported, inter alia, by Compeau's opinions (see ¶43, supra), the contemporaneous internal email traffic detailed in the People's case (see ¶¶18, 27, 32-33,[20] supra), the

---

[18] This evidence is also significant to the extent Overstock argues that the ARP practices of other retailers "shape[] consumer expectations such that the advertising [at issue here] is not misleading." (1/27/14 Overstock Objections to Proposed Decision at 6.)  Evidently, the alleged practices of other retailers have not so influenced consumer perceptions that they now generally expect ARPs to be inflated.

[19] Overstock counters that there were some limits, e.g., if 20 websites had a price of $800 and one site sold the product for $2500, the $2500 would not necessarily be chosen. (1/27/14 Overstock Objections to Proposed Decision at 20.)  Such isolated and extreme examples do not begin to offset the overwhelming evidence that the goal was to set a high ARP that was well above what Overstock recognized as the street price.

[20] Overstock argues that *all* statements in internal email traffic and other documents regarding the percentage impact of the use (or the elimination) of ARPs on sales either come from one of Moore's tests (and were misunderstood or misused) or are otherwise totally lacking in any foundation.  The court agrees that much of the email traffic and other statements may be explained in this fashion (especially those at or about the time of Test 3) but does *not* agree that all such statements may be dismissed on that basis.  The importance of ARPs was a widespread and firmly held belief within the company, and Overstock's sales

consumer testimony and comments (see ¶¶23, 25, 35, 38, supra) and admissions such as that by King that the use of formulas to set ARPs led to "arbitrary" reference prices (see ¶36, supra).

105.    As for Steckel's opinion that Overstock's use of ARPs had no impact (and thus could cause no actual harm because of the miniscule impact on conversion rates), the court rejects the notion that a company-wide 1% increase in conversion rate[21] is insufficient proof of harm to support a cause of action.  First, this figure is most likely substantially diluted because the majority of Overstock products – up to 90% according to its CEO – are in the commodity BMMG category, while the practices at issue are primarily in other categories (e.g., jewelry, furniture, etc.) where Overstock serves as an outlet for its partners.  Formulas and the use of similar products did not arise in the BMMG category because all such products have discrete SKUs that lead to ready comparisons – even without an ARP – to real prices for the identical items on sites like Amazon.  The practices at issue here (the use of formulas, similar products and the highest market price as a reference) were more characteristic of partner products and yet the 1% conversion rate was not isolated to those products.  Further, Moore conceded that, while the results of his "third test" were not accurate metrics of the various conversion rates in absolute terms, those results did reflect the *relative* impact of ARPs in different

---

and marketing personnel had opportunities to observe the impact within their own departments.  The subsequent denials in deposition do not credibly eliminate this entire category of evidence.

[21] Overstock correctly points out that the "1% increase" formulation can be confusing.  An *absolute* increase in conversion rate of 1% from, say, 3% to 4%, would be huge – a "home run."  (Trial at 916.)  A 1% increase in the conversion rate, say, from 3% to 3.03%, is important but clearly not as dramatic.  At times the two concepts have been conflated by witnesses, the court and even the People.  In this Decision, whenever the 1% is referred to by the court, it is meant in the latter sense.  When a percentage increase in the conversion rate is referenced in the record, e.g., in trial exhibits or testimony, it is sometimes unclear which is meant.

product lines – again, corroborating the conclusion that in some product categories the impact was larger than 1%.[22]

106.    In addition, to focus on the change in conversion rate during a two week experiment misses the larger picture: Overstock recognized that "the best predictor of whether a customer returns to our site is whether they feel they have 'received a good deal.'" (Exh. 403.) Compeau referred to this as "transaction value" and Steckel referred to it as "transactional utility." Compeau testified that the consumer's perception of both acquisition and transaction value increases as ARP increases relative to the purchase price. (Trial at 282-283.) Thus one of the advantages Overstock gained from inflated ARPs was to increase consumer perception of transaction value and thereby increase the likelihood that they will return to Overstock. Even if the A/B tests conducted by Moore accurately captured the relatively small size of the "bump" engendered by the use of ARPs compared to products where the ARP was removed, those tests do not reflect the benefit Overstock had received from the prior use of inflated ARPs over an extended period of time or the benefits from that history going forward; nor do the Moore tests measure what Compeau's research and review of the literature identify as the resulting reduction in search intentions. (Trial at 265-268.) While Steckel may be correct that the frequency of comparative shopping online has increased over time, such an observation does not negate the likelihood that consumers' comparative shopping patterns may have

---

[22] As for Moore's A/B test on the MSRP nomenclature in 2011, the court is skeptical of the results because MSRP appears to have been a label used more often in the BMMG category rather than with furniture, jewelry and certain other products where it appears from this record that the challenged ARP practices were more problematic. While the record could be clearer on the latter point, Moore's observation based on the Test 3 data that the impact on conversion rate varied by category makes it difficult to see his test of MSRP products as probative without some analysis of the product categories covered and the variation (if any) among those categories.

been reduced by Overstock's inflated ARPs.[23]  In short, the supposed 1% impact on

conversion rate does not fully capture the influence of ARPs or the harm that may be

caused by inflated ARPs.[24]

107.    Perhaps most importantly, though, the increase in the conversion rate was

considered very important by Overstock and the raison d'être for using ARPs.  A "bump"

from such advertising techniques that is considered so significant to a retailer cannot be

easily dismissed as legally insufficient for purposes of a State's false advertising statute,

especially when it reflects a very substantial volume of sales to thousands of California

customers.  At the end of the day, the clear weight of the evidence – from the internal

email traffic, the Communispace evidence of consumer reaction to the temporary removal

of ARPs, Compeau's recital of the literature on ARPs and the myriad ways they influence

consumers, Moore's conversion rate data showing a company-wide "bump" from the use

---

[23] Moore and Steckel also placed reliance on data showing that visitors to the Overstock site frequently come from or leave to other internet shopping sites and would argue from this that consumers these days place less reliance on ARPs, preferring to do their own price comparisons with readily available and recently enhanced tools.  The court discounts that data because there is no way to distinguish in the data which visitors are real shoppers versus automated programs "scraping" prices and other data from the Overstock and other sites.  Moreover, even with a "consumer visitor," there is no way to determine whether the pattern reflects comparative shopping for the same product or moving down the "shopping list" to search for new items.  Further, even if the consumer visitor is doing comparative shopping for the same item, one cannot determine from the Moore data whether the presence or absence of ARPs *reduces* the extent of the consumer's comparative shopping exercise.  Finally, while many consumers may be actively engaged in comparison shopping, the Moore data certainly does not show that all consumers do so.  Thus if only *some* reasonable consumers believe Overstock's ARPs and rely on them, there is actual harm.

[24] Overstock objects to this entire paragraph on the grounds that there is no evidence to support any of the statements.  (1/27/2014 Overstock Objections to Proposed Decision at 32.)  This follows a pattern of Overstock objecting to any finding not based on a direct quotation from an Overstock officer or an empirical study of customers responding to Overstock ads.  The trier of fact may, however, rely on much more.  As recounted elsewhere, Compeau presented evidence of customer responses to ARPs; Moore and Steckel presented evidence that corroborated some of Compeau's opinions; various Overstock employees with relevant experience testified to their perceptions of the utility of ARPs; and there was customer testimony and customer comments in Overstock records.  A trier of fact may look at these various strands of evidence and draw inferences from them that may not precisely match a witness sound bite.  Overstock may not like the inferences drawn through this process, but it can hardly be said that the resulting conclusions are not supported by any evidence.  This case has plenty of evidence on these issues; the dispute is over the inferences that should be drawn.  On the latter point, the court certainly respects the fact that others may legitimately draw inferences different from those drawn herein.

of ARPs with higher impacts in some categories, Steckel's July 2013 experiment and
survey indicating consumer expectations regarding ARPs reflecting "regular/average
prices," and Overstock's clear commitment to the use of ARPs to drive sales – indicates
that ARPs matter and thus any confusing or misleading features of Overstock's use of
ARPs has the capacity to mislead consumers and in fact did so.  Harm has thus been
shown.

> (ii)    The "Misleading Prong"

108.    To prove the misleading element in the use of the verb "compare" (and
"compare at"), the People rely on the proposition that consumers perceive that when
retailers use that term the reference is to the "prevailing market price" for the identical
product rather than to some higher price such as list price, MSRP or the "high street
price" or to a "similar product."  They therefore argue that the use of the "compare"
terminology is misleading when the ARP is based on the highest price that may be found
anywhere in the market and/or to a "similar product."  The People argue that the ads
themselves support such an inference – especially when the display of the ARP is
accompanied by a "You Save" amount or percentage.  This latter representation, it is
argued, would lead a reasonable consumer to infer that he or she is actually "saving" the
amount or percentage displayed by buying "today" as opposed to elsewhere in the
marketplace.  This basic proposition implicit in the structure of the advertisement is said
to be sufficient to support a finding that this kind of advertising has the capacity to
mislead or confuse reasonable consumers.

109.    With respect to the prevailing market price issue, the court is somewhat
skeptical of the People's basic proposition or its sufficiency to support their case.  Put

simply, the inference the People would have the court draw is not as obvious as that

supporting summary judgment for the plaintiff in *Colgan*.  In contrast to the phrase

"Made in USA," the term "compare" coupled with a price does not so clearly imply

"prevailing market price" as the "Made in USA" slogan implies manufactured completely

in the United States.  On the other hand, the People's position draws unexpected support

from some of the Steckel survey data and in particular (a) the widespread consensus

among respondents that the various ARP nomenclatures used in his July 2013 experiment

reflect "real prices" and (b) the fact that substantially higher percentages of respondents

believed these labels also reflect some version of "regular/average price" rather than a

higher price or the highest price that could be found.  (See ¶72, supra.)  These findings

corroborate the conclusions Compeau reached based on similar research he conducted in

2004.  (Trial at 277-280.)  Both of these studies suggest that, whatever the ARP

nomenclature, there is indeed something misleading in basing ARPs on the highest price

Overstock or its partners can find in the marketplace.

110.    The difficulty with accepting this evidence as sufficient to support the

People's entire case is that the Steckel data also supports the inference that the particular

nomenclature may not matter and, whatever the nomenclature, there is a wide range of

consumer interpretations of the various ARP nomenclatures' meanings.  Moreover, while

use of the highest price that can be found may be misleading, it is hard to derive any

workable definition of the People's preferred standard: "prevailing market price."  Is that

the nonsale price found at most brick-and-mortar retail outlets?  Or the sale price?  Or is

it the nonsale price one can find on the internet?  Or the sale price?  If the internet sites

are the relevant reference, at which internet site, if as is frequently the case the internet

prices reflect a range? Should the one reflecting the highest volume of sales be used? If so, how can one determine the volume of a particular product sold at a third-party's website? The Steckel data shows a lack of any consumer consensus on the meaning of *any* ARP nomenclature. One might infer from such findings that *any* use of ARPs based on *any* definition is likely to confuse or mislead a significant number of consumers because they all bring different experiences and expectations to the Overstock site. From such a cacophony one might argue either that the use any ARP is misleading or that the FAL should not reach any of the possible uses.

  111. To ban the use of all ARPs would be an over-reaction to the data and clearly frustrate the many consumers who want ARPs. (E.g., Exh. 427.) Further, given the "informational function" of advertising that supports the First Amendment protection such speech does enjoy, banning comparative advertising because of its potential to confuse some consumers might be a constitutional over-reach as well. Yet the FAL requires that some boundaries be set because the evidence in this case clearly shows that unfettered use of ARPs does mislead consumers – a significant number of whom believe ARPs reflect "real prices" or "regular/average prices" rather than prices that are higher than "regular/average prices." The court concludes that the FAL and the UCL are flexible enough to allow the People to challenge ARPs that frustrate reasonable consumer expectations by using formulas to set ARPs rather than "real prices" and/or by basing ARPs on "similar" products without effectively disclosing that the comparison is to a non-identical item. To some extent these statutes may also be used to curb the practice of using the highest price that can be found to set ARPs without regard to the widespread availability of lower prices at retail and other online outlets.

112.    With respect to the use of formulas or similar products to set ARPs, the court finds such practices to be misleading or to have the capacity to mislead consumers as those terms are used in the FAL, UCL and CRLA.  This finding of fact is based on several factors.  First, the advertisements themselves suggest a comparison to real prices for the identical product when unaccompanied by qualifiers that would signal the use of a formula (e.g., "compare estimated value") or a similar product (e.g., "compare similar").  Second, the Steckel July 2013 experiment and survey results suggest that, while consumers have varying views of different ARP nomenclatures, with respect to any particular nomenclature, a significant portion of consumers view the given label as reflecting a "regular/average price."  (See ¶72, supra.)   Implicit in that assumption for an appreciable number of consumers is that one is looking at the same product rather than an estimated price or a price for a "similar" product.  Third, to allow the use of formulas or similar products without any disclosure invites abuse, and examples of such abuse are found in this record.  (E.g., ¶¶17-18, 30, supra; Exh. 382, 383.)  Fourth, as already noted, there are qualifiers that can easily be inserted into the nomenclature to signal the nature of comparison – e.g., "compare similar" – and given the "informational function" of advertising that supports its First Amendment protection, it is hard to see why it is unreasonable for the State to apply its statutory ban on misleading advertising so as to require more accurate reference terms.

113.    With respect to the practice of using the highest available price as the ARP instead of the "prevailing market price," the application of the statute is more difficult for several reasons.  First, as already noted, the People's preferred standard – "prevailing market price" – is not easily applied and could create such a legal hazard to retailers that

73

a prudent merchant would avoid ARPs altogether. That would be unfortunate as even Compeau agrees ARPs can provide useful information, consumers appear to want them (e.g., Exh. 427) and their "informational function" has constitutional significance. Second, some ARP terms such as MSRP may be higher than whatever one views as the prevailing market price but nonetheless convey relevant information (e.g., Ecenbarger's testimony that suggested or initial prices communicate relative quality; see also Bride testimony) and are readily ascertainable and easy to update if need be so as to maintain accuracy.[25] To require all ARPs to be based on some definition of "prevailing market price" may be over-restrictive and unnecessary to reduce potential consumer confusion. Third, as illustrated by Steckel's survey of consumer views as to the meaning of different ARP nomenclatures, it is probably impossible to eliminate all potential for confusion.

114. With these considerations in mind, the court finds that it is misleading to set ARPs based on the highest price that can be found without regard to the prevailing market price *and* without any disclosure of the practice. That finding is based, inter alia, on the Steckel July 2013 experiment and survey, Compeau's 2004 study, and the other evidence of harm cited in the previous section. Thus if a retailer uses the highest price it can find for an ARP, it should disclose that in the nomenclature – e.g., "compare highest retail" or "compare original retail" as the case may be. If the retailer uses MSRP as the ARP, it should disclose that in the nomenclature – e.g., "compare MSRP." If an online retailer uses non-sale department store prices as an ARP, it should disclose that in the nomenclature – e.g., "compare regular department store." If, however, Overstock wants to use an unqualified term such as "compare," then it needs to either use a range of prices

[25] "Compare original retail" is an example of an ARP term that would never need to be updated. "MSRP," on the other hand, might need to be updated depending on whether the manufacturer changed it or not.

that reflect what may be commonly found on the internet ("compare at $X to $Y") or make an effort to identify and use the prices it finds at one or more of the major online retail sites (e.g., the top online retail sites over all or the top sites for a particular category of trade such as furniture, jewelry, etc.) – in other words, make a good faith effort to identify what Overstock currently refers to internally as the "street price" and tries to beat by 5-to-10%. Overstock's failure to follow such practices has resulted in ARPs that are misleading or have the capacity to mislead.[26]

115.    In sum, the court finds that Overstock has consistently used ARPs in a manner designed to overstate the amount of savings to be enjoyed by shopping on the Overstock site. While Overstock strived to have the lowest prices available on the internet,[27] it knew that being in fact lower by a factor of, say, 5% was not as powerful as communicating savings of 40-to-60%, and that savings of the latter magnitude were important to reduce search intentions, communicate transaction value, build brand loyalty and encourage repeat business. Because Overstock recognized these marketing basics and their long-term utility, it consciously adopted and maintained policies for setting ARPs that it knew would communicate dramatic savings to consumers that were often overstated and therefore actionable under the FAL. For these reasons, the court

---

[26] The foregoing does not address the issue of *time* – that is, how long may Overstock continue to display an originally appropriate ARP? Neither party directly addressed the issue at trial, but it is obvious that an ARP can become "stale" in instances where it is used to refer to the current retail price and in that process can become misleading over time. Overstock has adopted a "90-day" policy under which any ARP must be re-validated every 90 days. The People explained at oral argument that, since that period appears in Section 17501 (in a different context), they chose not to contest that policy. Whether 90 days is too long a period is thus not before the court; however, for that reason this Decision should not be read as finding that leaving ARPs posted for 90 days is lawful.

[27] Overstock introduced uncontroverted testimony that this was its goal; however, there also was evidence that this was hard to achieve given the speed of the market's response. (E.g. Exh. 562, 681; Murakami 4/12/13 Tr. at 695.) As a result, Overstock's own 2011 Loyalty Study Report found its prices only to be "average" when compared to its competitors. (Exh. 567.) The People, of course, contend that whether or not Overstock had the lowest prices is not relevant to the FAL analysis. The court agrees with that legal position.

concludes that the People have proven that Overstock's use of ARPs was misleading, or

had the capacity to mislead reasonable consumers, in the following ways: (a) using

formulas to set ARPs prior to the introduction of the validation team process, (b) using

similar products to set ARPs (before and after the introduction of the validation team)

without disclosing on the product page that the ARP was based on a comparison to a

"similar" product, and (c) using the highest price that could be found as the basis for an

ARP without some qualifier that would signal to the reasonable consumer reading the

term that the comparison was not to the prevailing market price. An example of such a

"signal" would be "compare MSRP," which would alert the consumer who cared about

such details that the comparison was to something other than the prevailing market price.

<div align="center">(iii)   <u>Conclusion on First Cause of Action</u></div>

116.   With respect to the statements the court has found to have been untrue or

misleading, the other elements of the FAL are also met. The false and/or misleading

statements were made over the internet, concerned matters related to the proposed sale of

the advertised product(s) and were known to be untrue or misleading or could be known

to be such by the exercise of reasonable diligence. Where formulas were used during the

List Price Era, it was known that there was no list price. Indeed the policy was to use

formulas only in that circumstance. It was thus known to Overstock that the supposed list

price was only an estimate but that fact was not disclosed, except in a definition viewed

by only an infinitesimal number of visitors to the site. Where a similar product was used,

it was known that the list price on the product page was not the list price for that product;

further, when similar products were used by the validation team, it was known that the

resulting ARPs were for non-identical products and that that fact was not disclosed on the

<div align="center">76</div>

product page.  At all times, when the highest price was used as an ARP, it was known

that that was the company's policy and practice and that the ARP thus did not reflect the

"prevailing" or "regular/average" price of the product in the marketplace and that as a

result the "savings" displayed to the consumer was false or misleading, as the actual

savings, if any, were substantially less.  Accordingly the court finds for the People on the

First Cause of Action.

### B.    The Amount of Price Reduction Claim

117.    In its proposed decision, the court used its analysis of the First Cause of

Action to resolve the Second Cause of Action, finding that liability on the former

established liability on the latter.[28]  The court has, however, reconsidered the defense

argument that the pertinent CLRA provision only addresses the circumstance where a

defendant represents that *its* current price is a discount from *its* former price when there is

no such discount – that  is, the "false sale" scenario.  (*Hinojos v. Kohl's Corp.* (9th Cir.

2013) 718 F.3d 1098, 1107.)  That clearly would not apply to Overstock's use of ARPs

because Overstock is typically comparing its price to that of another retailer, the MSRP, a

former price somewhere on the internet, etc.  The court concludes that Overstock is

correct in its construction of section 1770(a)(13) of the CLRA and accordingly that

section does not apply to the various ways Overstock uses ARPs.

---

[28] The Proposed Decision reasoned as follows:  "The foregoing analysis is dispositive of the Second Cause of Action.  Whenever Overstock used a formula to set an ARP and also then displayed a "You Save" amount or percentage, it made a misleading statement as to the amount (and perhaps the existence) of a price reduction.  When the ARP nomenclature was 'list price,'" the statement was also false for the same reason: the representation that there was a 'list price' was false.....  When Overstock's ARP was based on a "similar" product and then displayed a "You Save" amount or percentage, the company made a misleading statement as to the amount (and perhaps the existence) of a price reduction.  Whenever Overstock set an ARP based on the highest price it could find for the product, it made a misleading statement as to the amount (and perhaps the existence) of a price reduction."

118.     This change from the tentative ruling does not, however, change the bottom line.  As previously construed, the CLRA claim reached conduct that constituted a subset of that found to have violated the FAL and the court did not provide any relief unique to the CLRA claim; indeed, the CLRA was not even mentioned in Part VI ("Remedy Analysis").  The latter claim was redundant in every respect, and thus does not affect the scope of the relief available to the People.  Nevertheless, the court does find for the defendant Overstock on the Second Cause of Action.

**C.     The Source of Products Claim**

119.     The Third Cause of Action has nothing to do with ARPs but rather is based on Overstock holding itself out as a liquidator of distressed merchandise when, over time, it began selling non-distressed merchandise and for the past several years has sold a majority of its merchandise provided by its fulfillment partners rather than from liquidations or similarly distressed sources.  At oral argument the court inquired if by this claim the People were attacking the mere use of the name "Overstock" and sought an injunction requiring that the name to be changed.  In response, the People stated they were not attacking the mere name but rather statements on the Overstock website explaining that it was able to offer such great pricing because it was a liquidator.

120.     Specifically, the People refer to Exhibit 963, which is a screen shot from the "About Us" page on the Overstock website in 2007.  There one finds a question: "How can we offer such great deals?"  Below that question are several short paragraphs, which refer, inter alia, to the Overstock's "partnerships with many companies" and states that these "relationships" provide opportunities to purchase at "significant discounts."  It goes on to give as examples manufacturers who overproduce certain products, have

cancelled orders or may be downsizing and need to reduce inventory. Nowhere on that page is there a disclosure that since about 2004 the "liquidation" portion of its business has been less than 50% overall and declining. The failure to disclose this fact is said to violate the FAL. To support the allegation that this failure has the capacity to mislead consumers, the People cite two consumer statements suggesting that they thought Overstock prices were the lowest because it was a liquidator. No other evidence is presented to support this claim.

121. The problem with this theory is that, apart from the company name, the evidence is extremely thin. There was no attempt to show that the challenged webpage from 2007 was displayed on a continuing basis or that the "liquidator theme" appears elsewhere or is otherwise touted by Defendant. The claims that are made on the cited page are not shown to be untrue and do not reasonably suggest that all of Overstock's offerings fit within the examples given. There is no evidence as to the frequency of the "hits" on this page and no effort to link the offending page to the two consumer examples cited. Indeed, it would appear that the two consumers were simply commenting on the inferences to be drawn from the "Overstock" name, but the People do not purport to challenge the continued use of that well-established trade name.

122. Based on the evidence presented, the court finds that the evidence offered to support this claim is insufficient. While the People are correct that an FAL claim may be supported by the advertisement alone, in this instance the one webpage cited to support the claim does not appear to be untruthful and, because the cited comments on the page are by way of example, the court concludes that standing alone the comments on

that page do not support an FAL cause of action.  The court therefore finds for defendant Overstock on the Third Cause of Action.

### D.    The Shipping Charges Claim

123.    The claim that advertising $2.95 or "free" shipping when shipping costs had already been factored into the base price is nonsensical.  What if one retailer factors shipping into its cost and another doesn't but uses a 20% gross profit margin?  If both advertise "free" shipping, has only the former violated the statute?  Do the People seriously contend that one can only advertise "free" shipping if the seller takes a loss or persuades UPS to accept its shipments at no charge?  Most importantly, is there any evidence or reason to believe that consumers think that no one pays for shipping?  The most logical inference by anyone seeing "free" shipping is that the cost thereof has already been factored into the price.  It is no different than advertising "shipping included."  Put another way, "free shipping" is not reasonably understood to mean that no one pays for shipping; rather the most reasonable inference is that there is no additional charge beyond the stated price of the goods being sold.  To argue otherwise is analogous to the notion that advertising "Danish pastries" is false unless the pastries being sold are actually made in Denmark.  That is not the law.  (*Lavie,* supra, 105 Cal.App.4[th] at 507.)  No reasonable consumer could believe that "free shipping" means that the shipping is "free" in the sense urged by the People.  Accordingly, the court finds for defendant Overstock on the Fourth Cause of Action.

### E.    The Derivative Claim

124.    As the court finds for the People on the First Cause of Action, the derivative UCL claim based on the underlying violations of the FAL also are established.

80

As the court finds for Overstock on the Second, Third and Fourth Causes of Action, the

Derivative Claim fails to the extent it relies on those causes of action to support the

"unlawful prong" of the UCL.  The court had thought that the People were nonetheless

relying on the "unfair prong" of the UCL to reach conduct that the court determined not

to be actionable under the first four causes of action.[29]  At oral argument, however, the

People stated that they were *not* seeking a liability determination on the Fifth Cause of

Action for any conduct not actionable under the other four.  The court thus need not push

the analysis any further.  The bottom line is that the court finds for the People on the Fifth

Cause of Action to the extent – and *only* to the extent – that it has found for the People on

one or more of the other four causes of actions.


## VI.   REMEDY ANALYSIS

125.    The People have requested an injunction, an order awarding restitution to

California consumers, an assessment of civil penalties and an award of various costs.

The court reviews each of these below, starting with the request for injunctive relief.

### A.    Injunctive Relief

126.    Section 17203 of the UCL and 17535 of the FAL authorize the court to

enjoin persons who have engaged in unfair competition.  They provide that "[t]he court

may make such orders or judgments ... as may be necessary to prevent the use or

---

[29] For reasons discussed in Part IV B (iii), the court does not view this prong as a license for a trial court to engage in a free form "balancing" exercise that may have been permitted by pre-*Cel-Tech* authorities. Rather the court must "tether" its analysis to a constitutional, statutory or regulatory foundation.  Here First Amendment considerations weigh against any constitutional ground, and the statutory possibilities have been exhausted by the FAL and CLRA analysis of the other causes of action.  That leaves at least the theoretical possibility of a regulatory basis and, specifically, the possibility that the FTC Guide might provide a basis for the court to find that advertising not violative of the FAL or CLRA might nonetheless be "unfair."  Based on the oral argument, though, the court concludes it need not go there.

employment by any person" of practices which violate their respective chapters. (*Ibid.*) While the People seek broad relief framed in terms of requiring all ARPs to be based on the "prevailing market price" of the advertised product (People's Op. Br. at 44), the court finds that formulation overbroad and vague and one that would be difficult for either the parties or the court to manage. More importantly, it might lead Defendant and others to simply abandon ARPs altogether, which would deprive consumers of information they in fact want. The challenge is thus to frame any relief in terms that will prevent the clear abuses of reference pricing in advertisements and yet provide enough flexibility to allow Overstock to use ARPs in various ways that may serve what *Central Hudson* referred to as the "informational function" of commercial speech.

127. The court concludes that the injunction should prohibit: (a) the use of ARPs based on a formula, multiplier or other method that would set the ARP on any basis other than an actual price offered in the marketplace at or about the time the advertisement is first placed; (b) the use of ARPs based on a similar but non-identical product than the one advertised for sale unless the use of a similar product as the basis for the ARP is disclosed on the product page in a manner reasonably designed to alert consumers – e.g., "compare similar," "like product at," "similar product at," etc.; and (c) the use of the highest price that may be found anywhere to set ARPs without regard to whether the reference price reflects a substantial volume of recent sales unless the basis of such a comparison is disclosed on the product page in a manner reasonably designed to alert readers to the context or nature of the comparison – e.g., "compare MSRP," "compare department store retail," "compare original retail price," "compare at some retailers," etc.

128.    If the ARP nomenclature is an unmodified term such as "compare," then the ARP must reflect a good faith effort to determine the "prevailing market price" of the identical product.  The "good faith effort requirement" shall be deemed to have been met if any of the following criteria are satisfied: (a) the ARP is a range of prices (i.e., $X to $Y) and that range reflects the range that is in fact identified in the validation process; (b) the ARP is a price from one of the five (5) largest internet shopping sites as identified by any third-party/industry source (or an average of such sites) and that method is identified by a hyperlink to the ARP label; or (c) the ARP is a price from one of the three (3) largest shopping sites for the category of product being sold (e.g., furniture, jewelry, etc.) as identified by any third-party/industry source (or an average of such sites) and that method is identified by a hyperlink to the ARP label.  These three alternatives are *not* meant to be the exclusive means of satisfying the "good faith effort requirement" but are only defined "safe harbors" that Overstock may utilize if it so chooses.

129.    In the event the nomenclature uses "MSRP" or some other marketing term or acronym, a hyperlink must define that term or acronym – e.g., for MSRP "manufacturer's suggested retail/resale price" – *and* state that that term or acronym may not be the prevailing market price or regular retail price.  When hyperlinks are used to define terms, the definitions must state what the term means rather than list alternatives without providing the consumer with any basis for determining which alternative is being used in a particular instance.  The disclosures in any such hyperlink shall be in plain English rather than the "legalese" characteristic of that found in Exhibit 961.

130.    In setting the ARP, Overstock may add to the price identified by the validation process an amount to reflect the cost of shipping the product from the source

83

of the reference price *provided that* (a) adding shipping cost is necessary to achieve an "apples-to-apples" comparison to the Overstock price *and* (b) the addition of shipping costs is identified in the nomenclature (e.g., "compare with shipping") or by hyperlink. And in any event if shipping charges are added, the method used to factor in the shipping costs to the ARP must be clearly explained in text connected to the ARP by hyperlink.

131.    As the People do not challenge Overstock's protocol of re-validating ARPs every 90 days, the court will not require a shorter timeframe, but the injunction shall incorporate the 90-day limit as the maximum such that the ARP may remain posted for *not longer than* the date on which the reference price was validated as a posted price. Whatever timeframe is used (90 days, 30 days, etc.) that parameter shall be noted either on the product page (e.g., "compare $999.01 as of 12/27/2013") or by a hyperlink connected to the ARP nomenclature.

132.    Overstock may not post any ARP unless it verifies the reference price and documents that verification by a screen shot of the product offering(s) and price(s) relied upon to comply with this order.  The verification documentation shall be maintained for two years from the date the ad containing the ARP is initially posted, and the People may have reasonable access to such documentation throughout the five year period during which this injunction shall be in place.

133.    The court expects the parties to meet and confer on the exact wording of the injunction to be entered in conformity with the above rulings.  If there are points of difference, the People should submit a proposed form and note the provisions where the defense requests a different wording.  The court expects this process to be completed within the month of February so that a final judgment may be entered by the end of the

month.  As it may take Overstock some time to determine the best way to bring its

website into compliance with the terms of the injunction, the injunction shall provide for

a period of 60 days after entry of judgment for Defendant to come into compliance and

also provide that it thereafter file and serve a declaration of such compliance detailing the

steps taken to ensure it.

### B.    Restitution

134.    Citing *Fletcher v. Security Pacific National Bank* (1979) 23 Cal.3d 442,

451, and *People v. Superior Court (Jayhill)* (1973) 9 Cal.3d 283, 286-278, the People

request as a form of "ancillary" relief restitution for consumers who were misled by the

advertisements found to have violated the consumer protection statutes at issue.  Citing

the language of the statutes, they argue that such restitution should be the money that

"may have been acquired" by the false advertising at issue.  To accomplish this, the

People suggest that Defendant should be required to contact each California consumer

who from January 1, 2004, through the date of judgment purchased any product in which

an ARP was displayed, advise them of the action and offer either the opportunity to

return the product or a 5% credit towards future purchases.

135.    The request that all California consumers who purchased any Overstock

product since January 2004 (or any other date) be offered an opportunity to return the

product for a refund is wildly excessive and if ordered on top of the other relief sought

could be ruinous.  It is also unjustified where there is no reason to believe that *all*

purchasers were deceived and the People chose not to contest the evidence offered by

Overstock that – except for instances of error as with Mr. Ecenbarger – its products were

the lowest in the market.  The alternative suggestion that all such consumers be offered a

5% credit is also unsupported: it could as easily be 1% or 10% or whatever.  The People

made no attempt here to present evidence from which the court could determine what

would be an appropriate refund or credit amount.  Indeed, the most powerful evidence

was not that the advertisements led consumers to pay more than they otherwise would

have but that there was a reduction in search intentions, an increase in a perception of

transaction value and a greater likelihood that the consumers would return to the

Overstock webpage.  While there was evidence that ARPs cause a "bump" in sales, there

is no way to determine which purchasers accounted for the "bump."  Nor is there any

way to identify which consumers may have been exposed to which ARP feature the court

has found to constitute a violation.  In short, this record simply does not suggest a

reasonable metric to determine what might be an appropriate award of restitution or any

methodology for identifying those who should receive it.  For these reasons the court

declines to order any form of restitution but has considered this as a factor in setting the

appropriate civil penalty.

## C.      Civil Penalties

136.    The People seek civil penalties pursuant to both the UCL and FAL.[30]
Section 17206(a) of the UCL provides that any person who has engaged in unfair

competition is liable for a civil penalty not to exceed $2,500 for each violation, which

may be assessed and recovered in a civil action brought by, among others, any district

attorney.  Similarly, section 17536(a) of the FAL provides that any person who violates

---

[30] During the pretrial process Overstock complained that the civil penalty provisions at issue present
constitutional problems given what it views as the vagueness of the standards and how they should be
applied in a case such as this.  Overstock may have intended to invoke this issue in its September 16, 2013,
written motion for judgment, wherein one of the issues framed is that " the relief being sought would be
unconstitutional."  This issue has not been developed, and thus the court does not address it other than to
note that there are numerous California cases that provide guidance as to how the penalty provisions should
be applied and the court has tried to follow them.

86

any provision of the FAL is also liable for a civil penalty not to exceed $2,500 for each

violation, which also may be assessed and recovered in a civil action brought by, among

others, any district attorney on behalf of the People of the State of California.  Sections

17206 and 17536 contain the following identical directives to the trial court regarding the

assessment of these civil penalties:

> The court shall impose a civil penalty for each violation of this chapter.  In
> assessing the amount of the civil penalty, the court shall consider any one or more
> of the relevant circumstances presented by any of the parties to the case,
> including, but not limited to the following: the nature and seriousness of the
> misconduct, the number of violations, the persistence of the misconduct, the
> length of time over which the misconduct occurred, the willfulness of the
> defendant's misconduct, and the defendant's assets, liabilities, and net worth.
> [§§ 17206, subd. (b), 17536, subd. (b).]

137.    Citing section 17205 of the UCL, the People argue the penalties under the

two statutes are cumulative and note that given the ubiquitous use of ARPs by Defendant

since 2006, the total amount of civil penalties at issue is "potentially astronomical."

(People's Op. Br. at 46:20-21.)  The People point to *People v. Superior Court (Olson)*

(1979) 96 Cal.App.3d 181, 198, for guidance to the court as to how to proceed under such

circumstances.  There the alleged violations were found in newspaper advertising and the

court found it reasonable under the statute "that a single publication constitutes a

*minimum* of one violation with as many additional violations as there are persons who

read the advertisement or who responded to the advertisement by purchasing the

advertised product or service or by making inquiries concerning such product or service."

(*Ibid* [emphasis original].)  The court reasoned that "[v]iolations so calculated would be

reasonably related to the gain or opportunity for gain achieved by the dissemination of

the untruthful or deceptive advertisement."  (*Ibid*; see also *People v. JTH Tax, Inc.* (2013)

212 Cal.App.4th 1219, 1250-1251.)

138.    Here it is impossible to determine how many Californians saw the offending advertisements. The People point to an interrogatory answer as indicating that there were approximately 718 million pages visited from California IP addresses between November 2006 and late 2012. (Exh. 902.) They argue that number reflects the number of views by California consumers during the relevant timeframe. The court is skeptical of that metric as it is impossible to determine whether any given visit was by a consumer or some automated program scraping the website for data. There is also no way to determine what percent of such visits were to pages with ARPs that had offending features. While the People argue that the vast majority of pages were based on the highest available price that could be located, the court notes that a large percentage of pages were for BMMG items and the ARPs there were populated in an automated fashion – often by going to Amazon. These issues undermine the "number of views" data relied upon by the People. Nonetheless, it is beyond cavil that even if one were to try to adjust for such considerations, the number of views by California consumers of pages containing ARPs that were based either on formulas or similar products or on the highest price found in the market is enormous. Taking that approach could result in civil penalties well in excess of a billion dollars.

139.    If one did not consider views but looked only at sales, the numbers are still daunting. As the People point out, one could tease out of the data the number of products sold to residents of the eight counties represented in this action from 2004 (or a later year) through the introduction of the validation team and then reduce it by various factors to account for the percentage of BMMG sales and the like, and one would come up with a figure in the hundreds of thousands of violations to be multiplied by a penalty amount of

88

up to $2,500 per violation.  (People's Op. Br. at 49.)  One could then try a similar

exercise for the post-validation team period and come up with an additional number.

However one would do it, the resulting penalty number would total in the hundreds of

millions of dollars.  Thus whether one approaches the issue based on the number of

California views or the number of California sales, or tries to limit it more narrowly to

the same metrics but for the eight counties represented in the action, civil penalties at

$2,500 per violation would be enormous and far beyond what the drafters of these

provisions would ever have envisioned.

     140.   Given these issues, the People suggest that the court start with the number

of days as a minimum.  As the statute of limitations was tolled effective March 24, 2010,

the time period for calculating civil penalties under the UCL runs from March 24, 2006,

through the date of trial.[31]  As the FAL and UCL remedies are cumulative, the maximum

daily penalty on a one-per-day basis would be $5,000 except for the earliest year, which

would be beyond the reach of the FAL's three year provision.  The People propose that

the court not use the maximum but rather a $1,000 per day penalty for each statute for a

total daily penalty of $2,000.  They would add an additional amount to reflect the

estimated number of purchases by California consumers of affected products.  Using this

approach and their estimated numbers, the People request a civil penalty of $7,102,000.

(People's Op. Br. at 48-49.)  In requesting such a penalty, the People note the other

factors that bear on determining the amount and argue that they all support a penalty in at

least the range requested.  Thus they argue that the violations were "serious" within the

meaning of the statutes, that the number of violations was astronomical, that the conduct

---

[31] For some reason the People would start the penalty accrual period on January 1, 2004, but fail to explain how they can reach back to 2004 or why they would start on January 1 instead of the anniversary of the tolling agreement.

was "persistent" in that it was every day for a number of years, and that the conduct was "willful" given the various ways Defendant was put on notice of the misleading nature of its ARP practices (see, e.g., ¶¶24, 25, 27, 31, supra).  With regard to Overstock's financial condition, the People point to Defendant's billion dollars in gross revenue, market capitalization of $600 million and $84 million in cash on hand.  (Exh. 698, 699.)

141.    The defense is dismissive of the "seriousness of the misconduct" factor because they continue to argue that there was no harm and the evidence is unrebutted that Overstock's prices were the lowest in the marketplace.  (E.g., Trial at 854-856.)  They also argue that Overstock's practices with respect to ARPs mirror that of the industry (e.g., Exh. 2727-2805) and its ARPs are lower on average than its competitors.  (Trial at 1454-1455.)  Defendant also argues that the People have failed to introduce an adequate evidentiary foundation as to the number of violations, rely on pure guess work regarding the number of violations or the number for each feature they complain violate the statutes, and fail to account for the significant changes (and reduced seriousness or frequency of any violation) after the introduction of the validation team process.  On the remaining factors of persistence, length of violation and willfulness, they argue that most of Overstock's products were BMMG and expressly tied to Amazon prices for ARP purposes, that Byrne's original adoption of ARP practices was guided by good faith reliance on BBB advice, that the company responded appropriately to the Ecenbarger incident and that its unique validation team process ensures appropriate policies are followed.  Regarding Overstock's financial circumstances, the defense argues that the People overlook years of unprofitability, minimal net income in 2012, its losses in 2011 and its relatively modest size in an extremely competitive online retail environment.

142.     Considering these arguments and the record as a whole, the court finds that the "seriousness of the misconduct" is moderate in that it was not as serious as may be found in other reported cases where the conduct amounted to egregious fraud, and any harm that occurred was mitigated in part by the fact that Overstock's prices were (at least on this record) at or below that of its competitors. It is also significant that the misconduct did not affect all product lines to the same extent and apparently did not implicate the BMMG category at all. This factor weighs in Overstock's favor. On the other hand, the three practices found to violate the statutes were "numerous" and "persistent" in that they occurred on a daily basis on thousands of product pages until the introduction of the validation team protocol, after which two of the three challenged practices continued on thousands of product pages on a daily basis. That the People cannot quantify whether the number of violations each day totaled in the hundreds, the thousands or hundreds of thousands is hardly a defense to the number or persistency factors, and certainly these factors support some kind of daily penalty over the length of time the practices occurred. Whatever the daily penalty, it should be reduced as of the date the validation team protocol was introduced in order to reflect the fact that at least one of the three practices was terminated when that new process was implemented and the team protocols reduced the potential for the various abuses documented in the earlier period. (E.g., ¶¶17-18, 30.)

143.     With respect to the willfulness factor, the court finds that the conduct was not as innocent as the defense portrays it. Whatever oral advice Byrne received from the BBB, it is totally undocumented and inconsistent with BBB's own Code of Advertising (Exh. 731), the FTC Guide or what prudent counsel would have advised; moreover, it is

clear that Overstock's objective was to brand itself as an "extreme value retailer" and to do so it exaggerate the amount of savings consumers were able to realize on its site. The conduct was in this sense willful. As to Overstock's financial condition, it is clear that civil penalties on the order of magnitude sought by the People are well within Overstock's ability to pay without damaging its capacity to compete in the marketplace and that such penalties are necessary for deterrence purposes. Finally, for reasons previously discussed, the court notes that restitution is not being ordered and this is a factor bearing on determining the appropriate penalty.

144.     Based on the foregoing factors and all of the evidence in the record, the court determines that a daily penalty in the amount of $3,500 ($1,000 for each of the three types of violation and $500 for the lack of controls that led to various abuses[32]) is appropriate from March 24, 2006, to October 1, 2008, which is the approximate date the validation team process was implemented and all ARPs were removed subject to re-posting. Thereafter a daily civil penalty of $2,000 from October 1, 2008, through the first day of trial (September 9, 2013) is appropriate as the evidence is that the practices in question were continuing through trial. The resulting subtotals are $3,220,000 for the first period ($3,500 x 920 days) and $3,608,000 for the second period ($2,000 x 1804 days), and combined they come to a total civil penalty in the amount of **$6,828,000**. The court finds that this total penalty is the minimum necessary to vindicate the purposes of the statutes and far below what may be within the bounds of its discretion.

---

[32] Another way to look at it is as a daily penalty of $1,167 for each of the three types of violations prior to October 1, 2008. A fine of that size is clearly well below $2,500/violation statutory provision.

### D.   Other Relief

145.   The People seek the recovery of their investigative costs but have not briefed that issue, and the record is devoid of evidence that would support any such award.  If the People contend they have a right to attorneys' fees, investigative costs or any other costs, they may seek such an award via the usual method for seeking costs or attorneys' fees.  The judgment shall only state that the People are entitled to such costs as allowed by law.

## VII.   CONCLUSION

146.   Within ten (10) days after this Decision becomes final, the People are directed to prepare a form of judgment (with a blank for costs in the event there ultimately is such an award) consistent with the foregoing Decision and include therein provisions for an award of civil penalties in the amount of **$6,828,000** and the form of injunction detailed above.  The parties are ordered to meet and confer on the form of judgment, and the People shall indicate in their submission the portions (if any) as to which the defense has objected that the proposed injunction does not conform to the provisions of this Decision.  The People are further ordered to submit the form of judgment to the court in both hardcopy and in an electronic (Word) format attached to an email to the clerk in D-21.

Dated:  February 5, 2014

Wynne S. Carvill
Judge, Superior Court

93